**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHARLES ZIEGENFUSS, DAVID MONTGOMERY, BRIAN ROBINSON, and FIREARMS POLICY COALITION, INC.,<br><br>　　　　　　　　　　　　*Plaintiffs*,<br><br>　　v.<br><br>STEVEN C. MCCRAW, in his official capacity as Director and Colonel of the Texas Department of Public Safety,<br><br>　　　　　　　　　　　　*Defendants*. | CIVIL ACTION NO. 4:24-cv-01049-P |

<br><br>

**<u>PLAINTIFFS' BRIEF IN SUPPORT OF THEIR</u>**

**<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

I. INTRODUCTION ............................................................................................................. 1

II. FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 2

    A. Plaintiffs Are Challenging The Penal Code's Prohibition On Carrying Firearms In Places That Law-Abiding Texans Visit Every Day ..................................... 2

        1. Businesses Deriving 51% or More of Their Sales From Alcohol ............. 2

        2. Sporting Events ........................................................................................ 3

        3. Racetracks ................................................................................................. 5

    B. Because The Relevant Facts Are Not In Dispute Here, The Court May Proceed Immediately To Summary Judgment ....................................................... 5

III. STANDARD OF REVIEW ............................................................................................. 6

IV. ARGUMENT ................................................................................................................... 6

    A. The Second Amendment's Plain Text Covers Plaintiffs' Conduct ...................... 7

    B. The State Cannot Meet Its Burden Of Showing A Historical Tradition Of Regulation Analogous To The Carry Bans ........................................................... 8

        1. The Supreme Court Has Provided Extensive Direction Governing Lower Courts' Consideration Of The Government's Effort To Meet Its Burden .. 8

            a. Historical Evidence At And Around The Founding Controls ........ 8

            b. Establishing A Historical Tradition Requires Identifying A Widely Representative Regulatory Analogue ...................................... 10

            c. Purported Analogues Must Be Relevantly Similar ...................... 11

        2. The Carry Bans Here Are Not Analogous To "Sensitive Place" Restrictions ............................................................................................ 12

        3. Texas Cannot Identify Analogous Historical Bans On Carrying In The Locations At Issue Here .......................................................................... 13

            a. There Is No Historical Tradition Of Banning Firearms In Bars Or Restaurants Serving Alcohol .................................................... 13

            b. There Is No Historical Tradition Of Banning Firearms At Sporting Events ............................................................................. 15

            c. There Is No Historical Tradition of Banning Firearms At Racetracks ................................................................................... 17

V. CONCLUSION .............................................................................................................. 18

CERTIFICATE OF SERVICE .............................................................................................. 19

## TABLE OF AUTHORITIES

**Cases**

*Ctr. for Individual Freedom v. Carmouche*,
   449 F.3d 655 (5th Cir. 2006) ................................................................................ 6

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................................................ 7, 9, 12, 16

*Duffy v. Leading Edge Prods., Inc.*,
   44 F.3d 308 (5th Cir. 1995) ................................................................................ 6

*Espinoza v. Mont. Dep't of Revenue*,
   591 U.S. 464 (2020) .......................................................................................... 10

*Koons v. Platkin*,
   673 F. Supp. 3d 515 (D.N.J. 2023) ........................................................... passim

*Lara v. Comm'r Pa. State Police*,
   125 F.4th 428 (3d Cir. 2024) ............................................................................. 8

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) .......................................................................................... 12

*McRorey v. Garland*,
   99 F.4th 831 (5th Cir. 2024) ............................................................................ 12

*Moore v. Madigan*,
   702 F.3d 933 (7th Cir. 2012) ............................................................................. 9

*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1, 33 (2022) ............................................................................... passim

*Ramos v. Louisiana*,
   590 U.S. 83 (2020) ....................................................................................... 9, 10

*Reese v. BATFE*,
   127 F.4th 583 (5th Cir. 2025) ....................................................................... 8, 12

*Rogers v. Bromac Title Servs., L.L.C.*,
   755 F.3d 347 (5th Cir. 2014) ............................................................................. 6

*Sheline v. Dun & Bradstreet Corp.*,
   948 F.2d 174 (5th Cir.1991) ............................................................................. 6

*Siegel v. Platkin*,
   653 F. Supp. 3d 136 (D.N.J. 2023) .............................................................. 15, 18

*Terral River Serv., Inc. v. SCF Marine Inc.*,
   20 F.4th 1015 (5th Cir. 2021) ........................................................................... 6

*Timbs v. Indiana*,
   586 U.S. 146 (2019) ....................................................................................... 9, 10

*United States v. Connolly*,
   117 F.4th 269 (5th Cir. 2024) ...................................................................... 13, 14

*United States v. Daniels*,
   77 F.4th 337 (5th Cir. 2023), petition granted, judgment vacated, and case remanded in light of
   *Rahimi*, 144 S. Ct. 2707 (July 2, 2024) ........................................................... 10

*United States v. Rahimi*,
   602 U.S. 680 (2024) ................................................................... 7, 11, 13, 18

*Virginia v. Moore*,
   553 U.S. 164 (2008) ....................................................................................... 9, 10

*Worth v. Jacobson*,
  108 F.4th 677 (8th Cir. 2024) ............................................................... 9

