## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

CHARLES ZIEGENFUSS, DAVID MONTGOMERY,
BRIAN ROBINSON, and FIREARMS POLICY COALI-
TION, INC.,

      *Plaintiffs,*

v.

FREEMAN MARTIN, in his official capacity as Di-
rector and Colonel of the Texas Department of
Public Safety,

      *Defendant.*

CIVIL ACTION NO. 4:24-cv-01049

---

## DEFENDANT'S BRIEF IN SUPPORT OF ITS
## CROSS-MOTION FOR SUMMARY JUDGMENT

---

Defendant Freeman Martin, in his official capacity as Director and Colonel of the Texas Department of Public Safety, by and through the Attorney General of the State of Texas, hereby files this brief, in support of Defendant's Cross Motion for Summary Judgment, and would respectfully show the Court as follows:

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................ iii

Introduction .............................................................................................................................1

Background ...............................................................................................................................1

Legal Standard ........................................................................................................................ 4

Argument .................................................................................................................................5

I.      Director Martin is immune from suit................................................................................5

II.     Plaintiffs also lack a valid cause of action. ...............................................................8

        A.      Plaintiffs cannot sue under § 1983 ..............................................................8

        B.      Because Plaintiffs cannot sue under § 1983, Plaintiffs' request for costs
                and attorneys' fees is improper..................................................................9

III.    Plaintiffs lack standing. .......................................................................................10

        A.      Plaintiffs' standing rests on the named, individual plaintiffs................................ 11

        B.      Plaintiffs cannot satisfy redressability....................................................12

        C.      Nonparty proprietors independently restrict carry in the challenged
                locations. ................................................................................... 15

IV.     The Challenged Provisions violate the Second Amendment...........................................19

        A.      The Challenged Provisions lack clear historical analogues...................................... 20

Conclusion ...........................................................................................................................25

Certificate of Service...........................................................................................................  26

ii

# TABLE OF AUTHORITIES

**Cases**

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*,
 851 F.3d 507 (5th Cir. 2017) ................................................................7

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
 421 U.S. 240 (1975) ........................................................................ 9

*Antonyuk v. James*,
 120 F.4th 941 (2d Cir. 2024) .......................................... 20, 23, 24

*Aransas Project v. Shaw*,
 775 F.3d 641 (5th Cir. 2014) ...........................................................18

*Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
 627 F.3d 547 (5th Cir. 2010)........................................................ 11

*B & B Hardware, Inc. v. Hargis Indus.,*
 *Inc.*, 575 U.S. 138 (2015) ...............................................................15

*Bell v. Health-Mor, Inc.*,
 549 F.2d 342 (5th Cir. 1977) ........................................................ 9

*Brown v. Offshore Specialty Fabricators, Inc.*,
 663 F.3d 759 (5th Cir. 2011) ...........................................................5

*Cedar Point Nursery v. Hassid*,
 594 U.S. 139 (2021) ........................................................................16

*City of Austin v. Paxton*,
 943 F.3d 993 (5th Cir. 2019)........................................................5, 8

*Clapper v. Amnesty Intern. USA*,
 133 S. Ct. 1138 (2013)............................................................ 16, 18

*Cutrera v. Bd. of Sup'rs of La. State Univ.*,
 429 F.3d 108  (5th Cir. 2005) ..........................................................7

*D.C. v. Heller*,
 554 U.S. 570 (2008)................................................................ 20, 22

*Davis v. Passman*,
 442 U.S. 228 (1979) .................................................................. 8, 9

*Dep't of Homeland Sec. v. New York*,
 140 S.Ct. 599 (2020).......................................................................13

*DOC v. New York*,
    588 U.S. 752 (2019) ........................................................................................ 16, 19

*Doe v. Bonath*,
    705 F. Supp. 3d 690 (W.D. Tex. 2023) ...................................................................5

*Dugan v. Rank*,
    372 U.S. 609 (1963) ...........................................................................................6

*Eltalawy v. Lubbock Indep. Sch. Dist.*,
    816 Fed. Appx. 958 (5th Cir. 2020) ......................................................................6

*Ex parte Young*,
    209 U.S. 123, 157 (1908) ....................................................................................7

*Firearms Policy Coal., Inc. v. McCraw*,
    623 F. Supp. 3d 740 (N.D. Tex. 2022) ............................................................12, 20

*Freedom from Religion Found., Inc. v. Mack*,
    4 F.4th 306 (5th Cir. 2021) ...........................................................................1, 8, 9

*Freeman v. Lester Coggins Trucking, Inc.*,
    771 F.2d 860 (5th Cir.1985) ..............................................................................15

*Frew ex rel. Frew v. Hawkins*,
    540 U.S. 431 (2004) ...........................................................................................7

*Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ..................................................................................... 10, 13

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ..........................................................................................10

*Garcia v. Morath*,
    624 F. Supp. 3d 690 (W.D. Tex. 2022) ................................................................14

*Gonzales v. Hunt Cnty. Sheriff's Dep't*,
    No. 3:20-CV-3279-K, 2021 WL 2580556 (N.D. Tex. June 23, 2021) ........................7

*Graf v. State*,
    925 S.W.2d 740 (Tex. App.—Austin 1996, pet. ref'd) ...........................................3

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ..........................................................................................14

*Hardy v. Johns–Manville Sales Corp.*,
    681 F.2d 334 (5th Cir.1982) ..............................................................................15

*Hochendoner v. Genzyme Corp.*,
   823 F.3d 724 (1st Cir. 2016) ............................................................................. 8

*Holcomb v. Waller Cty.*,
   546 S.W.3d 833 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ................. 16

*Hunt v. Cromartie*,
   526 U.S. 541 (1999) ......................................................................................... 4

*Kentucky v. Graham*,
   473 U.S. 159 (1985) ......................................................................................... 6

*Kling v. Hebert*,
   60 F.4th 281 (5th Cir. 2023) .......................................................................... 1, 8

*Koehler v. United States*,
   153 F.3d 263 (5th Cir. 1998) ........................................................................... 8

*Koons v. Platkin*,
   673 F. Supp. 3d 515 (D.N.J. 2023) ............................................................. 21, 23

*Lackey v. Stinnie*,
   145 S. Ct. 659 (2025) ...................................................................................... 9

*Legacy Cmty. Health Services, Inc. v. Smith*,
   881 F.3d 358 (5th Cir. 2018), *as revised* (Feb. 1, 2018) ................................ 10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................. 10, 13, 14

*Mi Familia Vota v. Ogg*,
   105 F.4th 313 (5th Cir. 2024) .......................................................................... 7

*Moore v. La. Bd. of Elementary & Secondary Educ.*,
   743 F.3d 959 (5th Cir. 2014) .......................................................................... 5

*Murthy v. Missouri*,
   603 U.S. 43 (2024) .................................................................................... 14, 18

*N.Y. State Rifle & Pistol Assoc. v. Bruen*,
   597 U.S. 1 (2022) .................................................................................... passim

*NAACP v. City of Kyle*,
   626 F.3d 233, 237 (5th Cir. 2010) ................................................................. 12

*Nat'l Press Photographers Assoc. v. McCraw*,
   90 F.4th 770 (5th Cir. 2024) ..................................................................... 6, 7, 8

*New Orleans Towing Assoc. v. Foster*,
    248 F.3d 1143 (5th Cir. 2001) ............................................................................. 6

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ............................................................................. 11

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) ............................................................................. 7

*Oliver v. Scott*,
    276 F.3d 736 (5th Cir. 2002) ............................................................................. 4

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ............................................................................. 8

*Perez v. United States*,
    312 F.3d 191 (5th Cir. 2002) ............................................................................. 10

*Quern v. Jordan*,
    440 U.S. 332 (1979) ............................................................................. 5, 9

Sanchez v. R.G.L.,
    761 F.3d 495 (5th Cir. 2014) ............................................................................. 13

