IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHARLES ZIEGENFUSS, et al., | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CIVIL ACTION NO. 4:24-CV-01049-P |
| FREEMAN MARTIN, | § § | |
| *Defendant.* | § § § § | |

**BRIEF OF APPOINTED AMICI CURIAE ERIC RUBEN AND GREGG COSTA
TO DEFEND THE MERITS OF TEXAS PENAL CODE § 46.03(a)(4), 46.03(a)(7),
AND 46.03(a)(8)**

TABLE OF CONTENTS

Page

Table of Authorities ........................................................................................................ iii

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 3

    I.     Texas's sensitive-places laws date back to at least 1870. ................................... 3

           A.    Texas enacted sensitive-places laws to address a staggering rise in violence in the mid-nineteenth century. ......................................................... 3

           B.    Sensitive-places laws have endured despite Texas's loosening of other firearm regulations. ..................................................................................... 7

    II.    Plaintiffs challenge the longstanding sensitive-places laws. .............................. 9

Legal Background ............................................................................................................ 9

    I.     The Second Amendment allows reasonable restrictions that are consistent with this Nation's history and tradition. ........................................................................ 9

    II.    Historical evidence from the Fourteenth Amendment's ratification bears on whether state laws are consistent with the Second Amendment. ................................... 11

           A.    The Fourteenth Amendment incorporated the Second Amendment against the states, so the right's scope turns on how it was understood in 1868. .......... 11

           B.    Even if it does not control, post-ratification history from 1868 bears heavily on the Second Amendment's meaning. .................................................... 13

Argument ....................................................................................................................... 14

    I.     Plaintiffs' facial challenge to Texas's sensitive-places law fails out of the gate. ............ 14

    II.    Plaintiffs haven't carried their burden at step one of *Bruen* because laws regulating carry in sensitive places are presumptively constitutional. .................................. 15

    III.    Each of the three challenged provisions is consistent with the Nation's tradition of firearm regulation. .................................................................................. 17

           A.    Section 46.03(a)(7) is consistent with the Nation's tradition of regulating firearms and alcohol. ..................................................................................... 18

                  1.    Section 46.03(a)(7) is consistent with the tradition of regulating the dangerous mix of firearms and alcohol. .................................................. 19

                  2.    Section 46.03(a)(7) is consistent with the tradition of prohibiting firearms where alcohol is sold. ........................................................... 21

                  3.    Section 46.03(a)(7) is consistent with the tradition of prohibiting the carrying of firearms at ballrooms and social gatherings. ...................... 22

           B.    Section 46.03(a)(8) is consistent with the Nation's tradition of prohibiting firearms at schools and places of amusement. .................................................. 25

TABLE OF CONTENTS
(continued)

Page

1.  Section 46.03(a)(8) is consistent with the tradition of prohibiting firearms at schools. .................................................................26

2.  Section 46.03(a)(8) is consistent with the tradition of restricting firearms where people gather for literary or educational purposes. ........27

3.  Section 46.03(a)(8) is consistent with the tradition of prohibiting firearms where people congregate in large numbers. .............................28

C.  Section 46.03(a)(4) is consistent with the historical tradition of prohibiting firearms at places of amusement. .......................................................32

Conclusion .................................................................................................35

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. State*,
    11 S.W. 628 (Tex. App. 1889).................................................................7

*Andrews v. State*,
    50 Tenn. 165 (1871)........................................................................29

*Antonyuk v. James*,
    120 F.4th 941 (2d Cir. 2024) ............................................... *passim*

*Bianchi v. Brown*,
    111 F.4th 438 (4th Cir. 2024) ..........................................................16

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)............................................................... *passim*

*English v. State*,
    35 Tex. 473 (1872).........................................................................6

*Fuld v. Palestine Liberation Org.*,
    606 U.S. 1 (2025)........................................................................12

*Hill v. State*,
    53 Ga. 472 (1874)........................................................................29

*Kipke v. Moore*,
    695 F. Supp. 3d 638 (D. Md. 2023)..............................................18, 26

*Koons v. Att'y Gen. N.J.*,
    2025 WL 2612055 (3d Cir. Sept. 9, 2025) .............................14, 18, 31

*LaFave v. County of Fairfax*,
    2025 WL 2458491 (4th Cir. Aug. 27, 2025)....................................15

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
    594 U.S. 180 (2021)......................................................................12

*Maupin v. State*,
    17 S.W. 1038 (Tenn. 1890)............................................................30

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)......................................................................11

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995)......................................................................12

*Md. Shall Issue, Inc. v. Montgomery County*,
    680 F. Supp. 3d 567 (D. Md. 2023)....................18, 25, 26, 27, 30, 31

*Mintz v. Chiumento*,
    724 F. Supp. 3d 40 (N.D.N.Y. 2024)..............................................27

TABLE OF AUTHORITIES
(continued)

Page(s)

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) ..................................................................................................14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ............................................................................................. *passim*

*NRA v. Bondi*,
   133 F.4th 1108 (11th Cir. 2025) ..............................................................................14

*Ex Parte Rodriguez*,
   39 Tex. 705 (1873) ....................................................................................................6

*Schoenthal v. Raoul*,
   2025 WL 2504854 (7th Cir. Sept. 2, 2025) ......................................................14, 22

*Snell v. State*,
   4 Tex. App. 171 (1878) .............................................................................................7

*State v. Duke*,
   42 Tex. 455 (1875) ....................................................................................................6

*State v. Pigg*,
   85 Mo. App. 399 (1900) ..........................................................................................29

*State v. Shelby*,
   2 S.W. 468 (Mo. 1886) ......................................................................................21, 29

*Summerlin v. State*,
   3 Tex. Ct. App. 444 (1878) .......................................................................................7

*Trump v. CASA, Inc.*,
   145 S. Ct. 2540 (2025) ........................................................................................9, 14

*United States v. Class*,
   930 F.3d 460 (D.C. Cir. 2019) ................................................................................16

*United States v. Harris*,
   144 F.4th 154 (3d Cir. 2025) ...................................................................................18

*United States v. Rahimi*,
   602 U.S. 680 (2024) ....................................................................................... *passim*

*United States v. Salerno*,
   481 U.S. 739 (1987) .................................................................................................14

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ...........................................................................................14, 15

*Wolford v. Lopez*,
   116 F.4th 959 (9th Cir. 2024) .......................................................................... *passim*

TABLE OF AUTHORITIES
(continued)

Page(s)

*Wynne v. State*,
51 S.E. 636 (Ga. 1905)............................................................................29

**Constitutional Provisions**

Del. Const. art. 28 (1776) ........................................................................17

**Statutes**

1889 Ariz. Terr. Sess. Laws 17................................................22, 23, 27, 28

An Act for The Better Regulation of the Militia, of the City of Baltimore, Passed
by the Legislature of Maryland, December Session, 1817, § 42 (1818) ................20

Blackwell, Okla., Town Ordinance No. 21, § 3 (Aug. 7, 1894) ...................21

Brookfield, Mo., Gen. Ordinances 116, § 32 (1900) ...........................21, 27

Chi., Ill., Ordinances, ch. 16, § 6 (July 23, 1851) ...................................21

Columbia, Mo., Gen. Ordinances, ch. 17 (1890)......................................21

1859 Conn. Pub. Acts 62, ch. 82, § 5......................................................20

An Act for Establishing a Militia in this Government (Delaware), 1756,
*reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION (1947) ...........20

DeSoto, Mo., Rev. Ordinances, art. 6, § 224 (1888) ...........................21, 27

An Act for Punishment of Crimes and Offences,
within the District of Columbia § 40 (1816)...........................................28

1328, 2 Edw. 3, c.3 ..............................................................................17, 28

1870 Ga. Laws 421, tit. 16, no. 285, § 1 ...................................................29

1715, 1 Geo., c.54 ..............................................................................17, 28

1402, 4 Hen. 4, c.29 ................................................................................17

1534, 26 Hen. 8, c.6, § 4 ......................................................................17, 28

Greenfield, Mo., Ordinance No. 39, § 1 (Jan. 4, 1886) ............................21

Huntsville, Mo., An Ordinance in Relation to Carrying Deadly Weapons
§ 1 (July 17, 1894) ...................................................................21, 27, 29

1909 Idaho Sess. Laws 6, § 1 .................................................................20

Jerome, Ariz., Town Ordinance No. 2, § 21 (Mar. 21, 1899).................21, 27

1867 Kan. Sess. Laws 25, ch. 12, § 1 .....................................................20

Lyons, Kan., Ordinance No. 179, § 1 (Sept. 7, 1891).................................21

TABLE OF AUTHORITIES
(continued)

Page(s)

Marceline, Mo., Ordinance No. 9 (Mar. 12, 1892)...................................................................27

An Act for Regulating the Militia of the Province of Maryland, 1756,
    *reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION (1947) ...........................20

1837 Mass. Acts 273, ch. 240, § 1 ...........................................................................................20

1837 Me. Laws 424, ch. 276, § 5 .............................................................................................20

1878 Miss. Laws 175, ch. 46, § 2 ............................................................................................20

1875 Mo. Laws 50 § 1 ................................................................................................23, 27, 29

MO. REV. STAT. § 1274 (1879) ................................................................................................20

1903 Mont. Laws 49, ch. 35, § 3 ....................................................................................23, 27, 28

1853 N.M. Terr. Laws 67, § 3....................................................................................................22, 23

An Act for Better Settling and Regulating the Militia of this Colony of New
    Jersey, for the Repelling Invasions, and Suppressing Insurrections and
    Rebellions, May 8, 1746, *reprinted in* 3 LAWS OF THE ROYAL COLONY OF NEW
    JERSEY 1746-1760 (1980)....................................................................................................19

New Orleans, La., An Ordinance Respecting Public Balls, art. 1 (Oct. 27, 1817)......................23

New Orleans, La., General Ordinances, tit. 1, ch. 1, art. 1 (May 1879) .......................................22

Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 THE COLONIAL LAWS OF NEW
    YORK FROM THE YEAR 1664 TO THE REVOLUTION (1894) .......................................................19

1890 Okla. Terr. Stats. 495, ch. 25, art. 47 ........................................................20, 21, 23, 27, 28

1780 Pa. Laws 368 ....................................................................................................................20

1844 R.I. Pub. Laws 503, § 1....................................................................................................20