**Statutes**
18 U.S.C. § 922(g)(1) ............................................................................. 5
Tex. Gov. Code §§ 411.2031(d-1) & (e) ................................................. 4
Tex. Penal Code § 12.21 .......................................................................... 4
Tex. Penal Code § 46.01(15) ................................................................... 5
Tex. Penal Code § 46.02(a-6) ............................................................. 1, 3
Tex. Penal Code § 46.03(a)(1) ................................................................ 4
Tex. Penal Code § 46.03(a)(4) ............................................................ 1, 5
Tex. Penal Code § 46.03(a)(7) ............................................................ 1, 3
Tex. Penal Code § 46.03(a)(8) ............................................................ 1, 3
Tex. Penal Code § 46.03(c)(4-a) ............................................................. 4
Tex. Penal Code § 46.03(g) ................................................................. 3, 5
Tex. Penal Code § 46.04(a)(1) ................................................................ 5
Tex. Penal Code § 46.15 .......................................................................... 5
Tex. Penal Code §§ 30.06 & 30.07 .......................................................... 4
Tex. Penal Code §§ 46.03(a-3), (a-4) ...................................................... 4

**Other Authorities**
1 Sawyer, FIREARMS IN AMERICAN HISTORY (1910) ............................... 15
6 WILLIAM WALLER HENING, THE STATUTES AT LARGE, BEING A COLLECTION OF ALL THE LAWS
  OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619 (Richmond,
  Franklin Press 1819) ........................................................................... 16
AT&T Stadium, *A to Z Guide - Prohibited Items and Behavior*, https://perma.cc/Z6NC-TYK9.. 4
Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY
  UNIV. L. REV. 653 (2014) .................................................................... 16
Breen, *Horses and Gentlemen: The Cultural Significance of Gambling Among the Gentry of
  Virginia*, 34 WM. & MARY Q. 239 (1977) ............................................ 17
Carson, COLONIAL VIRGINIANS (1965) .................................................... 17
Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, COLONIAL
  WILLIAMSBURG J. (Autumn 2008), https://tinyurl.com/23db8pzk ............ 17
Everytown for Gun Safety, *Which states prohibit the concealed carry of guns in bars?*,
  https://perma.cc/RF7U-F3YS ................................................................. 3
Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 WM. & MARY BILL RTS. J.
  93 (2022) ............................................................................................ 15
John Adams, Argument for the Defense: 3-4 December 1770, NAT'L ARCHIVES FOUNDERS
  ONLINE, https://perma.cc/XPJ2-PZNA ................................................... 16
Johnson et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATIONS, RIGHTS, AND
  POLICY (3d ed. 2021) ..................................................................... 15, 16
Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and Company of
  the Massachusetts Bay in New England, p. 190 (White 1853) (1639 order) ............................ 16
Office of the Lieutenant Governor, Press Release, *Lt. Gov. Dan Patrick: Statement on the
  Passage of House Bill 1927* (May 5, 2021), https://perma.cc/NC88-RJNL ............................ 1
Pepe, FREEHOLD: A HOMETOWN HISTORY (2003) .................................... 17
Precht, *Legalized Gambling*, 64 PARISHES (Nov. 16, 2011), https://perma.cc/9R9Y-5Y4D ........ 17
Rose, AMERICAN RIFLE: A BIOGRAPHY (2009) ...................................... 15

iii

Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J.
    L. PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://perma.cc/4Z3V-SUS2 ............................... 9

Thompson, RUM PUNCH AND REVOLUTION: TAVERNGOING AND PUBLIC LIFE IN EIGHTEENTH-
    CENTURY PHILADELPHIA (Penn 1999) ................................................................................. 13

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................................. 6

## I.  INTRODUCTION

In 2021, the Texas Legislature adopted so-called "constitutional carry" legislation via House Bill 1927. The Lieutenant Governor announced that this bill "affirms every Texan's right to self-defense and our state's strong support for our Second Amendment right to bear arms. In the Lone Star State, the Constitution is our permit to carry." Office of the Lieutenant Governor, Press Release, *Lt. Gov. Dan Patrick: Statement on the Passage of House Bill 1927* (May 5, 2021), https://perma.cc/NC88-RJNL. The next year, the United States Supreme Court affirmed in *New York State Rifle & Pistol Association v. Bruen*, that "the Second Amendment guarantees a general right to public carry," confirming that ordinary, law-abiding citizens have the constitutionally protected right to "'bear' arms in public for self-defense." 597 U.S. 1, 33 (2022).

Yet to this day, Texas maintains criminal bans on carrying firearms, with or without a permit, in several locations that law-abiding Texans visit in their everyday lives. This lawsuit was brought to enjoin three of those unconstitutional carry bans:

1.      Texas Penal Code § 46.03(a)(7) criminalizes carrying firearms "on the premises of a business that has a permit or license issued under [the] Alcoholic Beverage Code, if the business derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption." This is a blanket ban that applies to individuals even if they are not consuming alcohol. Texas has a separate law prohibiting those under the influence of alcohol from carrying arms. Tex. Penal Code § 46.02(a-6). By maintaining this blanket ban on carrying in "51%" establishments, Texas remains an outlier, along with California, New York, New Jersey, Illinois, and a few other states hostile to Second Amendment protected rights.

2.      Texas Penal Code § 46.03(a)(8) criminalizes carrying firearms "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place." This suit does not challenge the separate restrictions limiting carry on school grounds, nor the right of property owners to lawfully condition the terms by which guests enter their property.