*Siegel v. Platkin*,
    No. 1:22-cv-7463, 2023 WL 1103676 (D.N.J. Jan. 30, 2023) ............................. 23

*Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*,
    627 F.3d 134 (5th Cir.2010) ............................................................................. 4

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................. passim

*Tawakkol v. Vasquez*,
    87 F.4th 715 (5th Cir. 2023) ............................................................................. 7

*Taylor v. Seamans*,
    640 F. Supp. 831 (E.D. Tex. 1986) ............................................................................. 6

*Tex. All. for Retired Americans v. Scott*,
    28 F.4th 669 (5th Cir. 2022) ............................................................................. 7

*Tex. Bankers Assoc. v. Office of the Comptroller*,
    728 F. Supp. 3d 412 (N.D. Tex. 2024) ............................................................................. 11

*Texas v. U.S. Dep't of Homeland Sec.*,
    No. 6:24-CV-00306, 2024 WL 4711951 (E.D. Tex. Nov. 7, 2024) ....................... 19

*Three Expo Events, L.L.C. v. City of Dallas,*
    907 F.3d 333 (5th Cir. 2018) ...................................................................16

*Turner v. Houma Mun. Fire & Police Civil Serv. Bd.,*
    229 F.3d 478 (5th Cir. 2000) ..................................................................... 6

*Union Pac. R. Co. v. La. Pub. Serv. Comm'n,*
    662 F.3d 336 (5th Cir. 2011) ..................................................................... 8

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024) .............................................................................21

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,*
    454 U.S. 464 (1982).................................................................................10

*Warth v. Seldin,*
    422 U.S. 490 (1975) .................................................................................11

*Whole Woman's Health v. Jackson,*
    595 U.S. 30 (2021) ...................................................................................13

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58 (1989) ...........................................................................1, 5, 8

*Wilson v. Birnberg,*
    667 F.3d 591 (5th Cir. 2012) ..................................................................... 8

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024) ................................................... 20, 23, 24

**Constitutional Provisions**

Tex. Const. art. I, § 23 ................................................................................. 2

**Statutes**

42 U.S.C. § 1988(b) ..................................................................................... 9

Act of June 16, 2021, 2021, 87th Leg., R. S.,
    Tex. HB 1927; 2021 Tex. Gen. Laws, Firearm Carry Act of 2021 ........... 2

Fed. R. Civ. P. 56(a) .................................................................................... 4

Tex. Code Crim. Pro. Art. 2A.051...............................................................3

Tex. Code Crim. Pro. Art. 2A.063...............................................................3

Tex. Code Crim. Pro. Ch. 66 ............................................................................. 4

Tex. Gov't Code § 411.002(a) ...........................................................................3

Tex. Occ. Code § 2021.003 ............................................................................... 2

Tex. Occ. Code § 2021.003(41) ........................................................................ 2

Tex. Penal Code § 30.05 ........................................................................... 16, 18

Tex. Penal Code § 30.06 ................................................................................16

Tex. Penal Code § 30.07 ........................................................................... 16, 18

Tex. Penal Code § 46.01(15) ........................................................................... 2

Tex. Penal Code § 46.03(a) ............................................................................. 2

Tex. Penal Code § 46.03(a)(4) ......................................................................... 2

Tex. Penal Code § 46.03(a)(7) ......................................................................... 2

Tex. Penal Code § 46.03(a)(8) ......................................................................... 2

Tex. Penal Code § 46.03(c)(4) ......................................................................... 2

Texas Penal Code tit. IX, ch. 4, art. 320 (1879) .......................................... 24

**Treatises**

13A Fed. Prac. & Proc. Juris. (Wright & Miller) § 3531 (3d ed.) .................................10

**Other Authorities**

"2025 - Arrest Stats by Offense (XLS)," Crime Records Reports and Statistical
   Information https://www.dps.texas.gov/section/crime-records/crime-records-reports-
   and-statistical-information ........................................................................ 4

"2025 - Conviction Stats by Offense (XLS)," Crime Records Reports and Statistical
   Information https://www.dps.texas.gov/section/crime-records/crime-records-reports-
   and-statistical-information ........................................................................ 4

"2025 Live Race Date Calendar as of January 9, 2025," Texas Racing Commission,
   https://perma.cc/Z34T-28EV ...................................................................3

"AT&T Stadium Bag Policy," https://perma.cc/UJF4-JL49.....................................17

viii

"Firearms/Concealed Handguns," American Airlines Center Arena FAQ's,
https://perma.cc/6CJ6-FSX7 .................................................................................... 17

"Possession of Firearms and Weapons," Dallas ISD Employee Handbook, at 36,
https://perma.cc/A3AL-PMEX ................................................................................ 17

"Possession of Firearms and Weapons," Fort Worth ISD Employee Handbook, at 59,
https://perma.cc/74VN-KBD8 ................................................................................ 17

"State Fair of Texas Announces Safety & Security Measures for 2024 Event,"
https://perma.cc/S73Y-8738 .................................................................................... 17

"Weapons," University Policy Manual, Southern Methodist University,
https://perma.cc/RZ2F-2HJ9 ................................................................................... 17

Christine Sismondo, *America Walks into a Bar: A Spirited History of Taverns, Saloons,
Speakeasies and Grog Shops* 15 (Oxford 2011)....................................................... 22

Ed Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, Colonial
Williamsburg J. (Autumn 2008).............................................................................. 22

Jane Carson, Colonial Virginians 108 (1965)............................................................... 22

Lone Star Park Frequently Asked Questions, "What Items are Prohibited,"
https://perma.cc/S68J-Y5UW .................................................................................. 16

Retama Park Training Stall Application, https://perma.cc/DC46-53A2 ...................... 16

Sam Houston Race Park About Us, "Rules and Regulations for Sam Houston Race
Park," https://www.shrp.com/about-
us#:~:text=Prohibited%20Items,Weapons%20of%20Any%20Kind ........................... 16

Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a
Privilege of the Ruling Class?* 131–35 (2021) .......................................................... 22

## INTRODUCTION

The parties appear to agree on the merits of this case. The challenged carry restrictions, Tex. Penal Code §§ 46.03(a)(4), (7), (8), are not compatible with "a law-abiding citizen's right to armed self-defense" enshrined in the Second Amendment. *N.Y. State Rifle & Pistol Assoc. v. Bruen*, 597 U.S. 1, 29, 2127 (2022). However, while the parties are not adverse on the merits, the numerous justiciability problems that plague this case prevent the Court from reaching them. The laws at issue in this case may one day give way to the Second Amendment's protections—but because Plaintiffs have failed to meet the minimum standards necessary to obtain relief in federal court, today their suit must be dismissed.

Director Martin is immune from Plaintiffs' Second Amendment challenge. State officials are not subject to suit under § 1983 when acting in their official capacity. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989*).* That bar to justiciability alone requires the Court to grant judgment for Defendant. *See e.g., Kling v. Hebert*, 60 F.4th 281, 284 (5th Cir. 2023). But Plaintiffs' suit is riddled with other justiciability defects. First, Plaintiffs' reliance on § 1983, aside from running up against sovereign immunity, also fails to plead a valid cause of action. *See Freedom from Religion Found., Inc. v. Mack*, 4 F.4th 306, 311–12 (5th Cir. 2021). Next, Plaintiffs lack standing. The Texas Department of Public Safety ("DPS") does not have primary responsibility for enforcing the State's carry restrictions; therefore, relief against the Director of DPS would not redress the injury that Plaintiffs complain of. Apart from Defendant's tenuous responsibility for the challenged law, Plaintiffs' standing is further undermined by the bevy of carry restrictions imposed by nonparties. In particular, every racetrack in Texas has adopted its own prohibition of firearm possession independently of the challenged law.

Accordingly, the Court should grant summary judgment in favor of Director Martin.