San Antonio, Tex., Ordinance Concerning the Carrying of Arms or Deadly
    Weapons, § 1 (Dec. 14, 1870).................................................................................6, 22, 27

Shelbyville, Mo., Ordinance No. 23, § 1 (July 6, 1891).............................................................27

St. Paul, Minn., An Ordinance to Regulate the Sale of Gunpowder,
    ch. 21, § 4 (July 16, 1858) ...................................................................................................21

Stockton, Kan., Ordinance No. 76, § 1 (July 1, 1887)..........................................................27, 29

1869 Tenn. Acts 23, ch. 22, § 2 .......................................................................................28, 29, 34

TEX. GOV'T CODE § 411.2031 ....................................................................................................26

TEX. OCC. CODE § 2021.001 ....................................................................................................34

TEX. PENAL CODE art. 483 (1925).............................................................................................7

TEX. PENAL CODE art. 483 (1936).............................................................................................7

TABLE OF AUTHORITIES
(continued)

Page(s)

TEX. PENAL CODE art. 483 (1948)................................................................7

TEX. PENAL CODE art. 485 (1925)................................................................7

TEX. PENAL CODE art. 485 (1936)................................................................7

TEX. PENAL CODE art. 485 (1948)................................................................7

TEX. PENAL CODE § 46.02 (1974)................................................................7

TEX. PENAL CODE § 46.03 ...................................................................*passim*

TEX. PENAL CODE § 46.03 (1997)................................................................8

TEX. PENAL CODE § 46.04 (1984)................................................................7

TEX. PENAL CODE § 46.035 (1995)..............................................................8

TEX. PENAL CODE § 47.02................................................................34

TEX. PENAL CODE § 47.09................................................................35

TEX. PENAL CODE, tit. 9, ch. 4, art. 320 (1879) ...........................23, 27, 28

TEX. PENAL CODE, tit. 13, ch. 4 (1856)................................................34

71st Leg., R.S., ch. 749, § 2, 1989 Tex. Gen. Laws 3332 .........................7, 35

74th R.S., ch. 229, 1995 Tex. Gen. Laws 1998 ....................................8

12th Leg., 1st C.S., ch. 34, § 3, 1871 Tex. Gen. Laws 25 ........................5, 23

12th Leg., 1st C.S., ch. 46, § 1, 1870 Tex. Gen. Laws 63 ........................5

85th R.S., ch. 1049, § 5, 2017 Tex. Gen. Laws 4106 ...........................8

87th R.S., ch. 809, Tex. Gen. Laws 1960 ....................................8

69th Leg., 2nd C.S., ch. 19, 1986 Tex. Gen. Laws 48 ...........................7

Acts of Mar. 10, 1655, Act XII, *reprinted in* 1 William Waller Hening, THE
    STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA
    FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619 (1823)............19

1786 Va. Acts 35................................................................17, 28

Waco, Tex., An Ordinance (July 9, 1891) ....................................23, 27, 29

Wallace, Kan., Ordinance, § 3 (Dec. 22, 1887)................................21

Warrensburg, Mo., Concealed or Deadly Weapons, § 1 (June 5, 1890) ........27

1883 Wis. Laws 290, ch. 329, § 3................................................20

WIS. STAT. § 4397b(3) (1878)................................................20

TABLE OF AUTHORITIES
(continued)

Page(s)

## Other Authorities

Akhil Reed Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION (1998).....................11

Benjamin Heber Johnson, TEXAS: AN AMERICAN HISTORY (2025) .........................................3, 4, 6

Benjamin Rush, AN INQUIRY INTO THE EFFECTS OF ARDENT SPIRITS UPON THE
    HUMAN BODY AND MIND (8th ed., Boston, James Loring 1823) ...........................................18

Brennan Gardner Rivas, *The Deadly Weapon Laws of Texas: Regulating Guns,
    Knives, and Knuckles in the Lone Star State, 1836-1930* (May 2019)
    (Ph.D. dissertation, Texas Christian University) ......................................................................4

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:
    Locational Limits on the Right to Bear Arms,*
    13 CHARLESTON L. REV. 205 (2018) .......................................................................................6

Evan D. Bernick, *Fourteenth Amendment Confrontation,*
    51 HOFSTRA L. REV. 1 (2022)...............................................................................................12

Fandango, DICTIONARY OF AMERICAN REGIONAL ENGLISH (1991) .............................................22

François-Xavier Martin, A COLLECTION OF THE STATUTES OF THE PARLIAMENT OF
    ENGLAND NOW IN FORCE IN THE STATE OF NORTH CAROLINA (1792) .............................17, 28

Gary A. O'Dell, *Under Siege: Kentucky and the Transformation of American
    Thoroughbred Racing, 1865-1936*, 118  REG. KY. HIST. SOC'Y 389 (2020) .........................33

George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*,
    3 UNLV GAMING RSCH. & REV. J. 65 (1996).........................................................................34

H.J. of Tex., 11th Leg., R.S. 199 (1866).........................................................................................4

John Gravois, *Against All Odds: The Evolution and Ups and Downs of Legalized
    Gambling Efforts in Texas*, Dallas Morning News (Jan. 30, 2023)...........................................7

1 John Hervey, RACING IN AMERICA: 1665-1865 (1944).........................................................32, 33

Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller, *"A Map Is Not The
    Territory": The Theory and Future of Sensitive Places Doctrine,*
    98 N.Y.U. L. REV. ONLINE 438 (2023) ..................................................................................16

Joshua Hochman, *The Second Amendment on Board: Public and Private
    Historical Traditions of Firearm Regulation*, 133 YALE L.J. 1676 (2024) ............................34

Kellen Heniford & Kari Still, *Panic! At the Ballroom: The 1804 New Orleans
    Ballroom Weapons Ban in a Post-Bruen Context,*
    BUFFALO L. REV. (forthcoming 2025)................................................................................22, 23

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation,*
    97 IND. L.J. 1439 (2022) .......................................................................................................11

TABLE OF AUTHORITIES
(continued)

Page(s)

Lena London, *The Militia Fine* 1830-1860, 15 MILITARY AFFAIRS 133 (1951) ..........................20

Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in
Reconstruction Texas*, 4 TEX. A&M L. REV. 95 (2016) ....................................................3, 4, 6

S.J. of Tex., 12th Leg., 1st C.S. 15 (1870)...........................................................................5

Sherif Girgis, *Living Traditionalism*, 98 N.Y.U. L. REV. 1477 (2023) .........................................13

Steven A. Riess, SPORTS IN AMERICA FROM COLONIAL TIMES TO THE TWENTY-
FIRST CENTURY (2015) ............................................................................................25

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State
Constitutions when the Fourteenth Amendment Was Ratified in 1868: What
Rights Are Deeply Rooted in History and Tradition?*,
87 TEXAS L. REV. 7 (2008) .........................................................................................11

TEXAS CONSTITUTIONAL CONVENTION (1868-1869), JOURNAL OF THE
RECONSTRUCTION CONVENTION: WHICH MET AT AUSTIN, TEXAS,
JUNE 1, A.D. 1868 (1870)...........................................................................................4

William H.P. Robertson, THE HISTORY OF THOROUGHBRED RACING
IN AMERICA (1964)...............................................................................................32, 33

ix

INTRODUCTION

This case arises from a choice by the People of Texas to preserve longstanding limits on where firearms may be carried. For more than a century and a half, Texans have regulated firearms in sensitive locations, including schools, churches, polling places, and social gatherings. These laws protect the community in spaces where children learn, families gather, and crowds congregate. Sensitive-places restrictions are no anomaly. They have historical analogues from both 1791, when the Bill of Rights was adopted, and 1868, when it was incorporated against the States.

Texas has preserved sensitive-places restrictions despite its role as a leader in protecting Second Amendment rights. Even as Texas has embraced permitless carry, it has maintained restrictions on carrying weapons into—among other places—bars where alcohol is consumed, sporting events where passions run high, and racetracks where crowds, cash, and chance collide. *See* TEX. PENAL CODE § 46.03(a)(4), (a)(7), (a)(8). These choices reflect a deep-rooted democratic consensus: Texans want the freedom to keep and bear arms alongside common-sense safeguards in the sensitive places where the risk of violence is most acute.

Plaintiffs ask this Court to override the will of the People of Texas, not just for themselves, but for every Texan. Despite a long tradition of sensitive-places restrictions, plaintiffs mount a facial challenge that would strip the People of their ability to keep those areas free of firearms.

The Court should reject that challenge. The Second Amendment protects the right to keep and bear arms, but like other constitutional freedoms, that right is not absolute. *See District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). When modern gun laws have a "well-established and representative historical analogue," those laws are constitutional. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022).

1

The sensitive-places laws that plaintiffs challenge pass *Bruen*'s constitutional test with flying colors. As the Supreme Court has recognized, laws restricting the carry of firearms in "sensitive places"—like the laws at issue here—are presumptively constitutional. *Heller*, 554 U.S. at 626–27 n.26; *United States v. Rahimi*, 602 U.S. 680, 735 (2024) (Kavanaugh, J., concurring).

History confirms that presumption. Texas's laws prohibiting firearms on the premises (1) "of a business . . . [that] derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption," TEX. PENAL CODE § 46.03(a)(7); (2) "where a high school, collegiate, or professional sporting event or interscholastic event is taking place," *id.* § 46.03(a)(8); and (3) "of a racetrack," *id.* § 46.03(a)(4), have historical analogues firmly rooted in this Nation's tradition of firearms regulation. At minimum, the historical evidence demonstrates that the challenged laws are without doubt constitutional in some—if not all—of their applications. Plaintiffs' facial challenge—the "most difficult challenge to mount successfully," *Rahimi*, 602 U.S. at 693, as it requires showing that a law is unconstitutional in all applications—cannot succeed in the face of such robust historical evidence.

The laws that plaintiffs challenge reflect the balance Texans have struck between liberty and security. That balance is a constitutional one that is firmly grounded in historical practice, which is why courts across the Nation have repeatedly rejected challenges to similar laws. This Court should respect Texans' democratic choice, affirm Texas's longstanding sensitive-places laws, and grant summary judgment dismissing this case.[1]

---

[1] The Court appointed Eric Ruben and Gregg Costa as "*amici curiae* to defend the merits of Texas Penal Code §§ 46.03(a)(4), 46.03(a)(7), and 46.03(a)(8)" after the Attorney General declined to do so. Dkt. 34. For the Court's convenience, *amici* submit an appendix of the historical materials cited in this brief.