3.      Texas Penal Code § 46.03(a)(4) criminalizes carrying firearms "on the premises of a racetrack."

These criminal carry bans (the "Carry Bans") violate the Second Amendment. Based on the State's answer to Plaintiffs' complaint, it is unclear whether it intends to defend the Carry Bans. Any such defense would be futile, however. *Bruen* has already established that the Plaintiffs' proposed conduct is covered by the plain text of the Second Amendment and therefore "presumptively protect[ed]." 597 U.S. at 24.  Thus, Texas bears the burden of demonstrating that each of the Carry Bans "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. But Texas cannot meet its burden, because there is no historical tradition at and around the Founding of banning firearms in these or analogous locations. As a result, judgment must be entered in Plaintiffs' favor, and the Carry Bans must be enjoined.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Plaintiffs Are Challenging The Penal Code's Prohibition On Carrying Firearms In Places That Law-Abiding Texans Visit Every Day.

Plaintiffs are three law-abiding citizens licensed to carry in Texas and Firearms Policy Coalition, Inc. ("FPC"), a non-profit membership association with members licensed to carry in Texas, including the named, Individual Plaintiffs. Ziegenfuss Decl., ¶¶ 4–8 (App.5–6); Montgomery Decl., ¶¶ 4–7 (App.9); Robinson Decl., ¶¶ 4–7 (App.13). FPC exists to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms, and to protecting the means by which individuals may exercise the right to carry and use firearms. Combs Decl., ¶ 4 (App.17). The Individual Plaintiffs intend and desire to carry firearms in locations barred by the Carry Bans, and only decline to do so for fear of arrest and prosecution. Ziegenfuss Decl., ¶¶ 4–8 (App.5–6); Montgomery Decl., ¶¶ 4–7 (App.9); Robinson Decl., ¶¶ 4–7 (App.13).

This case challenges three statutory prohibitions on carrying firearms:

### 1.  Businesses Deriving 51% or More of Their Sales From Alcohol.

Texas imposes criminal liability on peaceable people who exercise their right to bear arms "on the premises of a business that has a permit or license issued under [the] Alcoholic Beverage Code, if the business derives 51 percent or more of its income from the sale or service of alcoholic

beverages for on-premises consumption . . . ." Penal Code § 46.03(a)(7).[1] Based on this definition, Section 46.03(a)(7)'s Carry Ban is not limited to just bars, but rather applies to a number of restaurants and other establishments throughout the State. Violating this ban is a third-degree **felony**. Penal Code § 46.03(g). Third-degree felonies are punishable by imprisonment for between two and ten years and a fine of up to $10,000. *Id*. § 12.34. Plaintiffs would carry in "51%" businesses but have not done so because of the prohibition for fear of prosecution. Ziegenfuss Decl., ¶ 5 (App.5); Montgomery Decl., ¶ 5 (App.9); Robinson Decl., ¶ 5 (App.13).

The ban operates as a blanket prohibition on carrying arms in these locations, regardless of whether an individual is consuming alcohol. Importantly, Texas law **separately** bans carrying firearms while intoxicated. Penal Code § 46.02(a-6). Plaintiffs do not challenge that restriction. Indeed, all Plaintiffs have confirmed that they would not consume alcohol while carrying at "51%" businesses. Ziegenfuss Decl., ¶ 5 (App.5); Montgomery Decl., ¶ 5 (App.9); Robinson Decl., ¶ 5 (App.13).

While it is not relevant for the legal analysis under *Bruen*, it is nevertheless worth observing that Texas is part of a distinct minority of States when it comes to banning individuals from carrying in bars and restaurants. According to anti-gun-rights group Everytown for Gun Safety, only 14 other States (including California, Illinois, New York, and New Jersey) maintain such bans. Everytown for Gun Safety, *Which states prohibit the concealed carry of guns in bars?*, https://perma.cc/RF7U-F3YS.

### 2.    Sporting Events.

Texas imposes criminal liability on citizens who exercise their right to bear arms "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place . . . ." Penal Code § 46.03(a)(8).[2] Violating this Carry Ban is a class A misdemeanor.

---

[1] The "51%" determination is based on the Texas Alcoholic Beverage Commission's authority to monitor each license holder's gross receipts under Alcoholic Beverage Code § 104.06. Penal Code § 46.03(a)(7).

[2] The statute contains a narrow exemption only where a "person is a participant in the event and a firearm, location-restricted knife, club, or prohibited weapon listed in [Penal Code] Section

Penal Code § 46.03(g-2). Class A misdemeanors are punishable by a fine of $4,000 or less, up to a year in jail, or both. Penal Code § 12.21. The Plaintiffs have each confirmed that they either have been forced to disarm themselves while attending sporting events (against their wishes), or have chosen not to attend sporting events, because of the Carry Ban. Ziegenfuss Decl., ¶ 5 (App.5); Montogomery Decl., ¶ 5 (App.9); Robinson Decl., ¶ 5 (App.13)

This Carry Ban covers some locations that duplicate separate restrictions that are not at issue here. Namely:

- For sporting events or "interscholastic events" taking place at a high school, Section 46.03(a)(1) separately prohibits carrying firearms "on the premises of a school." "School" is separately defined to mean "an accredited primary or secondary school." Penal Code § 46.03(c)(4-a). This lawsuit does not challenge that restriction.