## BACKGROUND

Texas proudly embraces the Second Amendment. In recognition of an individual's right to armed self-defense, state law permits non-felon adults to carry a handgun in public places, openly or concealed, without a license. *See* Act of June 16, 2021, 2021, 87th Leg., R. S., Tex. HB 1927; 2021

Tex. Gen. Laws, Firearm Carry Act of 2021 (amending the Penal Code to allow permit-less carry). Texas's own constitution capaciously protects the right of citizens "to keep and bear arms in the lawful defence of himself." Tex. Const. art. I, § 23. In 2021, the Texas Legislature removed the last barriers to as-of-right personal carry in order to give full force to the rights enshrined in both the Second Amendment and its state counterpart. In Texas, the public square offers an open door to lawful carry.

Coexisting with this solicitude towards the Second Amendment, state law cordons a handful of sensitive places from its open carry regime. These are enumerated in Texas Penal Code § 46.03(a), which provides that "[a] person commits an offense if the person intentionally, knowingly, or recklessly possesses or goes with a firearm . . . " in any of the specified locations. Tex. Penal Code § 46.03(a). This prohibition applies to both open and concealed carry and does not except individuals who have obtained a license to carry. *Id.*

Plaintiffs challenge just three of the State's place-specific carry restrictions. They contend that the Second Amendment is incompatible with § 46.03's prohibitions of carry "on the premises of a racetrack," *id.* at § 46.03(a)(4), "on the premises of a business that has a permit or license issued under Chapter 25, 28, 32, 69, or 74, Alcoholic Beverage Code, if the business derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption," *id.* at § 46.03(a)(7), "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place." *Id.* at § 46.03(a)(8); Complaint, ECF No. 1 at 1–2, 11–13.

"Premises" is defined to mean "a building or portion of a building," *id.* at § 46.03(c)(4), and the restriction on carry into "racetrack[s]" applies only to places "licensed . . . for the conduct of pari-mutuel wagering on horse racing or greyhound racing." Tex. Occ. Code § 2021.003(41); *see also* Tex. Penal Code § 46.01(15) (copying definition of "racetrack" found in Tex. Occ. Code § 2021.003). Section 46.03(a)(4) applies to exactly four locations, the four racetracks in Texas that

are licensed and operational.[1] Thus, the Challenged Provisions make it a crime to carry firearms in licensed racetracks, licensed establishments that derive 51% or more of their income from the sale of alcoholic drinks onsite ("51% establishments"), and buildings where sporting or interscholastic events take place.

Plaintiffs have brought their challenge against the Director of the Texas Department of Public Safety, despite § 46.03 lying outside the scope of DPS's primary responsibility. Law enforcement in Texas is decentralized with county or municipal police handling the bulk of locally committed crime, *see e.g.*, Tex. Code Crim. Pro. Art. 2A.051, 2A.063, and DPS does not control or direct local law enforcement agencies. Rather, DPS, as a state law enforcement agency, focuses on addressing criminal activity that affects the entire state. *See* Tex. Gov't Code § 411.002(a); *Graf v. State*, 925 S.W.2d 740, 742 (Tex. App.—Austin 1996, pet. ref'd) (explaining that DPS is "an agency of the state with a statewide charge of responsibility") (quotation omitted). DPS's principal divisions, the Texas Highway Patrol and the Texas Rangers, respectively police roadways and confront major violent crime. Nonetheless, DPS has authority to enforce every portion of the State's criminal law, aside from narrow exceptions. Tex. Gov't Code § 411.002(a).

Consistent with Texas's decentralization of law enforcement, local authorities take charge of enforcing § 46.03's carry restrictions. During the three years spanning 2022 to 2024, local law enforcement agencies reported 1738 arrests for all offenses under § 46.03, other than unlawful

---

[1] Licensed and operational racetracks can be found on the calendar of live races published on the Texas Racing Commission's website. *See* "2025 Live Race Date Calendar as of January 9, 2025," Texas Racing Commission, https://perma.cc/Z34T-28EV (last visited Apr. 16, 2025).

possession of location-restricted knives.[23] In the same period, local county and district attorneys reported 863 convictions related to § 46.03.[4] Unlawful carry is a quintessentially local offense that does not entail statewide consequences. Unsurprisingly, responsibility for enforcing § 46.03 falls within the purview of local police and sheriff departments, rather than DPS. Yet inexplicably, Plaintiffs pin the entirety of their injury on the public official least responsible for it, naming the Director of DPS as sole defendant.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir.2010).

However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002). Summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the

---

[2] Both this figure and the figure for convictions were calculated using publicly available arrest and conviction figures that DPS collects from local law enforcement agencies and courts. State law requires reporting these figures to DPS and charges DPS with maintaining a centralized "criminal history record system." *See* Tex. Code Crim. Pro. Ch. 66. DPS is tasked with collecting and administering this information but not assisting in law enforcement. *Id.* at art. 66.051. These records are available at a webpage operated by DPS. *See* "2025 - Arrest Stats by Offense (XLS)," Crime Records Reports and Statistical Information https://www.dps.texas.gov/section/crime-records/crime-records-reports-and-statistical-information (last visited Apr. 16, 2025); "2025 - Conviction Stats by Offense (XLS)," Crime Records Reports and Statistical Information https://www.dps.texas.gov/section/crime-records/crime-records-reports-and-statistical-information (last visited Apr. 16, 2025).

[3] Both this figure and the figure for convictions encompass all § 46.03 offenses (except for unlawful possession of location-restricted knives), including under provisions that are not subject to challenge in this litigation. More granular arrest and conviction records are not available.

[4] This figure makes the same exclusion of arrests under § 46.03(g-1) for unlawful possession of "location-restricted knives," as the previous.

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quotation omitted).

## ARGUMENT

### I.    Director Martin is immune from suit.

"In most cases, Eleventh Amendment sovereign immunity bars private suits against non-consenting states in federal court." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). That immunity "also prohibits suits against state officials or agencies that are effectively suits against a state." *Id.* "Federal courts are without jurisdiction over suits against a state, a state agency, or a state official in his official capacity unless the State has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary & Secondary Educ.,* 743 F.3d 959, 963 (5th Cir. 2014).

Defendant has not consented to the instant suit, and Plaintiffs have brought their challenge to his enforcement of § 46.03 under 42 U.S.C. § 1983. *See* ECF No. 1 at 11, 13; *see also* ECF No. 1-1 (Civil Cover Sheet) (citing "42 U.S.C. § 1983" as Plaintiffs' only cause of action). Congress may, within limits, abrogate Eleventh Amendment immunity under the enforcement powers granted to it by the Fourteenth Amendment, but "§ 1983 does not . . . indicate . . . an intent to sweep away the immunity of the States." *Quern v. Jordan*, 440 U.S. 332, 345 (1979); *Doe v. Bonath*, 705 F. Supp. 3d 690, 704 (W.D. Tex. 2023) ("the Supreme Court has explicitly held that § 1983 does not abrogate state sovereign immunity") (citing *Quern*, 440 U.S. at 345). Because § 1983 did not "override well-established immunities or defenses," including "[t]he well-established immunity of a State from being sued without its consent," "Section 1983 . . . does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Mich. Dep't of State Police,* 491 U.S. at 66–67. And this conclusion extends to "a suit against a state official in his or her official capacity." *Id.* at 71. Accordingly, the Eleventh Amendment shields official capacity defendants from suit under § 1983. *Id.*

There can be no doubt that Director Martin has been sued in his official, not personal, capacity. "Suits brought against a state official in his official capacity 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *New Orleans Towing Assoc. v. Foster*, 248 F.3d 1143 (5th Cir. 2001) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)); *Eltalawy v. Lubbock Indep. Sch. Dist.*, 816 Fed. Appx. 958, 961–63 (5th Cir. 2020). Official capacity suits target "the governmental entity's policy or custom" and seek to restrain the State. *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985). Thus, "[a] suit in which relief is sought nominally against a state official 'is in fact against the sovereign if the decree would operate against the latter.' "*New Orleans Towing Assoc.*, 248 F.3d 1143 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984)); *Dugan v. Rank*, 372 U.S. 609, 620 (1963) ("The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, *or if the effect of the judgment would be to restrain the Government from acting*, or to compel it to act." (cleaned up) (emphasis added)).