BACKGROUND

The challenged provisions of the Texas Penal Code prohibit "intentionally, knowingly, or recklessly possess[ing] or go[ing] with a firearm, location-restricted knife, club, or prohibited weapon" on the "premises":

- "of a racetrack," TEX. PENAL CODE § 46.03(a)(4).
- "of a business that has a permit or license issued under [the Texas Alcoholic Beverage Code], if the business derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption," *id.* § 46.03(a)(7).
- "where a high school, collegiate, or professional sporting event or interscholastic event is taking place," *id.* § 46.03(a)(8).

These sensitive-places laws are not of recent vintage. For more than 150 years, the People of Texas have repeatedly chosen to bar Texans from carrying firearms in sensitive places.

## I.    Texas's sensitive-places laws date back to at least 1870.

The precursors to Texas's sensitive-places laws date back to 1870, just 25 years after Texas was admitted to the Union. In the wake of astonishing levels of violence, Texas enacted laws that restricted the carrying of firearms in certain public spaces. Ever since, sensitive-places laws have prohibited Texans from carrying firearms where people congregate closely and in large numbers. And despite foreswearing other restrictions and making Texas the gold standard for protecting the Second Amendment, Texans have kept sensitive-places laws on the books.

### A.    Texas enacted sensitive-places laws to address a staggering rise in violence in the mid-nineteenth century.

Mid-nineteenth century Texas "was a uniquely violent place." Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 97 (2016). "[A]ssaults, murders, and fights over all sorts of disputes were commonplace." Benjamin Heber Johnson, TEXAS: AN AMERICAN HISTORY 164 (2025). That violence was fueled

3

by the "infusion of guns and veterans after the Civil War, the continued influx of new residents, and the poor functioning of the criminal justice system." *Id.* at 165.

Racial strife augmented the violence. Given Texas's resistance to Reconstruction, this violence was frequently directed against Blacks and Unionists. *See* TEXAS CONSTITUTIONAL CONVENTION (1868–1869), JOURNAL OF THE RECONSTRUCTION CONVENTION: WHICH MET AT AUSTIN, TEXAS, JUNE 1, A.D. 1868, 194–96, 501–03 (1870) (Ex. 1). The campaign of violence against Blacks and Unionists turned "the years 1867 and 1868 into some of the bloodiest in Texas history." Brennan Gardner Rivas, *The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836–1930* at 60 (May 2019) (Ph.D. dissertation, Texas Christian University), at https://tinyurl.com/k2wdxchu. Some measures "suggest a murder rate" in Texas "around thirty times that of the United States in the 2020s, about 250 per 100,000 inhabitants." Johnson, *supra*, at 164–65.

Ending post-war lawlessness and violence was paramount—and regulating where guns could be carried became a central focus. Rivas, *supra*, at 46–48. Governor Throckmorton, elected by Confederate sympathizers and Democrats, unsuccessfully asked the Legislature in 1866 to enact a tax on weapons carried on the person because he didn't believe "the Constitution to convey the idea that men and boys, vagabonds and vagrants, were to be licensed to have arms about their persons on all occasions." H.J. of Tex., 11th Leg., R.S. 199 (1866) (address of Gov. James W. Throckmorton) (Ex. 2). After a new election was held to "fill the state government created by the 1868 Constitutional Convention," Frassetto, *supra*, at 102, Republicans and Unionists took "control[ ] [of] the statehouse." Johnson, *supra*, at 170. Governor Edmund Davis echoed his predecessor in harboring "no doubt that to the universal habit of carrying arms is largely to be attributed the frequency of homicides in this State," and he called for the regulation of public carry.

S.J. of Tex., 12th Leg., 1st C.S. 15 (1870) (address of Gov. Edmund Davis) (Ex. 3).   The Legislature—which now included Republicans and Unionists—obliged.

Texas's first sensitive-places law thus emerged in 1870; it prohibited specified knives and all firearms in select public spaces.   That law provided, in relevant part,

> That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same[.]

An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st C.S., ch. 46, § 1, 1870 Tex. Gen. Laws 63 (Ex. 4).

The Legislature reenacted the sensitive-places law the following year, adding prohibitions on firearms at additional places, including assemblies for "amusement" and "any circus, show, or public exhibition of any kind."   An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg., 1st C.S., ch. 34, § 3, 1871 Tex. Gen. Laws 25–27 (Ex. 5).[2]   Sensitive-places laws were in effect not only at the state level but also at the local level.   For example, the San Antonio City Council prohibited carrying weapons at any "assembly or gathering," including any "bar-room"

---

[2]   The Legislature also enacted a general prohibition on a person publicly carrying a "deadly weapon," defined to include concealable weapons like any "pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife," without "reasonable grounds for fearing an unlawful attack on his person."   *Id.* § 1.   That provision carried a lesser penalty—a "fine of not less than twenty-five nor more than one hundred dollars"—than the sensitive-places law.   *Id.*

or "drinking saloon."  San Antonio, Tex., Ordinance Concerning the Carrying of Arms or Deadly Weapons, § 1 (Dec. 14, 1870) (Ex. 6).

Texas's firearm laws soon made their way to the Supreme Court of Texas.  The first case involved three defendants, two of whom had been convicted under section 1 of the 1871 law (the broad public-carry restriction) and one of whom had been convicted under section 3 (the location restriction).  *See English v. State*, 35 Tex. 473 (1872).[3]  The defendants challenged the 1871 Act, arguing that it was "repugnant to the second article of the amendments to the constitution of the United States."  *Id.* at 474.  The court rejected the challenge.  *Id.*  And as to the sensitive-places challenge, the court expressed its emphatic view that it was "little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentleman are congregated together."[4]  *Id.* at 478–79.  Throughout the late 1870s and 1880s, Texas courts consistently applied the sensitive-places laws

---

[3]  *English* was decided by the "Semicolon Court"—a court made up of Union sympathizers. Frassetto, *supra*, at 112; *see Ex Parte Rodriguez*, 39 Tex. 705, 773–74 (1873) (purporting to invalidate an election won by former Confederate supporters based on a semicolon in the statutory language).  That the Semicolon Court rendered this decision and that the sensitive-places laws were passed when "Black Republicans and white Unionists controlled the statehouse," Johnson, *supra*, at 170, undermines the suggestion by some that these laws were driven by racism in "jurisdictions where slavery had recently been common."  David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 250–55 (2018).  After control of the court flipped to Democrats, the court yet again confronted the public-carry restriction.  Frassetto, *supra*, at 118; *see State v. Duke*, 42 Tex. 455 (1875).  Despite the change in the court's composition, the law was yet again upheld against a challenge under the state constitution.  *Duke*, 42 Tex. at 458–59.

[4]  Although *Bruen* referred to the rationale in *English* as an "outlier[ ]," *Bruen*, 597 U.S. at 65, the Court focused on section 1 of the 1871 law—the public-carry restriction.  The Court didn't address section 3's sensitive-places restrictions.  As explained below, the sensitive-places restrictions were no outlier and appeared in the codes of other jurisdictions.

without doubting their constitutionality. *See, e.g.*, *Summerlin v. State*, 3 Tex. Ct. App. 444 (1878); *Snell v. State*, 4 Tex. App. 171 (1878); *Alexander v. State*, 11 S.W. 628 (Tex. App. 1889).

**B.    Sensitive-places laws have endured despite Texas's loosening of other firearm regulations.**

The 1871 sensitive-places law endured well into the twentieth century. *See, e.g.*, TEX. PENAL CODE arts. 483, 485 (1925) (Ex. 7); TEX. PENAL CODE arts. 483, 485 (1936) (Ex. 8); TEX. PENAL CODE arts. 483, 485 (1948) (Ex. 9).

Over a century after the enactment of the original sensitive-places law, in 1973, Texas reorganized and revised its criminal laws in a new Penal Code. Sensitive-places laws survived that reorganization in a patchwork fashion. Along with general public-carry restrictions, Texas punished as a third-degree felony the carrying of a "handgun, illegal knife, or club" on "any premises licensed or issued a permit . . . for the sale or service of alcoholic beverages." TEX. PENAL CODE § 46.02(c) (1974) (Ex. 10). It also punished as a class A misdemeanor going onto "the premises of a school or an education institution" or "the premises of a polling place" on election day with any "firearm." *Id.* § 46.04. Courts and government offices were soon added to the list of places where firearms were prohibited. TEX. PENAL CODE § 46.04 (1984) (Ex. 11). And in 1989, when horse race gambling returned to the State,[5] Texas amended section 46.04 to add racetracks to the list of locations where firearms were prohibited. *See* An Act Relating to the Creation of the Offense of Going on the Premises of a Racetrack With a Firearm, Explosive, Weapon, or Illegal Knife, 71st Leg., R.S., ch. 749, § 2, 1989 Tex. Gen. Laws 3332 (Ex. 12).

---

[5]   In 1986, the Legislature passed the Texas Racing Act, and in 1987, Texans voted to amend the state constitution to legalize gambling on horse races after the practice had been outlawed for the vast majority of the twentieth century. *See* Texas Racing Act, 69th Leg., 2nd C.S., ch. 19, 1986 Tex. Gen. Laws 48; John Gravois, *Against All Odds: The Evolution and Ups and Downs of Legalized Gambling Efforts in Texas*, Dallas Morning News (Jan. 30, 2023), available at https://tinyurl.com/mr42r2jc.

In recent years, Texas has loosened its gun restrictions to become the gold standard for protecting the right to keep and bear arms. All the while, the State has maintained sensitive-places restrictions. In 1995, for instance, then-Governor Bush signed into law a concealed-carry licensing regime. *See* An Act Relating to the Issuance of a License to Carry a Concealed Handgun, 74th R.S., ch. 229, 1995 Tex. Gen. Laws 1998. At the same time, Texas added new sensitive-places restrictions, barring people with a concealed-carry license from carrying handguns on the "premises of a business that derives 51 percent or more of its income from the sale or service of alcoholic beverages" or "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place," among other places. *Id.* § 4; TEX. PENAL CODE § 46.035 (1995). And the restrictions on carrying any firearm at locations like schools, polling places, racetracks, and government offices remained in force and were made third degree felonies. TEX. PENAL CODE § 46.03(a), (f), (g) (1997). Later, in 2017, Texas added provisions to section 46.03 specific to "location-restricted kni[ves]," in which it prohibited "intentionally, knowingly, or recklessly possess[ing]" a location-restricted knife on various premises, including at a "51%" business and "where a high school, collegiate, or professional sporting event or interscholastic event is taking place." An Act Relating to the Carrying of Certain Knives, 85th R.S., ch. 1049, § 5, 2017 Tex. Gen. Laws 4106.