- For sporting events taking place at public or private colleges, Penal Code Section 46.03(a)(1) allows *licensed* carry "on the premises of a postsecondary educational institution." However, the Texas Government Code separately authorizes public and private colleges to establish regulations limiting carry on portions of their campuses, *see* Texas Government Code §§ 411.2031(d-1) & (e), and Penal Code sections 46.03(a-3) and (a-4) criminalizes violations of such localized restrictions. To the extent particular colleges in Texas have adopted such restrictions, they are not at issue here.

- Private property owners (or lessees) may prohibit guests from entering their property while carrying firearms, consistent with the general rule that private property owners may condition the terms on which guests may enter the property. *See*, *e.g*., AT&T Stadium, *A to Z Guide - Prohibited Items and Behavior*, https://perma.cc/Z6NC-TYK9 (prohibiting "firearms and weapons of any kind").[3] Thus, even if Plaintiffs obtain an injunction prohibiting enforcement of

---

46.05(a) is used in the event." Penal Code § 46.03(a)(8). That exception does not apply to Plaintiffs.

[3] Licensed carry holders who ignore notices prohibiting carry on private property face potential criminal trespass charges. *See* Penal Code §§ 30.06 & 30.07.

the Carry Bans at issue here, privately-owned sports venues would still be able to condition entry on their property (as would privately-owned bars and restaurants).

**3.    Racetracks**.

Texas imposes criminal liability on citizens who exercise their right to bear arms "on the premises of a racetrack." Penal Code § 46.03(a)(4). A "racetrack" is defined as a facility licensed "for the conduct of pari-mutuel wagering on horse racing or greyhound racing." Penal Code § 46.01(15) (incorporating definition in Occupations Code § 2021.003(41)). Violating this ban is a third-degree felony. Penal Code § 46.03(g). Plaintiff Ziegenfuss will not go to racetracks because of this Carry Ban, but he would do so if he were permitted to carry his personal firearm for self-defense. Ziegenfuss Decl., ¶ 7 (Ap..5–6).

\* \* \*

Each of the Carry Bans is subject to minor exceptions for prosecutors, police officers, and the like. Penal Code § 46.15. But an ordinary, law-abiding member of the general public, including the Individual Plaintiffs, cannot carry a firearm at these locations. In addition to the immediate criminal penalties associated with violating any of these Carry Bans, a violation can also result in a lifetime ban on an individual's ability to exercise their right to keep and bear firearms under state and federal law. *See* Penal Code § 46.04(a)(1); 18 U.S.C. § 922(g)(1).

**B.    Because The Relevant Facts Are Not In Dispute Here, The Court May Proceed Immediately To Summary Judgment.**

Texas filed an answer that was remarkable in that it did not expressly deny the core allegations that the Carry Bans at issue here violate the Second Amendment. Instead, in multiple instances, Texas purported to lack sufficient information to admit or deny the allegations. *See*, *e.g*., Defendant's Original Answer, ECF No. 20, ¶¶ 27, 29–31. In another, Texas actually admitted a critical point: Texas *admitted* Plaintiffs allegation in paragraph 14 of the Complaint that, "[d]espite *Bruen*'s confirmation that peaceable citizens such as Plaintiffs have a 'general right' to carry handguns outside the home, Texas law forbids possessing a firearm in a variety of *ordinary public*

*places*." Compl. ¶ 14 (emphasis added); *see* Answer ¶ 14. If the Carry Bans apply to ordinary places, they cannot be analogized to the few "sensitive places."

Soon after the Answer was filed, the Court observed that Plaintiffs' challenges "appear to be purely legal in nature," ECF No. 22, and the parties agreed with the Court's suggestion that proceeding to summary judgment was appropriate, ECF No. 23. On February 12, 2025, the Court ordered the parties to file cross-motions for summary judgment on before April 16, 2025. ECF No. 24. Summary judgment is appropriate because "a facial challenge to the constitutionality of a statute presents a pure question of law." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006); *see Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir.1991) ("Summary judgment is appropriate where the only issue before the court is a pure question of law.").

## III.  STANDARD OF REVIEW

Summary judgment is proper where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "However the movant 'need not negate the elements of the nonmovant's case.'" *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (citation omitted). The movant may meet its burden by pointing out the absence of evidence supporting the nonmovant's case. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

## IV.  ARGUMENT

"[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens have a constitutionally protected right to "'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33; *see id.* at 31 (referring to "the general right to publicly carry arms for self-defense"). Accordingly, this general right to public carry cannot be restricted absent "exceptional circumstances" in which such restrictions have a strong historical foundation. *Id.* at 38, 70.

To determine whether a governmental restriction on carry is constitutional, *Bruen* requires that courts first assess whether the Second Amendment's text covers an individual's proposed conduct, and if it does, the Constitution presumptively protects that conduct. 597 U.S. at 22–24. The only way the State can justify its regulation and defeat the presumption of constitutionality is "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. It is thus the State's burden to "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19; *see also United States v. Rahimi*, 602 U.S. 680, 691 (2024) ("[W]hen the Government regulates arms-bearing conduct . . . it bears the burden to 'justify its regulation.'" (quoting *Bruen*, 597 U.S. at 24)). In doing so, this Court's task is to assess whether each Carry Ban is consistent "with the principles that underpin our regulatory tradition," in short, that whatever principles support the government's historical analogues, would extend equally strongly to cover the Carry Ban today. *Rahimi*, 602 U.S. at 692.