Plaintiffs are seeking to restrain Director Martin from exercising a governmental function, namely the enforcement of state gun control legislation. ECF No. 1 at 13. Their requested relief would bind DPS, and apply to the Director's successors in office. Conversely, Director Martin's personal conduct is irrelevant and not at issue. *See e.g., Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 485 (5th Cir. 2000) (stating a personal capacity suit "concerns only the personal liability of individuals"). In short, Plaintiffs' claim against the Director exclusively "arise[s] out of [his] [alleged] actions in enforcing state law." *New Orleans Towing Assoc.*, 248 F.3d 1143. Plaintiffs' Second Amendment claim against the Director is only cognizable as an official capacity suit. *See Nat'l Press Photographers Assoc. v. McCraw*, 90 F.4th 770, 787 (5th Cir. 2024) (finding DPS Director was entitled to sovereign immunity for constitutional claims asserted against him); *Taylor v. Seamans*, 640 F. Supp. 831, 833 (E.D. Tex. 1986) (§ 1983 case) ("There is no question that . . . the Texas Department of Public Safety are entitled to immunity from this controversy under the doctrine of sovereign immunity as contained in the Eleventh Amendment"); *Gonzales*

6

*v. Hunt Cnty. Sheriff's Dep't*, No. 3:20-CV-3279-K, 2021 WL 2580556, at \*2 (N.D. Tex. June 23, 2021) (dismissing § 1983 claims against DPS).

The only potential avenue for Plaintiffs to bypass sovereign immunity would be *Ex parte Young*'s exception for "suits for prospective . . . relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). However, Plaintiffs chose to bring their action under § 1983 and should not be allowed to raise *Ex parte Young* after the close of pleadings. *Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). Moreover, for the *Young* exception to apply, "three criteria must be satisfied: (1) A plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective." *Tawakkol v. Vasquez*, 87 F.4th 715, 720 (5th Cir. 2023) (citation omitted).

To satisfy the first of *Young*'s criteria not just any state official will do; rather, plaintiff must name an official who has "sufficient connection [to] the enforcement" of the challenged statute. *Ex parte Young*, 209 U.S. 123, 157 (1908); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017). The requisite enforcement connection constitutes a high bar that only applies when "the official has a 'demonstrated willingness' to enforce the challenged statute" manifested in "some step to enforce the statute." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 329 (5th Cir. 2024) (citations omitted). "[A]ny probe into the existence of a *Young* exception should gauge . . . the demonstrated willingness of the official to enforce the statute." *Okpalobi v. Foster*, 244 F.3d 405, 417 (5th Cir. 2001); *Nat'l Press Photographers Assoc.,* 90 F.4th at 786–88 (5th Cir. 2024).

Plaintiffs have not alleged a single action that could be taken to portend enforcement by the Director. Nor has it indicated statements that imply a willingness to enforce any of the Challenged Provisions. At most Plaintiffs have pointed to DPS's general authority to enforce the Texas Penal Code. That does not suffice, however, because "an official must have more than 'the general duty to see that the laws of the state are implemented.'" *Tex. All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 999–1000). But to have

7

the requisite connection the Director "must have 'the particular duty to enforce the statute in question *and* a demonstrated willingness to exercise that duty.'" *Id.* (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)) (emphasis added). Since Plaintiffs have not even shown "a scintilla of enforcement," they cannot avail itself of *Young*'s exception to sovereign immunity. *Nat'l Press Photographers Assoc.*, 90 F.4th at 786–87.

Since "[t]he Eleventh Amendment bars a suit against state officials when the state is the real substantial party in interest," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (citation omitted), the Court lacks jurisdiction to hear this case. *Kling v. Hebert*, 60 F.4th 281, 284 (5th Cir. 2023) ("Sovereign immunity operates like a jurisdictional bar, depriving federal courts of the power to adjudicate suits against a state."); *Union Pac. R. Co. v. Louisiana Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011) (same). Indeed, "sovereign immunity deprives the courts of jurisdiction *irrespective of the merits of the underlying claim*." *Koehler v. United States*, 153 F.3d 263, 267 (5th Cir. 1998) (emphasis added).

## II.    Plaintiffs also lack a valid cause of action.

### A.  Plaintiffs cannot sue under § 1983

Plaintiffs' reliance on § 1983 deprives their challenge of a viable cause of action against Director Martin, compounding their justiciability problems. The text of § 1983 is clear that the redress it authorizes is only available against a "person." *See* 42 U.S.C. § 1983. Since neither States nor state officials are "persons" within the meaning of the statute, § 1983 does not create a right of action that allows individuals to sue state personnel for violations of their rights. *Mich. Dep't of State Police,* 491 U.S. at 64–65, 71. Consequently, "[s]uits against the State under 42 U.S.C. § 1983 are doubly dismissible because the State is not a 'person' under that statute." *Mack*, 4 F.4th at 311 (citation omitted).

The plaintiff bears the burden of establishing a right to bring his suit. *See e.g., Davis v. Passman,* 442 U.S. 228, 238–40 (1979); *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012); *see also Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016) ("[T]he plaintiff bears the burden of plausibly alleging a viable cause of action."). A litigant "has a 'cause of action' under the

statute" if he "may enforce in court [constitutional] rights or obligations." *Davis,* 442 U.S. at 239. Claims that have not been brought under an appropriate cause of action must be dismissed. *Bell v. Health-Mor, Inc.*, 549 F.2d 342, 345 (5th Cir. 1977); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (holding a cause of action is a non-jurisdictional requirement).

"The plaintiff is the master of his complaint. And here, the plaintiff chose to invoke *only* § 1983." *Mack*, 4 F.4th at 312 (emphasis in original). Therefore, "[Plaintiffs'] suit arises only under § 1983." *Id.* Since that statute does not offer a right to enforce the Second Amendment against state officials, this Court must "doubly" dismiss Plaintiffs' challenge. *Id.* at 312–13; *Bell,* 549 F.2d at 345.

### B. Because Plaintiffs cannot sue under § 1983, Plaintiffs' request for costs and attorneys' fees is improper.

At minimum, because Plaintiffs do not have a viable claim under § 1983, they cannot request costs or attorney fees under 42 U.S.C. § 1988. *See* ECF No. 1 at 13 (requesting that "this Court award costs of suit, including reasonable attorneys' fees"). That statute permits an award of attorneys' fees in cases where private plaintiffs have successfully brought an action under certain specified federal statutes, including 42 U.S.C. § 1983. *See* 42 U.S.C. § 1988(b*); see also Quern*, 440 U.S. at 344–45 (explaining that § 1988 abrogates state sovereign immunity for awards of costs and attorneys' fees); *Lackey v. Stinnie*, 145 S. Ct. 659, 665–66 (2025) (explaining § 1988 "provides that, in actions brought under certain civil rights statutes—including 42 U.S.C. § 1983—'the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.'") (quoting 42 U.S.C. § 1988). But without a right to proceed under § 1983 or any of the other enumerated statues, § 1988 does not provide a basis for this Court to order the State to pay attorneys' fees.

"The prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). And it is "inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation." *Id.*; *Lackey*, 145 S. Ct. at 665–66 (2025) (reiterating the "American Rule" that courts may not

award attorneys' fees or costs absent "express statutory authority") (citation omitted). Accordingly, without access to § 1983—and by extension without § 1988—Plaintiffs cannot claim attorneys' fees or costs. Therefore, even if the Court allows some rendition of Plaintiffs' challenge to survive, despite its glaring jurisdictional defects, the Court must dismiss their request for fees and costs.