In 2021, Texas passed permitless carry, no longer requiring a license for carrying a handgun in public. *See* Firearm Carry Act of 2021, 87th R.S., ch. 809, Tex. Gen. Laws 1960. But the Legislature preserved the longstanding location restrictions on where Texans can carry guns. Indeed, the Legislature consolidated its patchwork of location restrictions that previously distinguished between the types of weapons at issue (for example, knives and firearms) and whether the person carrying held a license. *See* TEX. PENAL CODE § 46.03(a). Relevant here,

8

carrying a firearm on a "racetrack" or "51%" business is a third-degree felony, *id.* § 46.03(g), while carrying "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place" is a Class A misdemeanor. *Id.* § 46.03(g-2).

## II.    Plaintiffs challenge the longstanding sensitive-places laws.

Despite the historical pedigree of Texas's sensitive-places laws, plaintiffs bring this challenge to sections 46.03(a)(7), (a)(8), and (a)(4) of the Texas Penal Code. Plaintiffs allege that they "prefer[ ] to carry a firearm for personal self-defense at all times and in all locations"—including while "attend[ing] sporting events" and going to "51% businesses"—and that Texas's sensitive-places laws prevent them from doing so. *See, e.g.*, Compl. ¶¶ 19–22. In their view, the Second Amendment entitles them to "carry[ ] loaded, operable handguns in case of confrontation for immediate self-defense in [all] public places," including those at issue here. Compl. ¶ 24.

Plaintiffs have not challenged the laws only as they might apply to them. Nor have they limited the relief they seek only for themselves. Instead, they claim that the sensitive-places laws are "facially unconstitutional under the Second Amendment." Compl. ¶ 38. And they seek a universal permanent injunction "enjoining enforcement of [Texas's sensitive-places laws] with respect to places open to the public." Compl. at 13. *But see Trump v. CASA, Inc.*, 606 U.S. ----, 145 S. Ct. 2540, 2554 (2025) ("Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority[.]").

## LEGAL BACKGROUND

## I.    The Second Amendment allows reasonable restrictions that are consistent with this Nation's history and tradition.

The Second Amendment is not absolute. *Heller*, 554 U.S. at 626. From Blackstone through present, courts and commentators have explained that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose." *Id.*; *see Rahimi*, 602 U.S. at 691–92. And the Supreme Court has emphasized that its decisions should not be taken to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626.

*Bruen* adopted a two-step framework for Second Amendment challenges. Under that framework, courts interpret the "Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. At step one, courts ask whether "the Second Amendment's plain text covers an individual's conduct"; if it does, "the Constitution presumptively protects that conduct." *Id*. at 24. At step two, the "government must [ ] justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

The *Bruen* framework thus requires pointing to historical regulations that are analogous to the challenged law. *Bruen*, 597 U.S. at 28–30. And whether a historical regulation is analogous to a modern one depends on "how and why the regulations burden" the right to bear arms. *Id.* at 29. Courts ask "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.*

Critically, only "a well-established and representative historical *analogue*, not a historical *twin*," is required to justify a modern regulation. *Bruen*, 597 U.S. at 30. That is why the Supreme Court emphasized a flexible approach in *Rahimi* and rejected the rigid approach that some courts had been taking. When considering historical analogues, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. The point is that "[h]istorical regulations reveal a principle, not a mold." *Id.* at 740 (Barrett, J., concurring). Modern regulations may be upheld even if they "do[ ] not precisely match [their] historical precursors." *Id.* at 692 (majority opinion).

II.   **Historical evidence from the Fourteenth Amendment's ratification bears on whether state laws are consistent with the Second Amendment.**

A.   **The Fourteenth Amendment incorporated the Second Amendment against the states, so the right's scope turns on how it was understood in 1868.**

In a Second Amendment challenge to a state law, the original public meaning is the meaning that the right had when the Fourteenth Amendment was ratified.[6]  "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."  *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35).  States did not become bound by the Second Amendment until the Fourteenth Amendment was ratified in 1868.  *McDonald v. City of Chicago*, 561 U.S. 742, 754 (2010).  States are thus "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second."  *Bruen*, 597 U.S. at 37.

That distinction is critical:  "When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings."  Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1439, 1441 (2022).  Because of those new meanings, when applying the Second Amendment—and other Bill of Rights guarantees—to the states, courts "must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789."  Akhil Reed Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 223 (1998).  So when analyzing whether a state law is compatible with the Second Amendment, "the question is controlled not by the original meaning of the first ten Amendments in 1791 but instead by the meaning those texts and the Fourteenth Amendment had in 1868."  Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions when the Fourteenth Amendment Was*

---

[6]  The Supreme Court has explicitly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or "when the Bill of Rights was adopted in 1791."  *Bruen*, 597 U.S. at 37; *Rahimi*, 602 U.S. at 692 n.1.

*Ratified in 1868: What Rights Are Deeply Rooted in History and Tradition?*, 87 TEXAS L. REV. 7, 115–16 (2008).

That the meaning of the Second Amendment as applied to the states should turn on the understanding of those who decided to incorporate the Bill of Rights makes sense. Those "who shaped and expounded the meaning of the Fourteenth Amendment held and expressed views about the antebellum Constitution that were decidedly out-of-step with the original meaning of the latter." Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 HOFSTRA L. REV. 1, 23 (2022) (calling the 1868 view "ascendant among originalists"). As the Second Circuit has explained, "[i]t would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk v. James*, 120 F.4th 941, 973 (2d Cir. 2024). That is why in the context of other constitutional guarantees applied to the states, like free speech, Justices Thomas and Scalia emphasized the understanding of ordinary citizens in 1868. *See Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 212–13 (2021) (Thomas, J., dissenting) (examining how ordinary citizens in 1868 understood the scope of free-speech rights incorporated against the States); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (urging consideration of "common practice in 1868"). And the Supreme Court recently rejected any notion that identical constitutional text must have identical meaning when applied to the federal government as when applied to the states. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 13 (2025).

Accordingly, in a Second Amendment challenge to state law, the controlling understanding is the one embraced by those who ratified the Fourteenth Amendment in 1868.

**B.    Even if it does not control, post-ratification history from 1868 bears heavily on the Second Amendment's meaning.**

Even if the Second Amendment's scope as applied against the states turns on the original meaning from 1791, post-ratification history from 1868 remains crucial to the analysis.

The Supreme Court's Second Amendment precedents "were not meant to suggest a law trapped in amber." *Rahimi*, 602 U.S. at 691.  A proper Second Amendment analysis encompasses both "pre-ratification and post-ratification history." *Id.* at 714 (Kavanaugh, J., concurring).  How the Second Amendment was understood "from immediately after its ratification through the end of the 19th century" is a "critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605; *see also Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) ("postenactment history can be an important tool").  The Framers themselves "intended" that post-ratification history would be used to "interpret[ ] vague constitutional text and determin[e] exceptions to individual constitutional rights." *Rahimi*, 602 U.S. at 723, 725 (Kavanaugh, J., concurring).  For that reason, "[r]eliance on post-ratification history 'has shaped scores of Court cases spanning all domains of constitutional law.'" *Id.* at 728 (quoting Sherif Girgis, *Living Traditionalism*, 98 N.Y.U. L. REV. 1477, 1480 (2023), and collecting cases).

Postenactment history prevents courts from mistakenly treating the absence of a Founding-era regulation as dispositive.  In other words, it prevents courts from falling into the "use it or lose it" trap by assuming that "founding-era legislatures maximally exercised their power to regulate" in 1791. *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring).

Plaintiffs' 1791-only approach would invalidate longstanding laws simply because 1791 legislatures did not anticipate modern social conditions or chose not to regulate for reasons having nothing to do with the Constitution.  That perverse outcome would defy the Supreme Court's recognition that modern regulations are valid if they are "relevantly similar" to historical

analogues. *Bruen*, 597 U.S. at 29. And it would conflict with a majority of circuits that have recognized that "evidence stretching into the nineteenth century is useful to a *Bruen* inquiry"— particularly when that evidence is consistent with and does not conflict with 1791-era history. *Schoenthal v. Raoul*, --- F.4th ----, 2025 WL 2504854, at *12 (7th Cir. Sept. 2, 2025); *see also NRA v. Bondi*, 133 F.4th 1108, 1121 (11th Cir. 2025) (en banc) (W. Pryor, C.J.) (relying on "[m]id-to-late-nineteenth-century laws"); *Antonyuk*, 120 F.4th at 973 (same); *Wolford v. Lopez*, 116 F.4th 959, 280 (9th Cir. 2024) (same); *Koons v. Att'y Gen. N.J.*, --- F.4th ----, 2025 WL 2612055, at *7–8 (3d Cir. Sept. 9, 2025) (same).

The post-ratification history discussed below—which is consistent with Founding-era practice—therefore remains a crucial tool to discern constitutional meaning even if the Court concludes that the public meaning from 1868 is not dispositive.

## ARGUMENT

### I. Plaintiffs' facial challenge to Texas's sensitive-places law fails out of the gate.

Plaintiffs' facial challenge is a nonstarter, and this Court can deny summary judgment on that ground alone. Facial challenges are the "'most difficult challenge to mount successfully,' because [they] require[] a defendant to 'establish that no set of circumstances exists under which the [law] would be valid.'" *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Thus, they are "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). And facial challenges may have become impossible to win when the remedy sought is an injunction because of the Supreme Court's recent holding that an injunction should not protect nonparties. *CASA*, 145 S. Ct. at 2554.

There are good reasons why facial challenges are so daunting. "Claims of facial invalidity often rest on speculation," so facial challenges risk "premature interpretation of statutes on the basis of factually barebones records." *Wash. State Grange v. Wash. State Republican Party*, 552

U.S. 442, 450 (2008) (Thomas, J.). By "formulat[ing] a rule of constitutional law broader than is required by the precise facts," courts "short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 450–51. That concern is at its zenith here. Despite plaintiffs' focus on how they are "law-abiding citizens," they bring not an as-applied challenge but a facial one, asking this Court to invalidate the challenged laws in *all* their applications, including hypothetical ones. *See* Compl. ¶ 38.