Texas cannot meet its burden here. As a result, the Court must enjoin each of the Carry Bans.

**A.      The Second Amendment's Plain Text Covers Plaintiffs' Conduct.**

Plaintiffs' proposed course of conduct—licensed carry in the three types of public places at issue here—falls within the Second Amendment's plain text. *Bruen*, 597 U.S. at 32–33. The Supreme Court has already defined the Second Amendment's key terms relevant here. "The people" includes "all Americans"; "Arms" includes "all instruments that constitute bearable arms[,]" including handguns; and, to "bear" simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008); *Bruen*, 597 U.S. at 32–33. Importantly, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Bruen*, 597 U.S. at 32. Thus, the "definition of 'bear' naturally encompasses public carry" for self-defense. *Id.*

The Supreme Court's interpretation of these words and phrases establishes that Plaintiffs' proposed conduct is presumptively protected by the Second Amendment. The Individual

Plaintiffs are law-abiding Americans who seek to carry bearable arms (handguns) for self-defense in the three public places at issue here during their daily lives. As in *Bruen*, these undisputed facts end the textual inquiry. *See* 597 U.S. at 31–32.

**B.    The State Cannot Meet Its Burden Of Showing A Historical Tradition Of Regulation Analogous To The Carry Bans.**

The burden thus shifts to Texas, which must show that the challenged provisions are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 34. And it must do so by offering persuasive legal history. *See id.* at 24–25 & 25 n.6. But no remotely similar historical tradition of analogous regulation exists here, so Texas cannot meet its burden.

**1.    The Supreme Court Has Provided Extensive Direction Governing Lower Courts' Consideration Of The Government's Effort To Meet Its Burden.**

*Bruen* and *Rahimi* explain in detail how the historical analysis is to proceed. Here, given the "general societal problem" of potential firearm violence at locations like bars, restaurants, racetracks, and public sporting events has existed since the Founding, the historical inquiry is "fairly straightforward": "the lack of a distinctly similar historical regulation addressing [the] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. There are no "unprecedented societal concerns or dramatic technological changes" at play here that would justify a "more nuanced approach" when reviewing the historical record. *Id.* at 27.

Three additional methodological considerations govern this Court's analogical review of the historical record, all of which confirm that Texas cannot meet its burden.

**a.    Historical Evidence At And Around The Founding Controls.**

First, any proffered historical analogue must be from at or around the Founding, centering on 1791, when the Second Amendment was ratified. *See Bruen*, 597 U.S. at 34–35; *Reese v. BATFE*, 127 F.4th 583, 599–600 (5th Cir. 2025) ("Proceeding past the bounds of founding-era analogues, however, is risky under *Bruen*."); *accord Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 438–43 (3d Cir. 2024) (holding that 1791 is the most probative period); *Worth v. Jacobson*,

108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests prioritizing Founding-era history."); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (calling 1791 the "critical year for determining the [Second] [A]mendment's historical meaning"). This is because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35; *see also Bruen*, 597 U.S. at 37. Thus, "not all history is created equal," and courts must not overweigh historical evidence that long predates or postdates the Founding. *Bruen*, 597 U.S. at 34; *see also* Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, Harv. J. L. Pub. Pol'y Per Curiam (Dec. 7, 2022), https://perma.cc/4Z3V-SUS2. By looking to 1791, the Court in *Bruen* continued its practice of focusing on the Founding era when analyzing constitutionally protected rights. *See, e.g.*, *Ramos v. Louisiana*, 590 U.S. 83, 90–91 (2020); *Timbs v. Indiana*, 586 U.S. 146, 150 (2019); *Virginia v. Moore*, 553 U.S. 164, 168 (2008). Consequently, evidence that long pre- or post-dates 1791 is less probative, *Bruen*, 597 U.S. at 35–37, and laws from the 20th-century are categorically too late to matter, *id.* at 66 n.28.

*Bruen*'s reasoning also underscores that 1791 carries the most weight. After initially rejecting "medieval English regulations," 597 U.S. at 40, the Court turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights. *See id.* at 44–45. After finding these sources somewhat probative of the Amendment's general original meaning (*i.e.*, that the right to bear arms is an individual, not a collective, right), the Court focused on "the history of the Colonies and early Republic," plus "the first decade after [the Second Amendment's] adoption." *Id.* at 46–50. And it found that the challenged law had "no historical basis" because no analogue in that relevant historical period supported it. *Id*. at 50.

Only after canvassing the historical evidence from these three periods did the Court discuss post-1868 sources and the late-19th century. *See Bruen*, 597 U.S. at 60–70. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect the origins and continuing significance of the Second Amendment." *Id.* at 67 (cleaned up). Thus, the Court declined to rely on such laws and regulations. *See id.* at 66–68. And it cautioned courts to likewise "guard against giving postenactment history

9

more weight than it can rightly bear." *Id.* at 35. In other words, the Founding era is the benchmark against which examples from later historical periods must be measured. Restrictions on the right to keep and bear arms adopted prior to or during the Reconstruction era may be *confirmatory* of earlier legislation but cannot alone establish the historical tradition of regulation required by *Bruen. See United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023), petition granted, judgment vacated, and case remanded in light of *Rahimi*, 144 S. Ct. 2707 (July 2, 2024) ("When 19th-century practice is inconsistent with the categorical protection of the Second Amendment, the text controls." (cleaned up)).