## III.    Plaintiffs lack standing.

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation omitted). "The requirement of standing focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,* 454 U.S. 464, 484 (1982) (quotation omitted); *see also* 13A Fed. Prac. & Proc. Juris. (Wright & Miller) § 3531 (3d ed.) (stating that when analyzing standing "[t]he focus is on the party, not the claim itself"). Jurisdiction is "a threshold issue that must be resolved before any federal court reaches the merits of the case before it." *Perez v. United States*, 312 F.3d 191, 194 (5th Cir. 2002); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

To establish standing, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant (causation); and (3) that is likely to be redressed by a favorable decision (redressability). *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81 (2000). "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co.*, 523 U.S. at 103–04; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Moreover, "standing is not dispensed in gross; a party must have standing to challenge each particular . . . alleged deficiency in Texas's [gun control] scheme." *Legacy Cmty. Health Services, Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir. 2018), *as revised* (Feb. 1, 2018) (citing *Lewis v. Casey*, 518 U.S. 343, 357–58 & n.6 (1996)).

### A. Plaintiffs' standing rests on the named, individual plaintiffs.

Plaintiffs are Firearms Policy Coalition ("FPC") and three named individuals, each of whom are members of FPC. ECF No. 1 at 3–4. FPC is an out-of-state corporation dedicated to promoting "individual liberty" including the "right to keep and bear arms" through a variety of educational and advocacy activities. *Id.* at 4. FPC has not alleged that the Challenged Provisions injure it as a corporate entity or otherwise harm "whatever rights and immunities the association itself [] enjoy[s]." *Warth v. Seldin,* 422 U.S. 490, 511 (1975). Instead, FPC has entered this litigation on behalf of its members, as an associational plaintiff, by alleging that § 46.03 infringes the Second Amendment rights of its Texas membership. *Id.*; *see also* ECF No. 1 at 4.

"An association or organization can establish an injury-in-fact through either of two theories." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Associational standing allows an organization to "bring suit on behalf of its members," *Tex. Bankers Assoc. v. Office of the Comptroller*, 728 F. Supp. 3d 412, 419 (N.D. Tex. 2024), and "is derivative of the standing of the association's members, requiring that they have standing" in order for an associational plaintiff to have standing. *OCA-Greater Houston,* 867 F.3d at 610. An association has standing to sue to vindicate its members' interests when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977)). The first two prongs are Article III requirements whereas the last is prudential. *Id.*

The "derivative" nature of associational standing, requiring members to have standing in their own right, renders FPC's standing dependent on the individual Plaintiffs'. The three individually named Plaintiffs are the only FPC members for whom standing-specific allegations have been made. The Complaint states that its Texas membership is "not limited to the Individual Plaintiffs," but does not identify any other members. However, Plaintiffs offer a general assertion that "FPC's members in Texas would carry a firearm outside the home for lawful purposes

including self-defense in the challenged locations." ECF No. 1 at 4. This blanket statement of injury reprises the Plaintiffs' description of the individual Plaintiffs' injury. *See e.g.*, ECF No 1 at 12 ("Individual Plaintiffs would and have concrete plans to possess . . . firearms in one or more such prohibited locations in the future."). Thus, the putative injury that FPC's unidentified members suffer is the same as that borne by the named Plaintiffs.

Accordingly, FPC will have standing only if the named Plaintiffs can demonstrate they have standing. Plaintiffs' lawsuit seeks to vindicate the public carry rights of FPC members, including the named Plaintiffs, and Plaintiffs have alleged that the Challenged Provisions burden that right in the same way for all FPC members. Therefore, the named Plaintiffs' standing theory is perfectly representative of unidentified members' standing. Since FPC's standing derives from the independently viable standing of its members, it satisfies Article III only if the named, individual Plaintiffs do. *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (finding that membership-organization lacked associational standing because no "specific member" had been affected by the challenged ordinance); *accord Firearms Policy Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 747 (N.D. Tex. 2022) (Pittman, J.) (applying *Hunt*'s three-prong test to FPC and concluding that FPC had standing based on the standing of individual members).

### B. Plaintiffs cannot satisfy redressability.

Plaintiffs run aground on the third part of standing's "triad," as they cannot show that the injury they complain of, their inability to carry inside 51% establishments, racetracks and sporting events, can be redressed by injunctive and declaratory relief against Director Martin. DPS does not have primary responsibility for enforcing carry restrictions. Instead, the bulk of § 46.03 enforcement is handled by local law enforcement, including county sheriffs and municipal police departments. DPS does not direct or control local-level law enforcement agencies, so Plaintiffs' sought-for relief would do nothing to restrain those local agencies, as remedies "operate with respect to specific parties." *California v. Texas*, 593 U.S. 659, 672 (2021) (citation omitted). Accordingly, even if Defendant were enjoined, Plaintiffs would still be subject to § 46.03 and would still face the prospect of arrest and prosecution for carrying in restricted locations.

12

Redressability requires a plaintiff to show "a likelihood that the requested relief will redress the alleged injury." *Steel Co.*, 523 U.S. at 103; *see also Friends of the Earth, Inc.,* 528 U.S. at 181. When "redress of the only injury in fact . . . complain[ed] of requires action" by a non-party, "and any relief the District Court could have provided" against a named party is "not likely to produce that action" by the non-party, then the injury is not redressable by a federal court. *Lujan*, 504 U.S. at 571.

Here, an injunction against the Director would not lift the restraint on Plaintiffs' freedom to carry. Nearly all enforcement of § 46.03 rests with local police, not answerable to the Director. As independent nonparties, they will not be bound by this Court's judgment. *See Ganpat v. E. Pac. Shipping PTE, Ltd.*, 66 F.4th 578, 585 (5th Cir. 2023) (stating that nonparties who may be bound by injunctions are "'persons who are in active concert or participation'" with parties") (quoting Fed. R. Civ. P. 65(d)(2)(C)). And equity cannot enlarge the remit of the Court's remedial powers to encompass parties not before it: "under traditional equitable principles, no court may lawfully enjoin the world at large or purport to enjoin challenged laws themselves." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021); *see also Dep't of Homeland Sec. v. New York,* 140 S.Ct. 599, 600 (2020) (Gorsuch, J., concurring in grant of stay) (explaining that remedies "are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit").

Plaintiffs may argue that an injunction that stops DPS from enforcing § 46.03 would at least reduce their injury even without eliminating it. Granted, "when establishing redressability, a plaintiff need only show that a favorable ruling could potentially lessen its injury." *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014). However, Plaintiffs have not pled a type of injury susceptible to mitigation. Plaintiffs' harm is their inability to carry inside the locations that § 46.03 restricts. ECF No. 1 at 1–2, 11–12. That alleged harm is not gradational; Plaintiffs are either free to carry or not free to carry. And relief that cannot bind the law enforcement agencies regularly engaged in effecting arrests and prosecutions under § 46.03 will not restore that freedom to Plaintiffs. Because Plaintiffs will continue to face restraint from local entities, an injunction that only applies to DPS will not "lessen" their inability to carry in covered locations.

Indeed, Plaintiffs' situation is analogous to the classic example of defective redressability identified by *Lujan*. The *Lujan* plaintiffs lacked standing because they had sued the Secretary of the Interior to halt foreign aid projects that were in fact overseen by separate governmental agencies. 504 U.S. at 568–71. There, plaintiffs attempted to patch up their faulty standing by arguing that the Secretary could issue instructions addressed to the aid project agencies, but the Court found this unavailing because those agencies were not under "the Secretary's controlling authority" and thus would not be "bound by the Secretary's regulation." *Id.* at 568–69; *accord Garcia v. Morath*, 624 F. Supp. 3d 690, 700 (W.D. Tex. 2022) (finding redressability was met because of the authority state education agency held over local agencies). Because effective redress "require[d] action . . . by the individual funding agencies," *Lujan*, 504 U.S. at 570, and these were independent of the named government defendant, plaintiffs "failed to demonstrate redressability." *Id.* at 568; *see also Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (rejecting redressability because "state officials who implement [the challenged statute]" were independent of federal defendants); *Murthy v. Missouri*, 603 U.S. 43, 44 (2024) (likewise rejecting redressability because "the plaintiffs' theories of standing depend on the [] actions" of independent government entities). Likewise here, Plaintiffs' freedom to carry in the restricted locations is impeded by independent agencies not before this Court.