Plaintiffs have failed to meet their facial-challenge burden of explaining how the sensitive-places laws are unconstitutional in all applications. Plaintiffs all but concede (at page 1 of their summary judgment brief) that the sensitive-places laws are constitutional in *some* potential applications—like when sporting events covered by section 46.03(a)(8) take place at high schools or universities, or when violent individuals or those who drink wish to carry at a bar. That is fatal. That concession (and the historical tradition detailed below) means plaintiffs cannot show that "no set of circumstance exists under which the [challenged regulation] would be valid." *LaFave v. County of Fairfax*, --- F.4th ----, 2025 WL 2458491, at *4 (4th Cir. Aug. 27, 2025) (plaintiffs' concession that "firearms may be banned in . . . schools" was enough to defeat facial challenge). The Court need not go any further to deny plaintiffs' motion for summary judgment.

## II. Plaintiffs haven't carried their burden at step one of *Bruen* because laws regulating carry in sensitive places are presumptively constitutional.

Laws restricting firearms in sensitive places, like the ones challenged here, are presumptively constitutional. As Justice Scalia explained in *Heller*, "nothing in our opinion should be taken to cast doubt on longstanding . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626. *Bruen* echoed *Heller*, citing "legislative assemblies, polling places, and courthouses" as other locations that "were

'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 597 U.S. at 30. Likewise, in *Rahimi*, Justice Kavanaugh underscored that sensitive-places laws are "presumptively constitutional." 602 U.S. at 735 (Kavanaugh, J., concurring). This carve out for sensitive places reflects "the idea that certain locations (as well as certain people, arms, and activities) fall outside the boundaries of the Second Amendment." Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller, *"A Map Is Not The Territory": The Theory and Future of Sensitive Places Doctrine*, 98 N.Y.U. L. REV. ONLINE 438, 439 (2023).

Plaintiffs assume that their proposed course of conduct falls within the Second Amendment's scope, but the right to keep and bear arms does not bar regulations that limit firearm possession in sensitive places. *See*, *e.g.*, *Bianchi v. Brown*, 111 F.4th 438, 450 (4th Cir. 2024) (sensitive-places laws "reflect a careful balancing of interests between individual self-defense and public protection from excessive danger that existed within the meaning of the phrase 'the right to keep and bear arms' when the Second Amendment was ratified"). At stadiums, bars, and racetracks, like at polling places and courthouses, (1) tensions rise, (2) judgment falters, and (3) risks of violence escalate. So these locations are sensitive places where gun regulations are presumptively constitutional. *See United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (a place is sensitive because of the "people found there" or the "activities that take place there").

Presumptively lawful regulatory measures can be upheld under the first step of *Bruen* because the original understanding of the Second Amendment did not include a right to carry in sensitive places. Plaintiffs have done nothing to rebut that presumption, so their challenge fails at step one.

16

III.    **Each of the three challenged provisions is consistent with the Nation's tradition of firearm regulation.**

Even if the location restrictions fall within the Second Amendment's scope, section 46.03's sensitive-places restrictions are constitutional because they are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

Prohibitions on the right to bear arms in sensitive places date at least as far back as fourteenth-century England. A 1328 English statute prohibited people from going or riding "armed by night [ ]or by day, in fairs, markets, nor in the presence of the [King's] justices or other ministers." Statute of Northampton 1328, 2 Edw. 3, c.3 (Ex. 13). A 1402 law extended the prohibition to Welshmen in "merchant towns," "churches," "congregations in the same," and "highways." 1402, 4 Hen. 4, c.29 (Ex. 14). Similar location-based laws continued into later centuries. 1534, 26 Hen. 8, c.6, § 4 (Ex. 15) ("town, church, fair, market or other congregation" in Wales); 1715, 1 Geo., c.54, §§ 1, 6–10 (Ex. 16) (similar in Scotland).

American colonies carried forward this tradition. At least two colonies passed similar laws prohibiting going or riding armed "in fairs" or "markets." *See* François-Xavier Martin, A COLLECTION OF THE STATUTES OF THE PARLIAMENT OF ENGLAND NOW IN FORCE IN THE STATE OF NORTH CAROLINA 60–61 (1792) (Ex. 17); An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (Ex. 18) (similar). Other colonies restricted firearms in other sensitive places. *See*, *e.g.*, Del. Const. art. 28 (1776) (Ex. 19) (prohibiting people from "com[ing] armed to" elections). As explained below, this tradition of restricting firearms at sensitive places has continued through the Founding to the modern era.

Given this lineage of sensitive-places regulations dating back to the Middle Ages, it is unsurprising that courts routinely have upheld such restrictions even as the Supreme Court has struck down other anomalous gun-restrictive practices. Courts have upheld laws prohibiting

carrying firearms into places where alcohol is sold or consumed like bars and restaurants, *see Antonyuk*, 120 F.4th at 1027–28; *Wolford*, 116 F.4th at 985–87; *Koons*, 2025 WL 2612055, at *33–35; and laws prohibiting the carry of firearms at sporting events, including stadiums and racetracks, *see Antonyuk*, 120 F.4th at 1039 (sporting events); *Wolford*, 116 F.4th at 987–89 (stadiums and places of amusement); *Kipke v. Moore*, 695 F. Supp. 3d 638, 660–61 (D. Md. 2023) (stadiums and racetracks); *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 585–88 (D. Md. 2023) (recreational facilities and multipurpose exhibition facilities); *Koons*, 2025 WL 2612055, at *28–32 (youth sporting events).

The laws at issue here are of a piece with sensitive-places restrictions that other courts have upheld. They are supported by a well-established tradition of analogous, location-based regulations. That tradition of location-specific firearm regulation confirms the constitutionality of section 46.03's prohibition on firearms (A) at places where alcohol is sold; (B) at sporting events and interscholastic events; and (C) at racetracks.

### A. Section 46.03(a)(7) is consistent with the Nation's tradition of regulating firearms and alcohol.

Both at the Founding and during Reconstruction, lawmakers were acutely aware of the danger of mixing alcohol and weapons. *See Wolford*, 116 F.4th at 985. "[T]he Founders . . . understood that drinking could provoke people to act dangerously" and that "intoxication breeds crime, including '[f]ighting,' '[b]urglary,' and '[m]urder.'" *United States v. Harris*, 144 F.4th 154, 158 (3d Cir. 2025) (quoting Benjamin Rush, AN INQUIRY INTO THE EFFECTS OF ARDENT SPIRITS UPON THE HUMAN BODY AND MIND 2 (8th ed., Boston, James Loring 1823)). As a result, legislatures understood "the need to disarm intoxicated individuals who could not be trusted with weapons," particularly in "crowded space[s]." *Antonyuk*, 120 F.4th at 1031.

18

Lawmakers sought to protect citizens from the dangerous mix of guns and alcohol in a variety of ways. Most relevant are three lines of historical laws that establish the tradition of regulating alcohol and guns: (1) laws reflecting legislators' general understanding that firearms and intoxication are a dangerous mix; (2) prohibitions on firearms where alcohol is sold; and (3) prohibitions on firearms at ballrooms and social gatherings. Section 46.03(a)(7) is analogous to those provisions.

> **1.     Section 46.03(a)(7) is consistent with the tradition of regulating the dangerous mix of firearms and alcohol.**

"[I]n a long line of regulations dating back to the colonial era, colonies, states, and cities have regulated in ways reflecting their understanding that firearms and intoxication are a dangerous mix." *Wolford*, 116 F.4th at 985.

Start with colonial-era laws. In 1656, Virginia prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of whether attendees became intoxicated. Acts of Mar. 10, 1655, Act XII, *reprinted in* 1 William Waller Hening, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619 at 401–02 (1823), available at https://tinyurl.com/4sr6xfv3. And in 1771, New York prohibited shooting around New Year's Eve to prevent the damage caused by combining alcohol with firearms. Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 244–46 (1894) (Ex. 20).

Further, during this era, many laws "separated the militia—which at the time included nearly all men—from liquor." *See Wolford*, 116 F.4th at 985 (citing *Heller*, 554 U.S. at 595–96). Certain laws prohibited the sale of liquor to militia members while on duty. *See* An Act for Better Settling and Regulating the Militia of this Colony of New Jersey, for the Repelling Invasions, and Suppressing Insurrections and Rebellions, May 8, 1746, *reprinted in* 3 LAWS OF THE ROYAL

COLONY OF NEW JERSEY 1746-1760 at 5–11 (1980) (Ex. 21). Other laws prohibited militia from meeting at or near taverns and prohibited the sale of liquor at or near militia meetings. *See* An Act for Establishing a Militia in this Government (Delaware), 1756, *reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION, pt. 2 at 2 (1947) (Ex. 22); An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania, ch. 167, 1780 Pa. Laws 368 (Ex. 23); An Act for Regulating the Militia of the Province of Maryland, 1756, *reprinted in* 2 MILITARY OBLIGATION: THE AMERICAN TRADITION, pt. 5 at 93 (1947) (Ex. 24). These laws did more than acknowledge that militiamen could not perform their duties while impaired as plaintiffs contend (at 14); they also prevented disorder and riots. *Cf.* Lena London, *The Militia Fine* 1830-1860, 15 MILITARY AFFAIRS 133, 136 (1951).

Similar laws continued into the nineteenth century. *See* 1859 Conn. Pub. Acts 62, ch. 82, § 5 (Ex. 25) (prohibiting the sale of alcohol near military encampments and parade); An Act for The Better Regulation of the Militia, of the City of Baltimore, Passed by the Legislature of Maryland, December Session, 1817, § 42, p. 15 (1818) (Ex. 61) (prohibiting militia members from "appear[ing] drunk"); 1890 Okla. Terr. Stats. 495, ch. 25, art. 47, § 4 (Ex. 26) (prohibiting "[p]ublic officers" from carrying "while under the influence of intoxicating drinks"). Rhode Island, Maine, and Massachusetts excluded "common drunkards" from the militia or from being officers in the militia. 1844 R.I. Pub. Laws 503, § 1 (Ex. 27); 1837 Me. Laws 424, ch. 276, § 5 (Ex. 28); 1837 Mass. Acts 273, ch. 240, § 1 (Ex. 29).