*Bruen*'s primary focus on the Founding is nothing new. The Court has employed the same reasoning in cases involving other incorporated rights. *See, e.g.*, *Ramos*, 590 U.S. at 90–91 (discussing the history of a unanimous jury right by referencing "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791); *Timbs*, 586 U.S. at 150 (discussing "colonial-era provisions" and the "constitutions of eight States" when analyzing the Eighth Amendment excessive fines clause); *Virginia v. Moore*, 553 U.S. at 168 ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."). *Bruen* cited these authorities in explaining why the period surrounding 1791 is the key era for analysis. 597 U.S. at 37.[4]

###### b. Establishing A Historical Tradition Requires Identifying A Widely Representative Regulatory Analogue.

Second, *Bruen* held that forming a historical tradition requires proof of representative, relevantly similar analogues. As *Rahimi* explained, such historical laws must evidence the

---

[4] While the *Bruen* Court noted that an *academic* debate exists about whether history from 1868 (when the Fourteenth Amendment was adopted) may be relevant, the Court found no need to address that question. 597 U.S. at 37–38. Thus, prior precedent establishing 1791 as the controlling date remains binding. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (finding unpersuasive "more than 30" provisions of state law from the "second half of the 19th Century" because they were not grounded in Founding-era practices regarding the Free Exercise Clause). At most, the Supreme Court has looked to 19th century evidence as "mere confirmation of what the Court thought had already been established" at the Founding. *Bruen*, 597 U.S. at 37 (citation omitted).

10

"principles that underpin our regulatory tradition" and that "underly[] the Second Amendment." *Rahimi*, 602 U.S. at 692. Analogues are representative, therefore, if they are broadly applicable and widely accepted. On the other hand, a handful of state laws that are unconnected, in principle, to earlier or later enactments is not a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding. *Bruen*, 597 U.S. at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" (emphasis omitted); *id.* at 67–68 (rejecting regulations applying to only 1% of the population). Put differently, laws existing in only a few jurisdictions—historical "outliers"—should be disregarded. *Id.* at 30 (internal quotation marks omitted); *see also Koons v. Platkin*, 673 F. Supp. 3d 515, 622 (D.N.J. 2023) (finding three Reconstruction era laws non-representative); *see also id.* at 642 (finding one state law and 25 local ordinances, covering less than 10% of nation's population, insufficient). Similarly, laws in the territories are afforded "little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." *Bruen*, 597 U.S. at 67–69.

### c.    Purported Analogues Must Be Relevantly Similar.

Third, any analogues must be "relevantly similar" based on "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.* The analysis of this relevant similarity yields, under *Rahimi*, the sort of "principles" to be applied in assessing a modern enactment. 602 U.S. at 692. This requirement means that Founding era laws arising in different contexts, and for different reasons, will be inapt comparators to a modern law, since they are not motivated by the same underlying principles. *See id.* ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.").

**2.      The Carry Bans Here Are Not Analogous To "Sensitive Place" Restrictions.**

Because of the absence of historical evidence to support the Carry Bans, *see* § B(3) *infra*, Texas may choose to argue that carry can be restricted in certain "sensitive places." *Bruen*, 597 U.S. at 30. Any such argument, however, should be foreclosed by the State's admission in its Answer that Texas "forbids possessing a firearm in a variety of *ordinary* public places." Compl. ¶ 14 (emphasis added); Answer ¶ 14. An "ordinary public place" does not fall within the "exceptional circumstances under which one could not carry arms" historically. *Bruen*, 597 U.S. at 70. Indeed, *Bruen* warned that extending "sensitive place" treatment to ordinary places where people "congregate" "would eviscerate the general right to publicly carry arms for self-defense." *Id*. at 31.

In any event, if Texas is allowed to pursue a "sensitive places" argument, *Heller* and *McDonald* do not exempt alleged "sensitive places" restrictions from the *Bruen* analysis or flatly justify carry bans in all government buildings. *See Heller*, 554 U.S. at 626–27 n.26; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) (quoting *Heller*, 554 U.S. at 626–27)). The Fifth Circuit recently rejected the idea that the "sensitive places" language in *Heller* could have controlling effect in a case, noting that because such laws "are likely captured by the plain text of the Second Amendment" they are, therefore "likely subject to *Bruen*'s historical analysis." *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024); *see also Reese*, 127 F.4th at 597 (reiterating "the Supreme Court's caution against construing too broadly the category of 'sensitive places such as schools and government buildings,' as it would 'eviscerate the general right to publicly carry arms for self-defense'" (quoting *Bruen*, 597 U.S. at 30–31)). Indeed, *Bruen* itself left no doubt that governments making sensitive-place arguments must justify them like any other regulation, by showing they are consistent with the historical tradition: "[C]ourts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30 (emphasis in *Bruen*).

In short, to carry its burden, Texas must "identify a well-established and representative"

tradition of analogous regulation, *Bruen*, 597 U.S. at 30, demonstrating that the Carry Bans are "consistent with the principles that underpin the Nation's regulatory tradition," *Rahimi*, 602 U.S. at 692.

### 3. Texas Cannot Identify Analogous Historical Bans On Carrying In The Locations At Issue Here.

Texas cannot carry its burden here because there is no relevantly similar Founding-era regulatory analogue for any of the Carry Bans, let alone an analogue that was widely representative.