Just as significantly, the *Lujan* Court concluded that even if relief were awarded against the project agencies, the "fact that the agencies generally supply only a fraction of the funding" constituted a "further impediment to redressability." 504 U.S. at 570. Because the agencies contributed only a minority of project funding, relief issued against them would be unlikely to shutter the projects at issue and therefore fail to redress plaintiffs' injury. *Id.* Similarly, DPS's enforcement connection to § 46.03 is so remote that an injunction against it would not decrease the likelihood of enforcement against Plaintiffs.

Accordingly, judgment against the Director will do nothing to assuage Plaintiffs' Second Amendment injury. This Court cannot grant relief that would prevent nonparty law enforcement

agencies from continuing to enforce § 46.03. The injury to Plaintiffs' Second Amendment rights takes place on a county and municipal level.

Other arguments for seeking redress from the Director are unavailing. Plaintiffs cannot claim that judgment against the Director will provide them the benefit of estoppel in subsequent actions against local law enforcement. "[T]he conclusive effect of a prior judgment may only be invoked against a party or a privy." *Hardy v. Johns–Manville Sales Corp.,* 681 F.2d 334, 338 (5th Cir.1982). The Director is the only party, and local law enforcement's independence of DPS means that local agencies do not have the privity with DPS that would be required for res judicata principles to apply to them. *See Freeman v. Lester Coggins Trucking, Inc.,* 771 F.2d 860, 864 (5th Cir.1985). Furthermore, because the parties are not adverse on the merits, the substance of Plaintiff's constitutional challenge to § 46.03 will not be "actually litigated" as to give preclusive effect to this Court's decision. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015).

For similar reasons, judgment for Plaintiffs would not likely have a deterrent effect on local enforcement of § 46.03. Because the parties are aligned on the substance of Plaintiffs' Second Amendment contentions, a decision endorsing Plaintiffs' claim will not address the legal case that a truly adverse party would mount in defense of the statute. Lacking the vim of merits-related controversy, such an etiolated decision would hold a merely academic interest to any nonparty committed to § 46.03's legality. Accordingly, a merits ruling on issues that are not in dispute is unlikely to deter local entities determined to continue enforcing sensitive place restrictions. In any case, a "generalized interest in deterrence . . . is insufficient for purposes of Article III." *Steel Co.*, 523 U.S. at 108–09 (citing *City of Los Angeles v. Lyons,* 461 U.S. 95,111 (1983)).

### C. Nonparty proprietors independently restrict carry in the challenged locations.

Plaintiffs' standing argument also depends on a speculative guess about the actions of nonparty owners and operators. None of the restricted locations are typically owned or controlled by the State, let alone by DPS. Accordingly, an injunction against DPS will not ensure that the myriad third-party bar and restaurant owners, stadium and racetrack operators, private and ISD schools will open their doors to firearm carry. Most of these entities have their own policies that prohibit

carry independently of state law. Plaintiffs cannot assume that nonparties will abandon their restrictive policies in response to an injunction against DPS. Rather, these independent restrictions will continue to deprive Plaintiffs of their freedom to carry in the challenged locations regardless of this Court's judgment and therefore constitute an additional redressability defect.

"Redressability" is not met when "[t]he plaintiff's ability to meet the elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Three Expo Events, L.L.C. v. City of Dallas*, 907 F.3d 333, 341 (5th Cir. 2018) (quoting *Lujan*, 504 U.S. at 562). This is because "unadorned speculation will not suffice to invoke the federal judicial power." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976); *see also DOC v. New York*, 588 U.S. 752, 767–68 (2019) (requiring plaintiffs to show "that third parties will likely react in predictable ways" to prove standing theory based on nonparty behavior); *Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138, 1141 (2013).

Even if § 46.03 were entirely lifted, Plaintiffs' "individual right to bear arms in public," ECF No. 1 at 2, ¶ 2, would still be blocked by nonparty owner-operators exercising the traditional rights of property owners and leaseholders. *See Holcomb v. Waller Cty.*, 546 S.W.3d 833, 835 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *cf. Cedar Point Nursery v. Hassid*, 594 U.S. 139, 140 (2021) (stating "[t]he right to exclude is "a fundamental element of the property right.") (quotation omitted). Violating proprietor weapons restrictions carries criminal penalties if an adequate written notice is visibly posted on the premises. *See* Tex. Penal Code §§ 30.05, 30.06, 30.07.

Nonparty owner-operators are already exercising their proprietary rights to exclude firearms. Each of the four racetrack operators have published policies forbidding weapons on their premises.[5] These policies all forbid "firearms" or "weapons," without qualification, so are at least

---

[5] *See* Sam Houston Race Park About Us, "Rules and Regulations for Sam Houston Race Park," https://www.shrp.com/about-us#:~:text=Prohibited%20Items,Weapons%20of%20Any%20Kind (last visited Apr. 16, 2025); Retama Park Training Stall Application, https://perma.cc/DC46-53A2, (stall application stating Retama's firearms policy as "No firearms shall be allowed on the premises of RETAMA.") (last visited Apr. 16, 2025); Lone Star Park Frequently Asked Questions, "What Items are Prohibited," https://perma.cc/S68J-Y5UW (last visited Apr. 16, 2025); Def. Appx. at 4, 6 (Declarations of William

equally restrictive of carry as the challenged statute. Accordingly, private gun restrictions forbid carry at all locations covered by § 46.03(a)(4).

Likewise, sports stadiums, arenas, school and college sports programs—entities covered by § 46.03(a)(8)—separately restrict firearm possession at sporting events. To the best of Defendant's knowledge, every major sports arena in the Dallas-Fort Worth metropolitan area—the urban area closest to Plaintiffs—prohibits firearms carry.[6] So too do schools that are part of the Dallas and Fort Worth ISDs.[7] Local universities ban carry at collegiate games.[8] And although state universities must allow licensed carry on campus, Tex. Gov't Code § 411.2031, state law leaves them free to dictate their own policies governing carry at sporting events. *Id*. at § 411.2031(d-1) (allowing public universities to post Section 30.06 notices prohibiting carry on portions of their premises).

Finally, 51% establishments are free to maintain their own weapons bans, and many do. An alcoholic beverages vendor who invites carry on his premises could subject himself to civil liability. *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 12 (Tex. 2008) (describing proprietor's "duty to use ordinary care to protect invitees . . . if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee"); *Flashdancer, Inc. v. Fulcher*, No. 05-21-00070-

---

Meurer and Shannon Cobb) (explaining that "Gillespie County Fair does not permit members of the public to carry or possess firearms at its horse races or on the premises of its racetrack.").

[6]   *See e.g.*, "Firearms/Concealed Handguns," American Airlines Center Arena FAQ's, https://perma.cc/6CJ6-FSX7 ("Firearms and/or Concealed Handguns with or without a license are not permitted at the American Airlines Center."); "State Fair of Texas Announces Safety & Security Measures for 2024 Event," https://perma.cc/S73Y-8738 ("the State Fair of Texas prohibits fairgoers from carrying all firearms . . . anywhere on the fairgrounds including Cotton Bowl Stadium"); "AT&T Stadium Bag Policy," https://perma.cc/UJF4-JL49 (last visited Apr. 16, 2025).

[7]   "Possession of Firearms and Weapons," Dallas ISD Employee Handbook, at 36, https://perma.cc/A3AL-PMEX ("Employees, visitors, and students, including those with a license to carry a handgun, are prohibited from bringing firearms . . . onto school premises . . . or any grounds or building where a school-sponsored activity takes place.") (last visited Apr. 16, 2025); "Possession of Firearms and Weapons," Fort Worth ISD Employee Handbook, at 59, https://perma.cc/74VN-KBD8 (identical language) (last visited Apr. 16, 2025).