In the nineteenth century, many states also prohibited the carrying of firearms while intoxicated. 1867 Kan. Sess. Laws 25, ch. 12, § 1 (Ex. 30); MO. REV. STAT. § 1274 (1879) (Ex. 31); 1883 Wis. Laws 290, ch. 329, § 3 (Ex. 32); WIS. STAT. § 4397b(3) (1878) (Ex. 33); 1909 Idaho Sess. Laws 6, § 1 (Ex. 34); *see also* 1878 Miss. Laws 175, ch. 46, § 2 (Ex. 35) ("That it shall

not be lawful for any person to sell to . . . any person intoxicated, knowing him to be . . . in a state of intoxication, any" dangerous weapons).

Many cities had similar laws. *See* DeSoto, Mo., Rev. Ordinances, art. 6, § 224 (1888) (Ex. 36); Huntsville, Mo., An Ordinance in Relation to Carrying Deadly Weapons at 58, § 1 (July 17, 1894) (Ex. 37); Columbia, Mo., Gen. Ordinances, ch. 17, §§ 163–64 (1890) (Ex. 38); Lyons, Kan., Ordinance No. 179, § 1 (Sept. 7, 1891) (Ex. 39); Blackwell, Okla., Town Ordinance No. 21, § 3 (Aug. 7, 1894) (Ex. 40); Wallace, Kan., Ordinance, § 3 (Dec. 22, 1887) (Ex. 41); Greenfield, Mo., Ordinance No. 39, § 1 (Jan. 4, 1886) (Ex. 42); Jerome, Ariz., Town Ordinance No. 2, § 21 (Mar. 21, 1899) (Ex. 43); Brookfield, Mo., Gen. Ordinances 116, § 32 (1900) (Ex. 44).

Finally, some cities "prohibited retailers of liquor from keeping gunpowder," including Chicago in 1851 and St. Paul in 1858. *Wolford*, 116 F.4th at 985; Chi., Ill., Ordinances, ch. 16, § 6 (July 23, 1851) (Ex. 45); St. Paul, Minn., An Ordinance to Regulate the Sale of Gunpowder, ch. 21, § 4 (July 16, 1858) (Ex. 46).

There was no dispute about the constitutionality of these laws, *see Wolford*, 116 F.4th at 985, and at least one state supreme court contemporaneously held that a statute's prohibition on carrying while intoxicated was "in perfect harmony with the [state] constitution." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

## 2. Section 46.03(a)(7) is consistent with the tradition of prohibiting firearms where alcohol is sold.

State, territorial, and local laws prohibiting firearms in places where alcohol and liquor were sold are directly analogous to section 46.03(a)(7). For example, in 1890, Oklahoma banned firearms at "any place where intoxicating liquors are sold." 1890 Okla. Terr. Stats. 496, ch. 25,

art. 47, § 7 (Ex. 26).[7]  In 1853, New Mexico prohibited firearms at a "Ball or Fandango"[8] and at any "room adjoining said ball where Liquors are sold."  1853 N.M. Terr. Laws 67, § 3 (Ex. 47). In 1870, San Antonio banned firearms at any "bar-room" or "drinking saloon."  San Antonio, Tex., Ordinance Concerning the Carrying of Arms or Deadly Weapons, § 1 (Dec. 14, 1870) (Ex. 6). Similarly, in 1879, New Orleans banned firearms at any "public hall" or "tavern."  New Orleans, La., General Ordinances, tit. 1, ch. 1, art. 1 (May 1879) (Ex. 48).  And in 1889, the territory of Arizona required the keepers of "drinking saloon[s]" to "keep posted up in a conspicuous place in his bar room . . . a plain notice to travelers to divest themselves of their weapons."  1889 Ariz. Terr. Sess. Laws 17, § 7 (Ex. 49).

> ### 3.    Section 46.03(a)(7) is consistent with the tradition of prohibiting the carrying of firearms at ballrooms and social gatherings.

A third line of laws "broadly prohibited the carry of firearms at ballrooms and at social gatherings."  *Wolford*, 116 F.4th at 986.  Although "[b]ars and restaurants are not ballrooms," this line of regulations "show[s] a well-established tradition of prohibiting firearms at crowded places, which included, at times, bars and restaurants."  *Id.*  Alcohol "was often served" at ballrooms "and drinking (sometimes copiously) was a favorite ballroom activity."  Kellen Heniford & Kari Still, *Panic! At the Ballroom: The 1804 New Orleans Ballroom Weapons Ban in a Post-*Bruen *Context*, BUFFALO L. REV. (forthcoming 2025) (manuscript at 16), available at https://tinyurl.com/yyd5ksja.

---

[7]  While *Bruen* cautioned against giving too much weight to territorial laws, it did not compel "automatic rejection of any territorial laws and statutes," and courts of appeals have found territorial laws to carry weight when, as here, they were "consistent with" contemporaneous state laws.  *Antonyuk*, 120 F.4th at 1029; *see Schoenthal*, 2025 WL 2504854, at *12 n.21.

[8]  "The term 'fandango' as used in New Mexico at the time meant a social gathering akin to a ball; an 'assembl[y] where dancing and frolicking are carried on.'"  *Wolford*, 116 F.4th at 986 n.5 (quoting Fandango, DICTIONARY OF AMERICAN REGIONAL ENGLISH (1991)).

Because balls "united wine, whiskey, honor-conscious men often heavily armed, and 'a great throng of women' they were determined to impress," "[v]iolence [was] commonplace." *Id.* at 19.

Accordingly, throughout the nineteenth century, states, territories, and localities passed laws prohibiting firearms at ballrooms and social gatherings, including a Texas law enacted immediately after the Fourteenth Amendment's ratification. *See*, *e.g.*, 12th Leg., 1st C.S., ch. 46, § 1 (Ex. 4); TEX. PENAL CODE, tit. 9, ch. 4, art. 320 (1879) (Ex. 50); *see also* New Orleans, La., An Ordinance Respecting Public Balls, art. 1 (Oct. 27, 1817) (Ex. 51) (prohibiting weapons in public ballrooms and requiring all weapons to be "deposit[ed]" at "the entrance"); 1853 N.M. Terr. Laws 67, § 3 (Ex. 47) (prohibiting firearms at a ball or fandango); 1889 Ariz. Terr. Sess. Laws 17, § 3 (Ex. 49) (prohibiting firearms at any "ball room, social party, or social gathering"); 1890 Okla. Terr. Stats. 496, ch. 25, art. 47, § 7 (Ex. 26) (same); 1903 Mont. Laws 49, ch. 35, § 3 (same) (Ex. 52); 1875 Mo. Laws 50 § 1 (Ex. 54) (prohibiting firearms at "any place where people [are] assembled for . . . social purposes"); Waco, Tex., An Ordinance (July 9, 1891) (Ex. 53).

                    *        *        *

These laws (taken together or individually) show a history and tradition of regulating firearms and alcohol that is sufficiently analogous to Texas's prohibition on carrying firearms on the "premises of a business" licensed to sell alcohol "if the business derives 51 percent or more of its income" from selling alcohol. TEX. PENAL CODE § 46.03(a)(7).

Courts of appeals agree. Consider just a few examples. In *Antonyuk*, the Second Circuit found a "consistent and representative national tradition of regulating firearms due to the dangers posed by armed intoxicated individuals" by analyzing "six analogues, which applied to nine-and-a-half percent of Americans by 1889"—Kansas, Wisconsin, and Missouri laws "disarming intoxicated persons," Mississippi's law "prohibiting the sale of firearms to intoxicated persons,"

and Arizona and Oklahoma laws "prohibiting firearms in liquor-serving or -selling establishments." 120 F.4th at 1030. And in *Wolford*, the Ninth Circuit held that "bars and restaurants that sell alcohol are among the Nation's 'sensitive places' where firearms may be prohibited" by considering a similar, although not identical, set of laws to those discussed above. 116 F.4th at 986. The court noted that although four directly on-point laws—from New Mexico, San Antonio, Oklahoma, and New Orleans—"post-dated the ratification of the Second Amendment, [and] governed only a small population," they "were enacted both before and soon after the ratification of the Fourteenth Amendment and are similar in all material respects to" the challenged "modern laws." *Id.* These laws "provide support analogous to that provided by the few, local, post-ratification regulations that justified designating schools as sensitive places." *Id.*

Plaintiffs ignore this history. Although they acknowledge that *both* Founding- and Reconstruction-era laws addressed concerns about mixing alcohol and weapons, plaintiffs hang their hat on the assertion (at 13) that "military men were all free to carry their weapons" into taverns. But as explained above, *see supra* pp.19–21, that assertion doesn't withstand scrutiny.

Plaintiffs also ignore that a "historical twin" or "dead ringer" is not required when they claim (at 14) that the lack of any "Founding-era regulations restricting carrying firearms in bars and taverns . . . is dispositive." In *Rahimi*, there was no "historical twin" to the federal statute prohibiting those with a domestic violence restraining order from possessing a firearm. Yet the Supreme Court looked to "two distinct legal regimes" (surety and going armed laws) to conclude that the prohibition on "the possession of firearms by those found by a court to present a threat to others fit[ ] neatly within the tradition" that those legal regimes represent. *Rahimi*, 602 U.S. at 694, 698.

24

So too here.  The historical record of prohibiting the dangerous combination of alcohol and firearms confirms that section 46.03(a)(7) is "consistent with the principles that underpin our regulatory tradition" of prohibiting carry of firearms in places where alcohol is sold or where individuals may become intoxicated. *Rahimi*, 602 U.S. at 692.  If anything, section 46.03(a)(7) is an even closer fit to this historical tradition than the federal law in *Rahimi* was to the surety and going armed laws that the Supreme Court analyzed.