#### a. There Is No Historical Tradition Of Banning Firearms In Bars Or Restaurants Serving Alcohol.

Texas cannot justify Section 46.03(a)(7)'s Carry Ban in bars, restaurants, and other venues that "derive[] 51 percent or more of [their] income from the sale or service of alcoholic beverages for on-premises consumption." The Fifth Circuit recognized in *Connolly* that "early Americans, including the Founders, consumed copious amounts of alcohol." *United States v. Connolly*, 117 F.4th 269, 279 (5th Cir. 2024). Bars and taverns were ubiquitous around the time of the Founding. *See, e.g.*, Thompson, RUM PUNCH AND REVOLUTION: TAVERNGOING AND PUBLIC LIFE IN EIGHTEENTH-CENTURY PHILADELPHIA 27 (Penn 1999) (table showing ratio of taverns to Philadelphia's population; estimating 178 taverns in 1769, when Philadelphia's population was roughly 28,000).

In one famous drinking session,

> only a few days before the Constitution's signing, a volunteer cavalry corps that crossed the Delaware River with George Washington during the Revolutionary War held a farewell party for him at The City Tavern in Philadelphia. According to the evening's bar tab, the 55 attendees ordered "54 bottles of Madeira, 60 bottles of Claret, 8 bottles of whiskey, 8 bottles of cider, 12 bottles of beer and 7 large bowls of punch."

*Connolly*, 117 F.4th at 279 n.4 (citing *Bill for an Evening of Entertainment for George Washington - 14 September 1787*, Quill Project). These military men were all free to carry their weapons into the tavern.

13

To be sure, there was a historical tradition of governments imposing licensing regulations on taverns. *See*, *e.g.*, Thompson, *supra*, at 33–41 (summarizing licensing of Philadelphia taverns). Yet Plaintiffs are not aware of *any* Founding-era regulations restricting carrying firearms in bars and taverns. This utter lack of firearm regulation is dispositive under *Bruen*.

Instead, "Founding-era laws concerning guns and alcohol were few, and primarily concerned with (1) misuse of weapons while intoxicated and (2) disciplining militias." *Connolly*, 117 F.4th at 280. As to the former category, a 17th century Virginia law, for example, outlawed "misusing" guns while drinking, and a 1771 New York law banned citizens from firing guns, while intoxicated, in the days around New Year celebrations. *Id*. (citing Virginia and New York restrictions). The Virginia law fails the "why" test because it was aimed "explicitly as a gunpowder preservation measure (which was at a premium), and because ill-timed gunshots could be mistaken as a signal that Natives were attacking." *Id*. And both of these narrow restrictions fail the "how" test by imposing a far lesser burden than disarming everyone who visits establishment serving alcohol, whether consuming alcohol or not.

Founding-era restrictions restricting alcohol use during militia service likewise fail to establish a regulatory tradition comparable to total disarmament of all who enter an establishment serving alcohol:

> The purpose behind these militia laws concerns military service—intoxicated servicemembers cannot perform their duties while impaired. More than that, these laws applied only to militia members; none of them spoke to a militia member's ability to carry outside of military service. Then, as today, restrictions on the liberties of service members tell us little about the limits acceptable for citizens at large.

*Connolly*, 117 F.4th at 281.

There is no historical tradition to support Section 46.03(a)(7)'s Carry Ban at bars and other venues selling alcohol, so Defendant should be enjoined from enforcing it.

14

**b.     There Is No Historical Tradition Of Banning Firearms At Sporting Events.**

Texas cannot justify Section 46.03(a)(8)'s Carry Ban "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place," because this restriction has no basis in the nation's history or tradition. On the contrary, while similar venues and events existed at the Founding, there was no tradition—widespread or otherwise—of banning carry in such places.

Many of the organized sports drawing the largest crowds in America today—such as football, baseball, and basketball—did not exist at the Founding. Nevertheless, the Founding generation did congregate for amusement and sporting events. Indeed, some of the most popular colonial gatherings for sporting events revolved entirely around firearms:

> Shooting competitions were an activity in which nearly anyone could participate. The matches offered an ideal opportunity to hone some of the most important skills for colonial life, while providing colonists with a source of amusement—especially in rural communities where entertainment was limited.

Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 Wm. & Mary Bill Rts. J. 93, 110 (2022) (citing Johnson et al., Firearms Law And The Second Amendment: Regulations, Rights, And Policy (3d ed. 2021) ("Long-distance shooting contests were major events in rural communities.")); *see also* 1 Sawyer, Firearms In American History 79–81 (1910) (describing a 1775 marksmanship exhibition as "a spectacular review of [Washington's] riflemen" in front of "an immense crowd of spectators"); Rose, American Rifle: A Biography 41–44 (2009) (describing public shooting exhibitions and marksmanship competitions held by riflemen in the Continental Army).

Despite widespread existence of gatherings analogous to today's sporting events at and around the Founding, no government chose to ban carry at those gatherings. *See, e.g.*, *Koons*, 673 F. Supp. 3d at 645–46 (finding no historical tradition of restricting weapons in "entertainment facilities," which include stadiums); *Siegel v. Platkin*, 653 F. Supp. 3d 136, 155–56 (D.N.J. 2023) (same).