[8]   *See e.g.*, "Weapons," University Policy Manual, Southern Methodist University, https://perma.cc/RZ2F-2HJ9 ("the University prohibits the possession of any dangerous weapon, or facsimiles of dangerous weapons, (either openly or in a concealed manner) within all University property . . . and any grounds or building on which University activities are conducted") (last visited Apr. 16, 2025).

CV, 2022 WL 1401438, *3 (Tex. App.—Dallas May 4, 2022, no pet.) (describing firearms on the premises of a 51% establishment as a "hazard" giving rise to premises liability). This potential for premises and related liability disincentivizes 51% businesses from allowing firearms at bars and restaurants.

This ubiquitous proprietary gun control fatally undermines Plaintiffs' standing. Nonparty owner-operators already prohibit carry independently of § 46.03. Individuals who flout private firearm restrictions are criminally liable, *see* Tex. Penal Code §§ 30.05, 30.07, so Plaintiffs' "fear of prosecution" would not be redressed by relief against the application of § 46.03. ECF No. 1 at 12, ¶ 39. Potentially, some nonparties might adopt permissive policies towards firearms if § 46.03 were enjoined, but Plaintiffs cannot rely on "guesswork as to how independent decisionmakers will exercise their judgment" to prove up their standing. *Clapper,* 133 S. Ct. at 1141. Accordingly, "plaintiffs have a redressability problem" because the relief sought would "prevent the[] Government defendants from interfering with" their rights, while leaving nonparty actors "free to enforce, or not to enforce, [similar] policies—even those tainted by initial governmental coercion." *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (rejecting standing for challenge to past restrictions placed on social media platforms in part because the platforms adopted their own allegedly identical policies).

Independent carry restrictions cut against Plaintiffs' standing to challenge § 46.03(a)(4) with especial clarity, as every one of the few facilities subject to that provision separately prohibits possession. Plaintiffs cannot expect to attend races armed, with or without this Court's judgment. Accordingly, they have no prospect "that their requested relief will redress the alleged injury," *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014), that does not turn on an assumption that racetracks would reverse their policies.

Plaintiffs' prospects fare little better for their challenges to §§ 46.03(a)(7) and 46.03(a)(8). Although Defendant cannot practically show that every covered entity in Plaintiffs' vicinity has its own prohibition on carry, independent restrictions are common. Moreover, the risk of civil liability that could arise from permissive firearms policies in venues that encourage alcohol consumption will continue to provide sporting facilities and 51% establishments with strong incentives to

inhibit carry, making it likely that the status quo would remain in place without § 46.03. *See Texas v. U.S. Dep't of Homeland Sec.*, No. 6:24-CV-00306, 2024 WL 4711951 (E.D. Tex. Nov. 7, 2024) (allowing "third-party incentives" to factor into standing analysis); *DOC v. New York*, 588 U.S. at 762 (same).

Moreover, federal courts' "steady refusal to endorse standing theories that rest on speculation about the decisions of independent actors" is especially strong against "speculation about future unlawful conduct." *Id.* at 768 (citations omitted). Because Plaintiffs have only sued DPS, local governments will continue to require private entities to observe § 46.03 regardless how this Court decides. Consequently, nonparty prohibitions are virtually guaranteed. A favorable decision for Plaintiffs would do nothing to alleviate the detriment that the Challenged Provisions impose on their Second Amendment rights.

"Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.,* 523 U.S. at 107. The actions of two groups of nonparties, proprietors and local law enforcement, independently deprive Plaintiffs of their ability to carry in the challenged locations. County and municipal police will continue to enforce the Challenged Provisions regardless of the outcome of this suit, while proprietors will continue to ban firearms both through private law and as criminal trespass under Texas Penal Code §§ 30.05 *et seq.* By contrast, DPS has little to do with carry restrictions, and relief against Defendant will not unlock any of the challenged locations to open carry. Consequently, "none of the relief sought by [Plaintiffs] would likely remedy [their] alleged injury in fact," and their challenge to § 46.03 must be dismissed. *Steel Co.,* 523 U.S. at 109.

## IV.    The Challenged Provisions violate the Second Amendment.

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Following the Supreme Court's decision in *N.Y. State Rifle & Pistol Assoc. v. Bruen,* courts apply a two-step test to determine the constitutionality of state laws that restrict the ownership or use of firearms. 597 U.S. 1, 24 (2022). First, "the Second Amendment's plain text" must cover the conduct regulated by statute, and second, "[t]he

government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. Consistency with traditional gun regulation is shown by locating "well established and representative" historical analogues that mirror or are sufficiently similar to the challenged statute. *Id*. at 26–29.

The *Bruen* standard permits the complete prohibition of firearms in "sensitive places," locations where "longstanding laws" have restricted firearm possession. *Id*. at 30–31; *D.C. v. Heller*, 554 U.S. 570, 626 (2008). Functionally, § 46.03(a) enumerates a list of "sensitive places" where individuals may not carry firearms. The Supreme Court has only expressly recognized schools, government buildings, legislative assemblies, polling places and courthouses as sensitive places where a total ban aligns with traditional firearms regulation. *Bruen*, 597 U.S. at 30. And the Fifth Circuit has not added to this list, unlike other of its sister circuits. *See, e.g., Wolford v. Lopez*, 116 F.4th 959, 982–92 (9th Cir. 2024); *Antonyuk v. James*, 120 F.4th 941, 1004–42 (2d Cir. 2024). Accordingly, no binding authority has found any of the locations that the Challenged Provisions restrict to count as sensitive places, and their constitutionality under *Bruen*'s two-step test remains an unsettled question.

There can be little question that the first of *Bruen*'s two steps is met. If "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 2. The Challenged Provisions regulate the right to carry firearms—the "central component" of the Second Amendment. *Heller*, 554 U.S. at 599; *see also Firearms Policy Coal., Inc.*, 623 F. Supp. 3d at 747 (N.D. Tex. 2022) ("It is undisputed that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home.") (citation omitted). Therefore, to pass constitutional muster the Challenged Provisions must come within "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.

### A.  The Challenged Provisions lack clear historical analogues.

To determine whether modern-day firearms regulations comport with traditional restrictions courts look for "relevantly similar" historical analogues. *Bruen*, 597 U.S. at 29. This

"requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* Indeed, a sufficient analogy can be founded on historic statutes that "are by no means identical" to their contemporary counterparts, *United States v. Rahimi*, 144 S. Ct. 1889, 1895 (2024), provided that "[w]hy and how the regulation burdens the [Second Amendment] right" are similar. *Id.* (citing *Bruen*, 597 U.S. at 29).

Relevantly similar legislation must be representative as well as apposite. *Bruen*, 597 U.S. at 30 (cautioning against the "risk[] [of] endorsing outliers that our ancestors would never have accepted") (quotation omitted). A few comparable regulations do not suffice to prove a "historical tradition" reflecting the original public understanding of the Second Amendment. *Id.* at 64–66 (rejecting the sufficiency of one Texas gun control statute and a pair of state court decisions); *id* at 46 (rejecting that "three colonial regulations could suffice to show a tradition of public-carry regulation" (emphasis omitted)); *Koons v. Platkin*, 673 F. Supp. 3d 515, 642 (D.N.J. 2023) (holding that one state law and 25 local ordinances were insufficient because they governed less than 10% of the nation's population). The inattention the *Bruen* Court showed laws from federal territories likewise reflects a requirement that analogues apply on a nationwide scale to demonstrate a national tradition of comparable gun regulation. *See Bruen*, at 66–69 (stating territorial gun control should be accorded "little weight" because they were "localized" and "short lived").

When "a challenged regulation addresses a general societal problem that has persisted since the 18th century," "the lack of a distinctly similar historical regulation . . . is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. On the other hand, "a more nuanced approach" applies to "cases implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 27; *see also Wolford*, 116 F.4th at 977.