**B.     Section 46.03(a)(8) is consistent with the Nation's tradition of prohibiting firearms at schools and places of amusement.**

Section 46.03(a)(8)'s prohibition on firearms "where a high school, collegiate, or professional sporting event or interscholastic event is taking place" is likewise consistent with the Nation's tradition of prohibiting firearms at schools, places where people are gathered for educational purposes, and places of amusement.  As plaintiffs concede (at 15), today's organized sports did not exist at the Founding.[9]  But sporting and interscholastic events are analogous to places of amusement at which firearms were restricted "[b]oth before and shortly following the ratification of the Fourteenth Amendment [in] cities, states, and territories." *Wolford*, 116 F.4th at 987.  Like places of amusement, sporting and interscholastic events typically involve people gathering close together in confined spaces for education, recreation, and social activities.  Like laws prohibiting carry at places of amusement, section 46.03(a)(8) thus seeks to "protect individuals engaged in these recreational and social activities from confrontations and encounters

---

[9]   At the time, sports were "dominated by participatory pastimes" like fishing, hunting, and riding horses.  Steven A. Riess, Sports in America From Colonial Times to the Twenty-First Century 9 (2015).  Though modern baseball was developed by Alexander Cartwright and the New York Knickerbocker Base Ball Club in 1845, only in 1869 did the first all-salaried team arrive—the Cincinnati Red Stockings. *Id.* at 15–16.  That progression traces to the fact that "a real boom in sports took place after the Civil War" that was tied to other phenomena like urbanization, cheap mass transit, and industrialism. *Id.* at 17.

involving firearms," "prevent[ ] disruption of educational and literary activities and ensur[e] safety during those activities," *Md. Shall Issue*, 680 F. Supp. 3d at 587, 588, maintain "orderly and peaceable assembly," and "protect 'the duties and proprieties of social life' in such spaces." *Antonyuk*, 120 F.4th at 1021, 1027.

> 1.    **Section 46.03(a)(8) is consistent with the tradition of prohibiting firearms at schools.**

Schools are "sensitive places" where firearm bans are "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26. Schools are a close analogue to the premises where high school or collegiate sporting or other interscholastic competition is taking place—even when those events take place off campus.[10] Like schools, interscholastic events—including sporting events—serve to educate and socialize children, "purposes furthered by prohibitions on bringing firearms into those locations." *Md. Shall Issue*, 680 F. Supp. 3d at 584. Firearm restrictions both in schools and at these school events "are meant to protect the same or similar vulnerable populations": students and children. *Id.* This analogy applies equally to high school and collegiate sporting events because "*Bruen* did not distinguish between public schools and private schools or limit the term 'schools' based on the age of the students." *Id.* at 583.

Courts have upheld similar regulations by analogizing them to schools. For instance, in *Wolford*, the Ninth Circuit concluded that "youth centers . . . are akin to schools." 116 F.4th at 985; *see also Antonyuk*, 120 F.4th at 1119 n.80 ("Insofar as the State relies on the tradition of regulating firearms in places frequented by children as an analogue for [public parks], *Bruen* tells us that tradition is well-established and representative."); *Kipke*, 695 F. Supp. 3d at 660 ("school

---

[10]  Plaintiffs do not challenge (1) the law insofar as it prohibits sporting events or interscholastic events that take place at a high school or (2) any restrictions private colleges or private property owners have adopted. *See* Dkt. 26. at 4 (citing TEX. PENAL CODE § 46.03(a)(1); *id.* § 46.03(c)(4-a); TEX. GOV'T CODE § 411.2031(d-1), (e)).

grounds are plainly analogous to school buildings, and therefore the grounds may also be designated as sensitive places"); *Md. Shall Issue*, 680 F. Supp. 3d at 584 (childcare facilities are analogous to schools); *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 64–65 (N.D.N.Y. 2024) (upholding firearm restriction at summer camps, analogizing them to schools).

### 2. Section 46.03(a)(8) is consistent with the tradition of restricting firearms where people gather for literary or educational purposes.

Section 46.03(a)(8)'s restriction on firearms at interscholastic events is also directly analogous to the many state and local laws that prohibited firearms where people assembled for educational, literary or scientific purposes. *See*, *e.g.*, 1875 Mo. Laws 50, § 1 (Ex. 54); Tex. Penal Code, tit. 9, ch. 4, art. 320 (1879) (Ex. 50); 1889 Ariz. Terr. Sess. Laws 17, § 3 (Ex. 49); 1890 Okla. Terr. Stats. 496, ch. 25, art. 47, § 7 (Ex. 26); 1903 Mont. Gen. Laws 49, ch. 35, § 3 (Ex. 52); *see also* San Antonio, Tex., Ordinance Concerning the Carrying of Arms or Deadly Weapons, § 1 (Dec. 14, 1870) (Ex. 6); Stockton, Kan., Ordinance No. 76, § 1 (July 1, 1887) (Ex. 55); DeSoto, Mo., Rev. Ordinances, art. 6, § 224 (1888) (Ex. 36); Warrensburg, Mo., Concealed or Deadly Weapons, § 1 (June 5, 1890) (Ex. 58); Waco, Tex., An Ordinance (July 9, 1891) (Ex. 53); Shelbyville, Mo., Ordinance No. 23, § 1 (July 6, 1891) (Ex. 56); Marceline, Mo., Ordinance No. 9 (Mar. 12, 1892) (Ex. 57); Huntsville, Mo., An Ordinance in Relation to Carrying Deadly Weapons at 58, § 1 (July 17, 1894) (Ex. 37); Jerome, Ariz., Town Ordinance No. 2, § 21 (Mar. 21, 1899) (Ex. 43); Brookfield, Mo., Gen. Ordinances 116, § 32 (1900) (Ex. 44).  Interscholastic events can include contests between schools on a variety of subjects in addition to sports including math, science, debate, drama, and music—making section 46.03(a)(8) directly analogous to the historical laws prohibiting firearms where people gathered for educational, literary, or scientific purposes.

3.    **Section 46.03(a)(8) is consistent with the tradition of prohibiting firearms where people congregate in large numbers.**

Section 46.03(a)(8)'s restriction on carrying firearms at sporting events is also consistent with the Nation's deep tradition of prohibiting firearms where people congregate.  In addition to the laws prohibiting firearms at ballrooms and social gatherings, *supra* pp.22–23, and places where people are assembled for literary, educational, or social purposes, *supra* p.27, many Reconstruction-era laws prohibited firearms at places of amusement.  As explained above, Texas itself banned firearms at "any circus, show, or public exhibition of any kind."  TEX. PENAL CODE, tit. 9, ch. 4, art. 320 (1879) (Ex. 50).  Other states and territories had similar laws.  *See* 1869 Tenn. Acts 23, ch. 22, § 2 (Ex. 59) (prohibiting the carrying of a pistol or other "deadly or dangerous weapon" at "any fair, race course, or other public assembly of the people"); 1889 Ariz. Terr. Sess. Laws 17 § 3 (Ex. 49) (prohibiting firearms in any "place where persons are assembled for amusement . . . or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering"); 1890 Okla. Terr. Stats. 496, ch. 25, art. 47, § 7 (Ex. 26) (same); 1903 Mont. Laws 49, ch. 35, § 3 (Ex. 52) (same).

Firearms have also been prohibited in fairs and markets dating back to fourteenth-century England.  *See* Statute of Northampton 1328, 2 Edw. 3, c.3 (Ex. 13); 1402, 4 Hen. 4, c.29 (Ex. 14); 1534, 26 Hen. 8, c.6, § 4 (Ex. 15); 1715, 1 Geo., c.54, §§ 1 & 6–10 (Ex. 16).  This tradition was adopted in colonial America where at least two colonies, Virginia and North Carolina, passed similar laws prohibiting going or riding armed "in fairs or markets, or in other places, in terror of the county."  An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (Ex. 18); Martin, *supra*, at 60–61 (Ex. 17) (similar).  And it continued into the early nineteenth century:  Congress prohibited arms at fairs in Washington, D.C. in 1816.  *See* An Act for Punishment of Crimes and Offences, within the District of Columbia § 40 (1816) (prohibiting going or riding "armed by night

nor day, in fairs or markets, or in other places, in terror of the county"), available at
https://rb.gy/7q0cv.  Tennessee prohibited firearms at fairs in 1869.  1869 Tenn. Acts 23, ch. 22,
§ 2 (Ex. 59).

Other states and localities more broadly prohibited firearms at "public gatherings."  *See*
1870 Ga. Laws 421, tit. 16, no. 285, § 1 (Ex. 60); 1875 Mo. Laws 50, § 1 (Ex. 54); Stockton, Kan.,
Ordinance No. 76, § 1 (July 1, 1887) (Ex. 55) (prohibiting carrying "into any other public
assemblage of persons not met for any unlawful purpose"); Waco, Tex., An Ordinance (July 9,
1891) (Ex. 53) (prohibiting firearms "where persons are assembled for amusement . . . or into any
circus, show, or public exhibition of any kind"); Huntsville, Mo., An Ordinance in Relation to
Carrying Deadly Weapons, § 1 (July 17, 1894) (Ex. 37) ("any other public assemblage of persons
met for any lawful purpose").

State courts analyzing these provisions agreed on their constitutionality under state analogs
to the Second Amendment.  *See Wolford*, 116 F.4th at 987–88 (collecting cases); *Hill v. State*, 53
Ga. 472, 476 (1874) ("the bearing [at a concert] of arms of any sort, is an eye-sore to good citizens,
offensive to peaceable people, an indication of a want of a proper respect for the majesty of the
laws, and a marked breach of good manners"); *Andrews v. State*, 50 Tenn. 165, 182 (1871) ("a
man may well be prohibited from carrying his arms to . . . [a] public assemblage"); *Shelby*, 2 S.W.
at 469 ("The mischief to be apprehended from an intoxicated person going abroad with fire-arms
upon his person is equally as great as that to be feared from one who goes into an assemblage of
persons with one of the prohibited instruments.").

So they "regularly upheld convictions for violating the statutes without even questioning
the constitutionality of the laws."  *Wolford*, 116 F.4th at 988; *see*, *e.g.*, *Wynne v. State*, 51 S.E.
636, 637 (Ga. 1905) (affirming conviction for carrying a shotgun to a public gathering); *State v.*

29

*Pigg*, 85 Mo. App. 399, 402 (1900) (affirming conviction for "going into the dwelling house of Josiah Jones, where there was a social gathering, having about his person a deadly weapon"); *Maupin v. State*, 17 S.W. 1038, 1039 (Tenn. 1890) (affirming conviction for "carry[ing] pocket-pistols" at a grist-mill, which is "a public place,—a place to which customers were constantly invited and daily expected to go").