Indeed, disarming individuals at such events runs counter to the Founding-era tradition of *requiring* individuals to be armed at certain public gatherings (which could potentially be analogized to off-campus "interscholastic events"). "The colonial generation recognized that citizens attending public gatherings exposed themselves to violent attack. . . . To abate that risk, American colonists obligated their citizenry to arm themselves for protection." *Koons*, 673 F. Supp. 3d at 629 (citing *Heller*, 554 U.S. at 601, observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons"); *see also*, *e.g.*, Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England, p. 190 (White 1853) (1639 order) (ordering that "all such persons . . . shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets"); Johnson, et al., FIREARMS LAW & THE SECOND AMENDMENT 183–85 (2d ed. 2017) (summarizing similar laws requiring carriage from Virginia in 1619 to Georgia in 1770). At one public gathering, now remembered as the Boston Massacre, British soldiers opened fire on a crowd of colonists in 1770. In defending the soldiers at trial, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, Argument for the Defense: 3-4 December 1770, NAT'L ARCHIVES FOUNDERS ONLINE, https://perma.cc/XPJ2-PZNA.

*Heller*, for example, cited a 1770 Georgia law requiring men to carry firearms "to places of public worship." 554 U.S. at 601. Virginia enacted a similar law in 1755, which persisted until 1878, allowing each county's chief militia officer to order all enlisted militiamen "to go armed to their respective parish churches." 6 WILLIAM WALLER HENING, THE STATUTES AT LARGE, BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 534 (Richmond, Franklin Press 1819); *see also* Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014) (reviewing Colonial and Founding-era historical precedent for requiring firearms at church services).

16

In short, there is no historical tradition to support Section 46.03(a)(8)'s Carry Ban at sporting events and off-campus "interscholastic events," so Defendant should be enjoined from enforcing it.

### c.    There Is No Historical Tradition of Banning Firearms At Racetracks.

Texas cannot justify Section 46.03(a)(4)'s Carry Ban "on the premises of a racetrack." Racetracks have existed since the Founding, yet there is no tradition of banning carry at such locations. *See, e.g.*, Carson, COLONIAL VIRGINIANS 108 (1965) (discussing prevalence of race tracks); Breen, *Horses and Gentlemen: The Cultural Significance of Gambling Among the Gentry of Virginia*, 34 WM. & MARY Q. 239, 251 (1977) ("By 1700, there were at least a dozen tracks, important enough to be known by name, scattered throughout the counties of the Northern Neck and the James River valley."); Pepe, FREEHOLD: A HOMETOWN HISTORY 81 (2003) (In New Jersey, "[h]orses were an integral part of the Freehold community and horseracing in Freehold dates back at least to the 1830s, when farmers brought their fastest horses to a makeshift racetrack at the same location as today's Freehold Raceway."). This point, standing alone, should be dispositive.

Texas might attempt to justify its carry ban at racetracks based on the fact that gambling may be taking place. But even from a broader lens, the effort would still fail. America "has a long history of gambling establishments." *Koons*, 673 F. Supp. 3d at 646. "Gambling in the English-speaking world was a powerful economic and social force from the 1660s . . . into the 1800s." Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, COLONIAL WILLIAMSBURG J. (Autumn 2008), https://tinyurl.com/23db8pzk. The practice "crossed the Atlantic" into America, and "colonial gaming gained a character all its own[,]" developing into a "pastime." *Id.* Louisiana eventually established a casino in 1753. *See* Precht, *Legalized Gambling*, 64 PARISHES (Nov. 16, 2011), https://perma.cc/9R9Y-5Y4D. And Founding-era Americans frequently bet on horse races. *See* Crews, *Apple-Pie American and Older than the Mayflower*, *supra*. Indeed, gambling was so pervasive that General Washington had to admonish soldiers in the Continental Army for it. *See id.*

Despite the longstanding presence of racetracks in the Nation, there is no historical tradition of banning arms at them. *See Koons*, 673 F. Supp. 3d at 646–47; *Siegel*, 653 F. Supp. 3d at 156–57. This is fatal: "[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. Defendant should therefore be enjoined from enforcing Section 46.03(a)(4)'s Carry Ban.

*   *   *

In short, Texas cannot meet its burden of proving that each of the Carry Bans challenged here "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. There is no relevantly similar Founding-era regulatory analogue for any of the Carry Bans, let alone an analogue that was widely representative. Despite the fact that venues similar to each of the targeted locations date back to the Founding, there is no well-established, representative tradition of restricting the carry of firearms in any of these locations. Texas' Carry Bans are therefore inconsistent with the "principles that underpin our regulatory tradition" and that "underly[] the Second Amendment." *Rahimi*, 602 U.S. at 692.

## V.  CONCLUSION

For the reasons set for the above, the Court should grant Plaintiffs' motion for summary judgment, issue a declaration that Texas' Carry Bans violate the Second Amendment, and enjoin Defendant from enforcing them.

Dated: April 16, 2025

Respectfully submitted,

/s/ Bradley A. Benbrook
Bradley A. Benbrook* (TX Bar No. 24142064)
Stephen M. Duvernay* (TX Bar No. 24139565)
BENBROOK LAW GROUP, P.C.
701 University Avenue, Suite 106
Sacramento, California  95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

R. Brent Cooper (TX Bar No. 04783250)
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas  75202
Telephone: (214) 712-9500
brent.cooper@cooperscully.com
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 16, 2025, a true and correct copy of the foregoing document and all supporting documents filed concurrently therewith were served via the Court's CM/ECF system to all counsel of record.

/s/ Bradley A. Benbrook
Bradley A. Benbrook