The Challenged Provisions do not implicate exclusively modern concerns that would have been unfamiliar to the Founding generation. Rather, by restricting carry in places the State has deemed especially vulnerable, they follow in the tradition of sensitive-place regulation that was established in early America. Racetracks, alcohol establishments, and sporting events existed at the

Founding, implying that the more nuanced approached used for uniquely modern situations is inapt. *See* Christine Sismondo, *America Walks into a Bar: A Spirited History of Taverns, Saloons, Speakeasies and Grog Shops* 15 (Oxford 2011) ("In all states" during the Founding era "tavern legislation was involved and constantly changing"); Ed Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, Colonial Williamsburg J. (Autumn 2008) (noting that Founding era Americans frequently bet on horse racing); Jane Carson, Colonial Virginians 108 (1965) (noting that racetracks existed in several states during early America). Racetracks are analogous to sports arenas and horse racing is a type of sporting event that took place in early and mid-nineteenth-century America. Thus, Founding-era racetracks are both an exact precursor for the locations covered by § 46(a)(4) as well as an analogue for the premises covered by § 46(a)(8). Since these locations all existed at the Founding, the Court should require a relatively tight fit between the Challenged Provisions and similar historical regulation to satisfy *Bruen*'s second step—were it to address the merits.

Despite the popularity of horse racing in the Founding era, no clearcut prohibitions of firearm possession on the premises of racetracks from that period has been proved to a court. Instead, those courts that have found a tradition of prohibiting carry in racetracks and other "places of amusement" rely on evidence that significantly postdates the Founding. *See, e.g., Wolford*, 116 F.4th at 987–89; *Kipke v. Moore*, 695 F. Supp. 3d 638, 652 (D. Md. 2023). The fact that racetracks were common during early America in many states strongly suggests that the absence of contemporaneous carry bans shows that those locations were not viewed as sensitive places in need of firearm restrictions.

In fact, the colonial generation often required Americans to carry weapons during public assemblies to defend against hostilities from Indians, criminals, and pirates, and to be ready to defend against foreign invasion. *See* Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class?* 131–35 (2021); *Heller*, 554 U.S. at 601 (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons"). The level of comfort with pervasive carry that those measures convey in turn suggests that the

Founding generation did not deem places where large social gatherings were held, such as race-tracks, to specially require legally-mandated gun control. *But see Antonyuk*, 120 F.4th at 1021 (finding conclusive evidence of historical legislation that restricted carry in "often-crowded public forums").

Little historic legislation exists to support a tradition of carry restrictions in venues where sporting events are held. *See Koons*, 673 F. Supp. 3d 515, 645–46 (D.N.J. 2023) (ruling against a national tradition of restricting carry in "entertainment facilities" including sports stadiums); *Siegel v. Platkin*, No. 1:22-cv-7463, 2023 WL 1103676, at *14 (D.N.J. Jan. 30, 2023) (same). While the Second Circuit upheld a carry ban that included sports arenas, *Antonyuk*, 120 F.4th at 1039, it only cited two Founding-era statutes, neither of which were distinctly similar to the law at issue. *Id.* at 120 F.4th at 1019–26, 1036–39 (finding a tradition of carry restrictions for "theaters, conference centers, and banquet halls" and "parks and zoos"); *see also Wolford,* 116 F.4th at 982–85, 987–89 (finding a similar tradition for "places of amusement" and "parks and similar areas"). *Antonyuk* relied on a 1786 Virginia prohibition on "go[ing] [ ]or rid[ing] armed by night [ ]or by day, in fairs or markets, or in other places, in terror of the county," *Antonyuk*, 120 F.4th at 1038 (citing J.A. 670 (1786 Va. Acts 35, ch. 49)), and a 1792 North Carolina law prohibiting similar conduct in fairs and markets. However, these "going armed" laws are not relevantly similar because they target firearm possession that inspires "terror," while the Challenged Provisions apply generally. *See Bruen*, 597 U.S. at 50 (concluding that historic "*in Terrorem Populi*" laws could not support restrictions on peaceable public carry). Further, neither law directly restricted carry in sporting venues or similar locations, and they are arguably unrepresentative since other states declined to adopt similar measures during the Founding era.

Likewise, no distinctly similar tradition of historic legislation exists to support a carry ban in licensed bars and restaurants that specialize in serving alcohol. Courts that have upheld restrictions on carry in places that serve alcoholic beverages have relied on inapposite regulations. A number of Founding-era laws prohibit the sale of liquor to active-duty militia, *see Wolford,* 116 F.4th at 985, but these were presumably intended to encourage military discipline and did not enact a

categorical ban on carry in taverns or similar places. Relevant counterparts must "impose a comparable burden on the right of armed self-defense" and be "comparably justified." *Bruen*, 597 U.S. at 29. Militia regulations are neither.

Concededly, a spate of legislation around the time of the Fourteenth Amendment's ratification did directly prohibit carry in places that sold liquor, while others prohibited carry in ballrooms and large social gatherings and still others prohibited the sale of intoxicating drinks to armed patrons or forbade selling firearms to intoxicated customers. *See Wolford*, 116 F.4th at 985–87 (collecting evidence); *Antonyuk*, 120 F.4th at 1029 (same). Similarly, an 1870 Texas statute banned carry at certain public gatherings, including "a ball-room" or "social party," Texas Penal Code tit. IX, ch. 4, art. 320 (1879), and in the same year, a San Antonio ordinance banned firearms in any "bar-room" or "drinking saloon." In light of the preponderance of this legislation, *Wolford* and *Antonyuk* both upheld carry bans in bars, restaurants and similar establishments that serve alcohol onsite. 116 F.4th at 987; 120 F.4th at 1032. However, although this legislation bears some likeness to § 46.03(a)(7), it falls short of 'distinct' similarity. *Bruen*, 597 U.S. at 29–30.

Given the lack of suitably analogous predecessor legislation, Defendant agrees with Plaintiffs that "an American tradition justifying the State's" restrictions codified in §§ 46.03(a)(4), (7), and (8) cannot be identified. *Id*. at 70.

24

## CONCLUSION

This case does not cross the threshold of justiciability. Defendant Martin is immune from suit, and Plaintiffs lack both a valid cause of action and Article III standing. For these reasons, the Court should grant Defendant's Cross-Motion for Summary Judgment.

Date: April 16, 2025

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

RYAN G. KERCHER
Chief, Special Litigation Division

BRENT WEBSTER
First Assistant Attorney General

/s/ Zachary L. Rhines
ZACHARY L. RHINES
Special Counsel
Texas State Bar No. 24116957
zachary.rhines@oag.texas.gov

RALPH MOLINA
Deputy First Assistant Attorney General

Ryan D. Walters
Deputy Attorney General for Legal Strategy

KYLE S. TEBO
Special Counsel
Texas State Bar No. 24137691
kyle.tebo@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Telephone: (512) 463-2100

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on April 16, 2025, a true and correct copy of the above and foregoing document has been served using the CM/ECF system to all counsel and parties of record.

Bradley A. Benbrook
Texas Bar No. 24142064*
brad@benbrook.lawgroup.com

Stephen M. Duvemay
Texas Bar No. 24139565
steve@benbrooklawgroup.com

BENBROOK LAW GROUP, P.C.
701 University Avenue, Suite 106
Sacramento, California 95825
Telephone:    (916) 447-4900
Facsimile:    (916) 447-4904

R. Brent Cooper
Texas Bar No. 04783250
brent.cooper@cooperscully.com

S. Hunter Walton
Texas Bar No. 24106548
hunter.walton@cooperscully.com

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone:    (214) 712-9500
Facsimile:    (214) 712-9540

COUNSEL FOR PLAINTIFFS

_/s/ Zachary L. Rhines_
ZACHARY L. RHINES
Special Counsel

26