*    *    *

This historical tradition of prohibiting firearms at schools, at literary or educational events, and where people congregate—a tradition that has "endur[ed] from medieval England to Reconstruction America and beyond," *Antonyuk*, 120 F.4th at 1019—allows laws that prohibit firearms where a high school, collegiate, or professional sporting event or interscholastic event is taking place. The laws prohibiting firearms at schools and literary and educational events aimed to prevent gun violence from affecting the most vulnerable population—children. And laws prohibiting firearms where people congregated "protect[ed] individuals engaged in these recreational and social activities from confrontations and encounters involving firearms," *Md. Shall Issue*, 680 F. Supp. 3d at 587, and thus "protect[ed] 'the duties and proprieties of social life' in such spaces." *Antonyuk*, 120 F.4th at 1021. Section 46.03(a)(8) serves the same purpose of preserving tranquility in social life by removing firearms from the mix when people gather to passionately support sports teams at massive stadiums or children at school sports and interscholastic events.

Courts have upheld restrictions similar to Texas's based on this well-established tradition. *See Wolford*, 116 F.4th at 987–89 (firearm ban at stadiums and other places of amusement likely constitutional based on a tradition of regulations at "places for social gathering and amusement"); *Antonyuk*, 120 F.4th at 1037–38 (firearm ban at theaters likely constitutional because it was

30

consistent with a tradition of prohibiting firearms in "quintessentially crowded places" where people are gathered for amusement); *Koons*, 2025 WL 2612055, at *35–36 (firearm ban at entertainment facilities consistent with tradition of regulating firearms in places with "crowds" in "enclosed spaces" and in places where people gathered for amusement); *Md. Shall Issue*, 680 F. Supp. 3d at 585–88 (law restricting firearms in recreational facilities and multipurpose exhibition facilities likely constitutional).

Neither of plaintiffs' rejoinders is persuasive. Plaintiffs first point (at 15) to marksmanship exhibitions as examples of firearms being allowed at crowded sporting events at the Founding. That firearms were permitted at firearm competitions is unremarkable. As plaintiffs acknowledge (at 3 n.2), the law currently exempts shooting sports from its prohibition: A person may carry a firearm where they are a "participant in the event and a firearm . . . is used in the event." *See* TEX. PENAL CODE § 46.03(a)(8). So contrary to plaintiffs' argument, events like Founding-era marksmanship exhibitions would not be prohibited under the law as it stands today. And plaintiffs never explain how the marksmanship exhibition laws they point to detract from the historical laws that barred carry in other crowded spaces where people congregated for amusement.

Plaintiffs also contend (at 16) that restricting firearms at sporting events runs counter to the "Founding-era tradition requiring individuals to be armed at certain public gatherings." But those laws shed no light on a legislature's ability to restrict the carrying of guns in other places. A collective-defense-related mandate has nothing to do with the constitutionality of a public-safety-related restriction on carrying guns. Tellingly, plaintiffs do not point to a single law that required individuals to be armed at *any* of the sensitive places challenged in this case.

31

**C.    Section 46.03(a)(4) is consistent with the historical tradition of prohibiting firearms at places of amusement.**

Likewise, Texas's restriction on carrying firearms at racetracks is consistent with the Nation's tradition of prohibiting firearms in places of amusement and other locations with large crowds. *See supra* p.22. Like modern stadiums and sporting events, racetracks are crowded places for amusement—and ones that pose an additional risk of violence due to the gambling that takes place. So Texas's restriction on carrying firearms at racetracks comfortably falls within that tradition of regulation. *See Antonyuk*, 120 F.4th at 1036, 1038 (upholding statute "regulat[ing] firearms in discrete, densely crowded physical spaces wherein people assemble for amusement," including at racetracks).

Plaintiffs are wrong to linger (at 17) on the lack of Founding-era provisions specifically banning firearms at racetracks because American horseracing has evolved over the centuries in significant ways that bear on the risks of carrying firearms. American horseracing traces back to the 1600s, but it took centuries for it to become formalized at racetracks. In colonial America, horseracing was "unorganized" and "spontaneous." 1 John Hervey, RACING IN AMERICA: 1665-1865, at 29 (1944). Given the cost and expense of clearing land, only one oval racecourse existed (in what is now Long Island). *Id.* at 29–30; William H.P. Robertson, THE HISTORY OF THOROUGHBRED RACING IN AMERICA 7 (1964). Instead, "quarter horses" raced short, one-on-one, straight-line sprints. Hervey, *supra*, at 22. These races often took place in the streets, which led to regulations banning them in places like Jamestown, Newport, and Philadelphia. *Id.* at 43, 16; Robertson, *supra*, at 8. Racing in streets persisted at the Founding—so shortly after Kentucky became a state in 1792, the Trustees of Lexington "recommend[ed] it to the people of the town, to call a public meeting, to consider of the means which ought to be adopted for applying a remedy

32

to the growing evil" of "racing through the streets."  Hervey, *supra*, at 225, Robertson, *supra*, at 8.

After the Revolution, an "Anti-Racing Crusade" emerged as part of "[a] natural reaction against things English."  Hervey, *supra*, at 131; Robertson, *supra*, at 31.  New York, Pennsylvania, and New Jersey passed laws "intended to prevent racing" and "[s]imilar legislation has been in existence on and off in various states ever since."  Robertson, *supra*, at 31.  Where racing was permitted, racecourses did not contain grandstands.  *See id.* at 33.  Many people watched races from their carriages, and "the tiny stands provided for officials became symbols of prestige."  *Id.*

Things changed after the Civil War.  "The pure concept of sport for sport's sake had to be tempered with the realities of economic necessity," *id.* at 91, "requir[ing] track operators to develop new sources of revenue."  Gary A. O'Dell, *Under Siege: Kentucky and the Transformation of American Thoroughbred Racing, 1865-1936*, 118 REG. KY. HIST. SOC'Y 389, 402 (2020).  "One way to do this was to attract a greater public patronage . . . by moving . . . from wagers made between individuals to trackside betting."  *Id.*  This was accomplished by bringing two new forms of wagering—bookmaking and pari-mutuels—into racetracks.  *Id.* at 404–05.  "[R]acing was transformed from a pastime of elites into a national industry" with "tremendous popularity and profitability," but "the increased dependence upon gambling revenue promoted crime and corruption."  *Id.* at 402–03.

Because racetracks in their modern form did not exist at the Founding, a "historical twin" or "dead ringer" prohibiting firearm carry at those locations could not have existed and is not required for Texas's racetrack provision to pass constitutional muster.  *Bruen*, 597 U.S. at 30.  As explained above, states have historically restricted carrying of firearms at crowded places and places of amusement; a racetrack is a crowded place of amusement; section 46.03(a)(4) is therefore

"consistent with the principles that underpin the Nation's regulatory tradition." *Rahimi*, 602 U.S. at 681. And as racing evolved toward more frequent meets with large crowds and centralized gambling, at least one state prohibited carry on premises where racing occurred: In 1869, Tennessee made it unlawful for "any person attending any . . . race course . . . to carry about his person, concealed or otherwise, any pistol." 1869 Tenn. Acts 23, ch. 22, § 2 (Ex. 59).

Plaintiffs also are wrong (at 17) that America's "long history of gambling establishments" without restrictions on firearm carrying helps them. While Americans may have long loved gambling, "many colonies and states throughout the eighteenth and nineteenth centuries banned gambling." Joshua Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L.J. 1676, 1721 (2024). And the few casinos that did exist historically "were often . . . privately owned" and "often operated outside the law entirely" because of those gambling bans. *Id.* The apparent dearth of laws prohibiting firearms at casinos is not because firearms were allowed—it is because casinos were illegal. *See id.* ("A search for gun regulations in casinos in the statute books would be highly unlikely to turn up any such tradition" because casinos generally were illegal.); *see also* George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV GAMING RSCH. & REV. J. 65, 69 (1996) (explaining that gambling was almost entirely illegal across the country in its early days and that, specifically, "[b]y 1910, only Maryland and Kentucky had legal horse racing").

Texas's own ban on firearms at racetracks illustrates this very point. Since its admission into the Union in 1845, the Lone Star State had a general ban on all forms of gambling. *See* TEX. PENAL CODE, tit. 13, ch. 4 (1856) (Ex. 62). That general prohibition persists today. *See* TEX. PENAL CODE § 47.02. Yet in 1987, Texans voted in a narrow exception for "pari-mutuel wagering" at horse and greyhound races. *See* TEX. OCC. CODE § 2021.001 *et seq.* (Texas Racing Act); *see*

34

*also* TEX. PENAL CODE § 47.09(a)(1)(D) (defense to prosecution for illegal gambling if conduct was authorized under the Texas Racing Act).  It was only then that it became necessary for Texas to address the carrying of firearms in places where gambling occurred.  Texas promptly did so by enacting section 46.03(a)(4) in 1989.  *See* 71st Leg., R.S., ch. 749, § 2 (Ex. 12).

A lack of a historical "dead ringer" for section 46.03(a)(4) (which is not even required by *Bruen* and *Rahimi*) is not a function of firearms being permitted at racetracks with modern-day pari-mutuel gambling.  Rather, it is a function of the less formal way that horse racing occurred during early American history; the development of open-to-all, centralized gambling at racecourses after the Civil War; and the patchwork of historical prohibitions on both racetracks and gambling.

*        *        *

Each of Texas's location-specific restrictions challenged by plaintiffs is rooted in the Nation's history and tradition.  They all survive Second Amendment scrutiny.

## CONCLUSION

For these reasons, the Court should grant summary judgment dismissing the case.

Dated:  September 12, 2025

Respectfully submitted,

Eric Ruben (New York Bar No. 4612495)
(*admitted pro hac vice*)
Associate Professor of Law
SMU DEDMAN SCHOOL OF LAW
3315 Daniel Avenue
Dallas, Texas 75205
Telephone: (214) 768-2581
*eruben@smu.edu*

*/s/ Gregg Costa*
Gregg Costa (Texas Bar No. 24028160)
Kylie Calabrese (Texas Bar No. 24120738)
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, Texas 77002
Telephone: (346) 718-6600
*gcosta@gibsondunn.com*
*kcalabrese@gibsondunn.com*

Alexa Acquista (Texas Bar No. 24126499)
Andrew Mitchell (Texas Bar No. 24125330)
Arjun Ogale (Texas Bar No. 24127222)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
*aacquista@gibsondunn.com*
*amitchell@gibsondunn.com*
*aogale@gibsondunn.com*

COUNSEL FOR AMICI CURIAE

36

**CERTIFICATE OF SERVICE**

I certify that on September 12, 2025, a true and correct copy of the foregoing document has

been served on counsel of record pursuant to the Federal Rules of Civil Procedure.

/s/ *Gregg Costa*
Gregg Costa