**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHARLES ZIEGENFUSS, DAVID MONTGOMERY, BRIAN ROBINSON, and FIREARMS POLICY COALITION, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> FREEMAN MARTIN, in his official capacity as Director and Colonel of the Texas Department of Public Safety, <br><br> *Defendants*. | CIVIL ACTION NO. 4:24-cv-01049-P |

<u>**PLAINTIFFS' BRIEF IN RESPONSE TO**</u>

<u>**BRIEF OF APPOINTED AMICI CURIAE DEFENDING THE MERITS OF TEXAS**</u>

<u>**PENAL CODE §§ 46.03(a)(4), 46.03(a)(7), AND 46.03(a)(8)**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

I.    Texas' Carry Bans Are Facially Unconstitutional ............................................... 3

II.   Amici Wrongly Claim That The State's Designation Of So-Called "Sensitive Places" Is A Second Amendment "Carve-Out" From The Historical Test ...................... 7

III.  *Heller*, *Bruen*, And Ample Precedent Outside The Second Amendment Context Demonstrate That The Scope Of Enumerated Rights Does Not Turn On How The Right Was Understood In 1868 ............................................................................. 8

IV.   Amici Have Failed To Demonstrate A Historical Tradition Justifying The Ban On Carrying Firearms In Bars Or Restaurants Serving Alcohol ............................. 12

    A.    There Is No Well-Established, Representative Historical Tradition Of "Regulating The Dangerous Mix Of Firearms And Alcohol," Let Alone One Sufficiently Analogous To Ban Everyone From Carrying In Bars ....................... 14

    B.    There Is No Well-Established, Representative Historical Tradition Of "Prohibiting Firearms Where Alcohol Is Sold" ................................................ 18

    C.    There Is No Well-Established, Representative Historical Tradition Of Prohibiting Firearms At Ballrooms And Social Gatherings ................................... 19

V.    Amici Have Failed To Demonstrate A Historical Tradition Justifying The Ban On Carrying Firearms At Sporting Events ............................................................. 21

    A.    The Ban On Carrying At All Sporting Events Is Not Relevantly Similar To Narrow On-Campus Restrictions ........................................................... 21

    B.    The Ban On Carrying At All Sporting Events Is Not Relevantly Similar To A Purported Tradition Of Restricting Firearms At Literary Or Educational Gatherings .......................................................................... 23

    C.    There Is No Historical Tradition Of "Prohibiting Firearms Where People Congregate In Large Numbers" ............................................................. 24

VI.   Amici Have Failed To Demonstrate A Historical Tradition Justifying The Ban On Carrying Firearms At Racetracks ................................................................. 27

CONCLUSION ............................................................................................................... 30

CERTIFICATE OF SERVICE ........................................................................................ 31

i

## TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) ............................................................. 19

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016) ................................................................. 6

*City of Chicago v. Morales*,
527 U.S. 41 (1999) ............................................................................... 3

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015) ......................................................................... 3, 5

*Club Madonna Inc. v. City of Miami Beach*,
42 F.4th 1231 (11th Cir. 2022) ....................................................... 3, 6

*Crawford v. Washington*,
541 U.S. 36 (2004) ............................................................................. 10

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................................ 7, 20, 25, 26

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012) ...................................................... 1, 4, 6

*Espinoza v. Montana Dep't of Revenue*,
591 U.S. 464 (2020) ............................................................................. 9

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ............................................................ 1, 4

*French v. Barber Asphalt Paving Co.*,
181 U.S. 324 (1901) ........................................................................... 11

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025) .............................................................................. 11

*Gamble v. United States*,
587 U.S. 678 (2019) ............................................................................. 8

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) .......................................................... 8

*Hill v. State*,
53 Ga. 472 (Ga. 1824) ....................................................................... 27

*Koons v. Att'y Gen. New Jersey*,
No. 23-1900, 2025 WL 2612055 (3d Cir. Sept. 10, 2025) ............. 20, 28

*Lara v. Comm'r Penn. State Police*,
125 F.4th 428 (3d Cir. 2025) ........................................................ 12, 22

*League of Women Voters of Ind., Inc. v. Sullivan*,
    5 F.4th 714 (7th Cir. 2021) ................................................................ 6

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
    594 U.S. 180 (2021) ........................................................................ 11

*Malloy v. Hogan*,
    378 U.S. 1 (1964) ............................................................................ 10

*McCauley v. Univ. of the Virgin Islands*,
    618 F.3d 232 (3d Cir. 2010) ............................................................ 23

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ........................................................................ 10

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ........................................................................ 11

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) .......................................................... 12

*Nat'l Rifle Ass'n v. Bondi*,
    133 F.4th 1108 (11th Cir. 2025) ..................................................... 22

*Nevada Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011) ........................................................................ 10

*New York State Rifle & Pistol Association v. Bruen*,
    597 U.S. 1 (2022) ...................................................................... passim

*Ramos v. Louisiana*,
    590 U.S. 83 (2020) ............................................................................ 9

*Samia v. United States*,
    599 U.S. 635 (2023) ........................................................................ 10

*Sonnier v. Crain*,
    613 F.3d 436 (5th Cir. 2010) ............................................................ 4

*Spirit Aerosystems, Inc. v. Paxton*,
    142 F.4th 278 (5th Cir. 2025) ........................................................... 5

*State v. Huntley*,
    25 N.C. 418 (N.C. 1843) ................................................................. 27

*State v. Shelby*,
    2 S.W. 468 (Mo. 1886) ............................................................. 17, 27

*Texas v. Mayorkas*,
    No. 2:22-cv-094-Z, 2024 WL 455337 (N.D. Tex. Feb. 6, 2024) ........... 4

*Timbs v. Indiana*,
    586 U.S. 146 (2019) .......................................................................... 9

*United States v. Connolly*,
117 F.4th 269 (5th Cir. 2024) ................................................................ 13, 16

*United States v. Daniels*,
77 F.4th 337 (5th Cir. 2023) ....................................................................... 12

*United States v. Rahimi*,
602 U.S. 680 (2024)............................................................................... passim

*United States v. Rahimi*,
61 F.4th 443 (5th Cir. 2024), *reversed and remanded*, 602 U.S. 680 (2024)............................ 4

*United States v. Salerno*,
481 U.S. 739 (1987)....................................................................................... 3

*United States v. Texas*,
No. 21-cv-173-KC, 2025 WL 2170007 (W.D. Tex. July 31, 2025)......................... 6

*Washington v. Glucksberg*,
521 U.S. 702 (1997)....................................................................................... 3

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024) ...................................................................... 18

*Worth v. Harrington*,
666 F. Supp. 3d 902 (D. Minn. 2023)........................................................... 22

*Worth v. Jacobson*,
108 F.4th 677 (8th Cir. 2024) ................................................................. 12, 22

**Statutes**

1 Records of the Colony of Rhode Island and Providence Plantations, In New England (Bartlett ed., 1856) ................................................................ 25

1 Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England (White ed., 1853) ................................................................ 25

1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature (Hening ed., 1808)..................................... 25

18 U.S.C. § 922(q)(2) ..................................................................................... 5

3 Archives of Maryland (Browne ed., 1885) ................................................ 25

Acts of Mar. 10, 1655, Act XII, *reprinted in* 1 William Waller Hening, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619 at 401–02 (1823)............................................... 14

Penal Code § 42.01(a)(7), (9) ..................................................................... 14

Penal Code § 42.12 ..................................................................................... 14

Penal Code § 46.02(a-6) ................................................................... 5, 14, 17

Penal Code § 46.03(a)(1) ............................................................................. 5

Penal Code § 46.03(a)(7) ................................................................................................ 5

Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven
Colony (Brown & Parsons eds., 1850) ...................................................................... 25

**Other Authorities**

"American Independence," Samuel Adams Speech (Aug. 1, 1776) .............................. 24

Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ........................... 10

Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty
Univ. L. Rev. 653 (2014) ........................................................................................ 25

Cramer, *Guns On Campus: A History*, 27 Acad. Questions 411 (Dec. 2014) ............................. 21

Halbrook, *Faux Histoire of the Right to Bear Arms*: Young v. Hawaii ........................................ 26

Howland, *Let's Not "Spit the Bit" in Defense of "The Law of the Horse": The Historical and
Legal Development of American Thoroughbred Racing*, 14 Marq. Sports L. Rev. 473 (2004)29

John Adams, Argument for the Defense (Dec. 1770), Nat'l Archives: Founders Online,
https://bit.ly/35FCuRh ............................................................................................. 25

Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203 (2018) ........... 22

Linnekin, *"Tavern Talk" and the Origins of the Assembly Clause: Tracing the First
Amendment's Assembly Clause Back to its Roots in Colonial Taverns*, 39 Hastings Const. L.Q.
593 (2012) ............................................................................................................. 12

*Monuments of Colonial New York: George III and Liberty Poles*, Gotham Ctr. (Oct. 15, 2020),
https://tinyurl.com/bdzkafap ..................................................................................... 24

Riess, THE SPORT OF KINGS AND THE KINGS OF CRIME: HORSE RACING, POLITICS, AND
ORGANIZED CRIME IN NEW YORK, 1865–1913 (2011) ............................................ 29

Robbins, *Christmas Shooting Rounds in America and Their Background*, in THE JOURNAL OF
AMERICAN FOLKLORE, vol. 86, no. 339 (1973) ....................................................... 14

Robbins, *Wishing in and Shooting in the New Year among the Germans in the Carolinas*, in
Yoder, AMERICAN FOLKLIFE (1976) ........................................................................ 14

Sismondo, AMERICA WALKS INTO A BAR (2011) ............................................................... 12, 13

THE PENNSYLVANIA-GERMAN, vol. 8, Jan.-Dec. 1807 ................................................... 14

## INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court confirmed that the Second Amendment protects a "general right to publicly carry arms for self-defense." 597 U.S. 1, 31 (2022). Plaintiffs have challenged three categories of locations where Texas unconstitutionally limits where law-abiding, licensed Texans may keep and bear arms. After Texas conceded that these Carry Bans violate the Second Amendment, the Court appointed Amici to defend their merits. Amici have not demonstrated that any of the challenged bans are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

Amici first try to insulate the Carry Bans from challenge by arguing that Plaintiffs failed to meet their burden in establishing that the laws are facially unconstitutional. Where, as here, a "constitutional violation inheres in the terms of [a] statute, not its application," then it is facially unconstitutional because it cannot be constitutionally applied to anyone. *Ezell v. City of Chicago*, 651 F.3d 684, 698–99 (7th Cir. 2011). Courts have routinely rejected the argument that a single hypothetical valid application can salvage an otherwise unconstitutional law. Instead, the Court's task is to apply "the relevant constitutional test" rather than swat down every conceivable application. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1123–27 (10th Cir. 2012). Here, that means subjecting the Carry Bans to *Bruen*'s analysis. And because these bans are inconsistent "with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, they violate the Second Amendment and therefore fail in all of their applications.

Amici also claim that laws such as the Carry Bans are special "carveouts" from *Bruen*'s historical test simply because they are labeled "sensitive places." But *Bruen* expressly foreclosed this sort of reasoning and instructs instead that all restrictions on the general right to public carry must still be justified by reference to the Nation's historical tradition.

When considering that historical evidence, *Bruen* followed the Supreme Court's consistent approach by looking at the public understanding of the right to keep and bear arms at the Founding. Accordingly, the Second Amendment's meaning in 1791 is paramount; 19th century regulations

can confirm that original understanding but later historical evidence that is inconsistent with Founding practice cannot shed light on the constitutionality of Texas' Carry bans.

Turning to the bans at issue here.

***Businesses Deriving 51% or More of Their Sales From Alcohol.*** There is no historical tradition justifying Texas' ban on carry in bars and restaurants that serve alcohol. Despite the widespread prevalence of taverns and similar locations since well before the Founding, there is no tradition of disarming all individuals that enter places that serve alcohol. Amici rely on some targeted regulations (restrictions on active-duty militia, or prohibitions on carrying while intoxicated) but these laws are neither comparably justified to Texas' outright ban nor do they impose a comparable burden on armed self-defense. Beyond that, Amici identify a handful of late-19th century frontier-state, territorial, and municipal regulations prohibiting firearms at public gatherings. These regulations cannot shed light on the Second Amendment's original meaning because they "conflict with the Nation's earlier approach to firearm regulation." *Bruen*, 597 U.S. at 67.

***Sporting Events.*** There is no historical tradition justifying Texas' ban on carrying at sporting and interscholastic events. Amici first rely on restrictions prohibiting students from possessing firearms on campus. This analogy fails to support a far broader ban on carry at *all* sporting events (not just on campus ones); in any event, the historical evidence demonstrates that restrictions on firearms at schools were limited to minors or students by virtue of the schools' authority *in loco parentis*, so therefore such school-imposed rules cannot serve as analogues for broad-based gun restrictions on law-abiding adults. Amici's core argument is that this ban is justified because such events involve "large numbers" of people. But this runs counter to *Bruen'*s recognition of "the general right to publicly carry arms for self-defense," and ignores its instruction that places are not sensitive "simply because [they are] crowded." 597 U.S. at 31. "[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Id.* And there is

a robust historical tradition dating back past the Founding of permitting—and often requiring—individuals to be armed at public assemblies.

*Racetracks.* There is no historical tradition justifying Texas' ban on carrying at racetracks. Amici again assert that this ban is justified because of the presence of "large crowds." *Bruen* forecloses this argument. And beyond that, horseracing (and horseracing regulation) has existed since before the Founding. Despite this, Amici managed to dust off only a single law from shortly after the Fourteenth Amendment's adoption prohibiting firearms at such events. This is insufficient to sustain Texas' carry ban under *Bruen*. "[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

\* \* \*

Texas' Carry Bans are inconsistent with the "Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The Court should enter summary judgment in Plaintiffs' favor.

## ARGUMENT

### I.    Texas' Carry Bans Are Facially Unconstitutional.

Amici lead with the argument that Plaintiffs have failed to satisfy their burden in mounting a facial challenge. Amici Br. at 14–15. This entire claim rests on the assertion that, for a facial challenge to succeed, Plaintiffs must "'establish that no set of circumstances exists under which the [challenged law] would be valid.'" *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). This argument fails on multiple fronts.

As a foundational matter, *Salerno*'s strict language is not so strict in practice. Rather, "the [Supreme] Court has allowed such challenges to proceed under a diverse array of constitutional provisions." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (collecting cases).[1] As one

---

[1] *Salerno* "has been subject to a heated debate in the Supreme Court, where it has not been consistently followed." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (citation omitted); *see, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 55 n.2 (1999) (plurality opinion) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court."); *Washington v. Glucksberg*, 521 U.S. 702, 740 (1997) (Stevens, J., concurring) ("I do not

judge in this district has put it, despite *Salerno*'s strict language, "informally, courts alter the scrutiny implicit in [the *Salerno*] standard depending on the rule, statute, or provision before them." *Texas v. Mayorkas*, No. 2:22-cv-094-Z, 2024 WL 455337, at *4 (N.D. Tex. Feb. 6, 2024).

Courts have long recognized that a facial challenge is appropriate where, as here, "the claimed constitutional violation inheres in the terms of the statute, not its application." *Ezell*, 651 F.3d at 698. In that regard, "a successful facial attack means the statute is wholly invalid and cannot be applied *to anyone*. [A] law, if unconstitutional, is unconstitutional *without regard* to its application—or *in all* its applications, as *Salerno* requires." *Id.* at 698–99. As the Tenth Circuit has explained:

> *Salerno*'s language … is accurately understood not as setting forth a test for facial challenges, but rather as describing the result of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard. In other words, where a statute fails the relevant constitutional test (such as strict scrutiny, the *Ward* test, or reasonableness review), it can no longer be constitutionally applied to anyone—and thus there is "no set of circumstances" in which the statute would be valid. The relevant constitutional test, however, remains the proper inquiry.

*Doe v. City of Albuquerque*, 667 F.3d at 1127; *accord United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2024), *reversed and remanded*, 602 U.S. 680 (2024) ("[I]f a statute is inconsistent with the Second Amendment's text and historical understanding, then it fails under any circumstances.").

To put it in the terms of this case, because Texas' Carry Bans are inconsistent "with this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, they violate the Second Amendment and therefore fail in all of their applications. There is "no set of circumstances" where the Carry Bans can be constitutionally applied. They are facially unconstitutional.

Amici argue that Plaintiffs cannot succeed because there are "*some* potential [constitutional] applications" of the Carry Bans. Amici Br. at 15 (citing high school and college

---

believe the Court has ever actually applied such a strict standard, even in *Salerno* itself"). As Judge Dennis put it, *Salerno*'s "no set of circumstances" language constitutes "nothing more than a controversial dictum" and his "diligent research" failed to turn up "a single Supreme Court case—including *Salerno* itself—in which the holding actually relied on the 'no set of circumstances' test." *Sonnier v. Crain*, 613 F.3d 436, 463–64 (5th Cir. 2010) (Dennis, J., concurring in part and dissenting in part), *reiterated on rehearing*, 634 F.3d 778, 779 (2011).

sporting events or "when violent individuals or those who drink wish to carry at a bar").[2] This, of course, presumes that the Carry Bans could be constitutionally applied in these circumstances in the first place.[3] Under Amici's logic, a facial challenge to a locational ban would never be possible since any restriction could be justified by reference to a hypothetical "violent individual" carrying in the restricted place.

And it also ignores how the Carry Bans work in that hypothetical situation. Take an example: Suppose two friends (Johnny and Kyle) go to a sports bar on a Saturday afternoon to watch the Texas A&M football game. Johnny offers to be the designated driver because he later has to chaperone his daughter's school dance. Kyle, on the other hand, had a long week at work and is anxious to get after it, so he has several beers. If they both carry, Johnny has violated § 46.03(a)(7), whereas Kyle has violated both § 46.03(a)(7) and § 46.02(a-6). If Plaintiffs are successful here, Kyle would still face prosecution for carrying while intoxicated. Contrary to Amici's argument (at 15), that prosecution would not be a "potential application" of Section 46.03(a)(7)'s separate (and unconstitutional) ban.

Setting that aside, Amici cannot salvage the Carry Bans' blanket prohibitions by pointing to one hypothetical valid application. Circuit courts have recognized that this logic would stretch *Salerno*'s dicta well past its breaking point by permitting the government to insulate its regulations from constitutional scrutiny. "Courts have … cautioned that applying *Salerno*'s test mechanically would render facial challenges virtually impossible, since '[i]t is always possible to imagine' a hypothetical in which a law might be valid.'" *United States v. Texas*, No. 21-cv-173-KC, 2025 WL

---

[2] Contrary to Amici's suggestion, as stated in Plaintiffs' summary judgment brief (ECF No. 26 at 4), they do not challenge the separate laws prohibiting the carry of firearms on school grounds or at "interscholastic events" at high schools.

[3] Amici's chosen hypotheticals run into problems on their own terms. These applications are already prohibited by either (1) federal and state laws that restrict carry on school grounds and at school-sponsored activities (18 U.S.C. § 922(q)(2); Penal Code § 46.03(a)(1)); or (2) state laws prohibiting carry while intoxicated (Penal Code § 46.02(a-6)). Because facial challenge "consider[s] only applications of [a] statute in which it actually authorizes or prohibits conduct," *Patel*, 576 U.S. at 418, the Carry Bans are "irrelevant" in these circumstances because they "do no work," *Spirit Aerosystems, Inc. v. Paxton*, 142 F.4th 278, 286 (5th Cir. 2025) (quoting *Patel*).

2170007, at *16 (W.D. Tex. July 31, 2025) (quoting *League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 728 (7th Cir. 2021)). Instead, the Court's task is "simply [to apply] the relevant constitutional test to the challenged statute, without trying to dream up whether or not there exists some hypothetical situation in which application of the statute might be valid." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016).

The Tenth Circuit considered this issue at length in *Doe v. City of Albuquerque* and rejected the position—advanced by Amici here—that a single hypothetical application can save an otherwise unconstitutional law. "[S]uch an interpretation completely divorces review of the constitutionality of a statute from the terms of the statute itself, and instead improperly requires a court to engage in hypothetical musings about potentially valid *applications* of the statute." 667 F.3d at 1123; *see id.* at 1123–27 (analyzing question at length). The court explained: "The idea that the Supreme Court applies the 'no set of circumstances' test to every facial challenge is simply a fiction," since "the Court has repeatedly considered facial challenges simply by applying the relevant constitutional test to the challenged statute without attempting to conjure up whether or not there is a hypothetical situation in which application of the statute might be valid." *Id.* at 1124; *see id.* at 1124–25 (collecting cases). Because a facial challenge is "a challenge to the terms of the statute, not hypothetical applications," it examines "whether the terms of the statute itself 'measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contain a constitutional infirmity that invalidates the statute in its entirety.'" *Id.* at 1127 (brackets and citation omitted).

The Eleventh Circuit likewise rejected the claim that *Salerno* requires a plaintiff to "prove that there is no hypothetical situation in which [a challenged law] could be validly applied," and held instead that the appropriate question is "whether the statute fails the relevant constitutional test." *Club Madonna*, 42 F.4th at 1256. The court when on to explain that the "larger problem" with this argument is that the government could "sidestep facial challenges and the unambiguous command of federal law"—and continue to engage in unconstitutional conduct—by "craft[ing] some instance" where the law could be validly applied. *Id.* And "[t]hat can't be right." *Id.*

6

In sum, the Carry Bans should be invalidated in their entirety because they are facially unconstitutional.

## II.    Amici Wrongly Claim That The State's Designation Of So-Called "Sensitive Places" Is A Second Amendment "Carve-Out" From The Historical Test.

Amici argue (at 15–16) that carrying firearms in the locations at issue in the Carry Bans falls outside the scope of the Second Amendment simply because Texas has deemed them so-called "sensitive places." This is wrong at the most basic level because, if Amici's theory were correct, states could simply label every place outside the home as "sensitive" and evade Second Amendment review. *Bruen* has expressly foreclosed this sort of reasoning: "Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense … . Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" 597 U.S at 31.

Amici nevertheless claim that such designations effect a Second Amendment "carve out" because *Heller* said that "nothing in our opinion should be taken to cast doubt on longstanding … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). *Bruen* explained why this is wrong.

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); *see also* Brief for Independent Institute as Amicus Curiae 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And **courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.**

*Bruen*, 597 U.S. at 30 (emphasis added).

In short, *Bruen* instructs that the designation of a location as a "sensitive place" must still be justified by reference to the Nation's historical tradition. The designation does not, as Amici

suggest, effect a magic "carveout" by which the Second Amendment's "presumptive[]

protect[ions]" do not apply. 597 U.S. at 24.

### III.    *Heller*, *Bruen*, And Ample Precedent Outside The Second Amendment Context Demonstrate That The Scope Of Enumerated Rights Does Not Turn On How The Right Was Understood In 1868.

Amici assert that "in a Second Amendment challenge to state law, the controlling

understanding is the one embraced by those who ratified the Fourteenth Amendment in 1868."

Amici Br. at 12. This cannot be squared with *Bruen*. While acknowledging the "scholarly debate

on whether courts should primarily rely on the prevailing understanding of an individual right" in

1868, 597 U.S. at 37, the Court explained in the preceding paragraphs exactly how the analysis is

supposed to proceed. Namely:

> [W]e must … guard against giving postenactment history more weight than it can rightly bear. It is true that in *Heller* we reiterated that evidence of "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" represented a "critical tool of constitutional interpretation." 554 U.S. at 605. We therefore examined "a variety of legal and other sources to determine the public understanding of the Second Amendment after its ratification." *Ibid.* … In other words, we recognize that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment).

*Id.* at 35–36 (cleaned up).

The Court then continued by explaining that "to the extent later history contradicts what

the text says, the text controls. … '[P]ost-ratification adoption or acceptance of laws that are

*inconsistent* with the original meaning of the constitutional text obviously cannot overcome or

alter that text.'" *Id.* at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C.

Cir. 2011) (Kavanaugh, J., dissenting)). Thus, when *Heller* relied on mid- to late-19th century

evidence, this consideration was "secondary" and relied upon as "'mere confirmation of what the

Court thought had already been established.'" *Id.* at 37 (quoting *Gamble v. United States*, 587 U.S.

678, 702 (2019)). Simply put, "freewheeling reliance on historical practice from the mid-to-late

19th century to establish the original meaning" of the Second Amendment is improper. *Id.* at 82–83 (Barrett, J., concurring).

Amici acknowledge that the utility of 19th-century evidence depends on whether "that evidence is consistent with and does not conflict with 1791-era history." Amici Br. at 13–14 (collecting cases). But, as detailed below, the problem with Amici's 19th and 20th century evidence is that it is manifestly *inconsistent* with the original meaning of the Second Amendment and therefore cannot shed light on the constitutionality of Texas' carry bans.

Nevertheless, Amici insist that the Second Amendment's meaning "should turn on the understanding of those who decided to incorporate the Bill of Rights." Amici Br. at 12. But as Plaintiffs explained in their opening brief, *Bruen*'s deliberate choice to focus on 1791 is consistent with the Court's approach in other cases involving incorporated rights. ECF No. 26, Plaintiffs' MSJ Br. at 10 & n.4 (citing *Ramos v. Louisiana*, 590 U.S. 83, 90–91 (2020); *Timbs v. Indiana*, 586 U.S. 146, 150 (2019); *Virginia v. Moore*, 553 U.S. 164, 168 (2008); and *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 482 (2020)).

*Espinoza* is particularly instructive to cases, like this one, where proponents of modern restrictions rely mainly on late Nineteenth Century regulations as supporting analogues. In *Espinoza*, Montana took the position that its tuition-assistance bill, which was generally applicable to private schools, had to exclude religious schools in light of the Montana state constitution's prohibition on "aid" to such schools. To support its claim that this "no-aid" law didn't violate the Religion Clauses, Montana argued "that a tradition ... arose in the second half of the 19th century, as more than 30 States—including Montana—adopted no-aid provisions." 591 U.S. at 482. But the Court rejected the notion that the 19th-century adoption of such laws by even a *majority* of States could "by itself establish an early American tradition." *Id.* The Court stressed that, "[i]n the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones." *Id.* at 480. Given that foundation, the "no-aid provisions of the 19th-century hardly evidence a tradition that should inform our understanding of the Free Exercise Clause." *Id.* at 482.

This approach makes sense because, as the Court put it in *Bruen*, "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 597 U.S. at 37 (citing *Ramos*, *Timbs*, and *Malloy v. Hogan*, 378 U.S. 1 (1964)). As a result, the Court "generally assume[s] that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* (citing *Crawford v. Washington*, 541 U.S. 36 (2004); *Virginia v. Moore*; and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011)); *see also McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) ("incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment") (quoting *Malloy*, 378 U.S. at 10)).[4]

The Court has continued to follow this approach in the three terms since it decided *Bruen*. In *Rahimi*, for example, the Court emphasized the importance of Founding era history, holding that 18 U.S.C. § 922(g)(8) was relevantly similar to the "founding era regimes" of surety and going armed laws. 602 U.S. at 698. And the Court notably focused on pre-Reconstruction historical sources. *See id.* at 693–98. In her concurrence, Justice Barrett once again emphasized that, when conducting the historical inquiry, "evidence of 'tradition' unmoored from original meaning is not binding law," so "scattered cases or regulations pulled from history may have little bearing on the meaning of the text." *Id.* at 738 (Barrett, J., concurring); *see also Samia v. United States*, 599 U.S. 635, 655 (2023) (Barrett, J., concurring) ("Evidence … from the late 19th and early 20th centuries [is] far too late to inform the meaning [of constitutional rights enumerated] at the time of the founding.").

---

[4] Amici try to shore up their argument (at 12) by quoting a law review article asserting that there is an "ascendant" view among originalist academics that 1868 is the key point of public understanding because "[t]he Republicans who shaped and expounded the meaning of the Fourteenth Amendment held and expressed views about the antebellum Constitution that were decidedly out-of-step with the original meaning of the latter." Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022). This does no more than restate the fact of the "scholarly debate" *Bruen* and *Rahimi* acknowledge by citing the exact same sources (by Professor Amar and Professor Lash) cited in *Bruen*.

Amici have no answer to this fundamental point and do not address these authorities. Instead, they argue that, in two instances, Justices Thomas and Scalia "emphasized the understanding of ordinary citizens in 1868." Amici Br. at 12 (citing Justice Thomas' dissent in *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180 (2021), and Justice Scalia's dissent in *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)). The passing views of two justices in two separate dissenting opinions two-and-a-half decades apart provides little insight for the Court's work here. Sure enough, Justice Thomas did look to the public's understanding of the Fourteenth Amendment's ratification when considering the free speech issues in *Mahoney*. *See* 594 U.S. at 212–13. But any doubt about Justice Thomas' position regarding the scope of the Second Amendment is put to rest by his authorship of *Bruen* where, as laid out above, he acknowledged the "scholarly debate" but offered multiple reasons why 1791 must be the lodestar and explained in detail how courts should treat postenactment history. As for Justice Scalia, his dissent in *McIntyre* looked to both 1791 and 1868 and concluded that there was little evidence of government regulation of anonymous electioneering at either time. 514 U.S. at 372–73. And Justice Scalia struck a chord similar to *Bruen* when emphasizing "that postadoption tradition cannot alter the core meaning of a constitutional guarantee." *Id.* at 378. At any rate, Plaintiffs do not seek to define the Second Amendment "exclusively by 1791 standards," Amici Br. at 12 (citation omitted), they only ask that the Court do as *Bruen* instructs when considering Reconstruction era history.

Finally, Amici argue that the Supreme Court "recently rejected any notion that identical constitutional text must have identical meaning when applied to the federal government as when applied to the states." Amici Br. at 12 (citing *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025)). *Fuld*, however, does little to aid Amici's point: The Court was not considering a question of incorporation, but rather recognizing—as it has for well over a century—that the Due Process Clauses of the Fifth and Fourteenth Amendments are not necessarily construed in lockstep. *See id.* at 13 (quoting *French v. Barber Asphalt Paving Co.*, 181 U.S. 324, 328 (1901)).

Taking their cue from the raft of Supreme Court precedent reviewed above, other circuits agree that Second Amendment analysis must be anchored to the original understanding at its adoption in 1791. *See, e.g.*, *United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023) ("A tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later."), cert. granted, judgment vacated, No. 23-376, 144 S. Ct. 2707 (2024); *Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) (holding "that the constitutional right to keep and bear arms should be understood according to its public meaning in 1791"); *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history."); *accord Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (calling 1791 the "critical year for determining the [Second] [A]mendment's historical meaning").

In sum, the Court must follow *Bruen* and focus its Second Amendment analysis on the original understanding of the right to keep and bear arms in 1791.

## IV.   Amici Have Failed To Demonstrate A Historical Tradition Justifying The Ban On Carrying Firearms In Bars Or Restaurants Serving Alcohol.

There is no historical tradition justifying Section 46.03(a)(7)'s Carry Ban in bars, restaurants, or other venues that "derive[] 51 percent or more of [their] income from the sale or service of alcoholic beverages for on-premises consumption."

As explained in Plaintiffs' opening brief (at 13–14), the Founders were intimately familiar with taverns, with any potential for violence relating to them, and with regulation of taverns and alcohol. "Consuming alcohol was one of the most widespread practices in the American colonies," and "[t]averns served as the most common drinking and gathering place for colonists." Linnekin, *"Tavern Talk" and the Origins of the Assembly Clause: Tracing the First Amendment's Assembly Clause Back to its Roots in Colonial Taverns*, 39 Hastings Const. L.Q. 593, 595 (2012). Playing an indispensable role in our Nation's birth, taverns are where: the Boston Tea Party and the Revolution were planned; George Washington gave his post-war farewell address; decisions were made during the Constitutional Convention; and federalists and anti-federalists jockeyed for political support. Sismondo, America Walks Into A Bar 66–67, 71–72, 76, 82–83 (2011).

The Founders were also familiar with firearm violence in taverns. *Id.* at 16 ("[T]averns were plagued with 'pernicious loitering' and the … 'firing and shooting off of guns.'" (citation omitted)). As early as Colonial America, "tavern legislation was involved and constantly changing." *Id.* at 15. As the Fifth Circuit recently put it in *United States v. Connolly*, "early Americans, including the Founders, consumed copious amounts of alcohol." 117 F.4th 269, 279 (5th Cir. 2024). And yet, there was no Founding Era tradition of banning the mere possession of firearms in taverns or other places selling alcohol. Rather, Colonial and Founding Era laws regulated "the misuse of weapons while intoxicated," not the right to carry are generally. *See id.* at 280.

Taverns have been prevalent since the Founding and, with those taverns, the risk of firearms violence associated with intoxication. As a result, this Court's Second Amendment "inquiry [is] fairly straightforward." *Bruen*, 597 U.S. at 26. There are no "unprecedented societal concerns or dramatic technological changes" underlying the law that could justify "a more nuanced approach." *Id.* at 27. Amici do not argue otherwise. Rather, Texas' 51% carry ban seeks to "address[] a general societal problem that has persisted since the 18th century"; as shown below there is a "lack of a distinctly similar historical regulation addressing that problem," which confirms that the "regulation is inconsistent with the Second Amendment." *Id.* at 26. Put another way, there is no "principle" from the Founding Era that the risk of firearms violence associated with drinking justified banning everyone who visited a bar or tavern from carrying. *See Rahimi*, 602 U.S. at 692.

Amici argue that the 51% ban is supported by three threads of historical regulation. Each of these strained efforts fails to draw an appropriate analogous tradition sufficient to demonstrate the ban's constitutionality.

### A. There Is No Well-Established, Representative Historical Tradition Of "Regulating The Dangerous Mix Of Firearms And Alcohol," Let Alone One Sufficiently Analogous To Ban Everyone From Carrying In Bars.

Amici first claim that the 51% ban is consistent with a purported tradition of "regulating the dangerous mix of firearms and alcohol." Amici Br. at 19–21. This effort requires Amici to stitch together a wide array of miscellaneous regulations in search of a tradition.

***Holiday Regulations***. Amici lead this argument with two colonial laws—a 1656 Virginia regulation and a 1771 New York law—that prohibited *shooting* firearms *while drinking* (Virginia) and discharging arms, fireworks, and the like on New Year's Eve (New York). Amici Br. at 19. But these are not appropriate analogues to Texas' 51% carry ban on either of *Bruen*'s "central" metrics: They are neither comparably justified nor do they impose a comparable burden on armed self-defense. Both are directed at preventing the misuse of firearms by individuals who are actively intoxicated. The Virginia law sought to address "the frequent shooting of gunns in drinking" and therefore prohibited "shoot[ing] guns at drinkeing." Acts of Mar. 10, 1655, Act XII, *reprinted in* 1 William Waller Hening, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619 at 401–02 (1823), *available at* https://tinyurl.com/4sr6xfv3. And the New York law noted that "[d]amages are frequently done" between December 31 and January 2 by "those who are often intoxicated with Liquor," and therefore prohibited public discharge of firearms (along with "any … Rocket, Cracker, Squib or other fire work") during that limited time. Amici Ex. 20.[5] The 51% law, by contrast, disarms everyone, all the time, even if they are not consuming alcohol—despite the fact that Texas separately criminalizes carrying firearms while intoxicated, Penal Code § 46.02(a-6), and for discharging a firearm in public, Penal Code §§ 42.01(a)(7), (9), 42.12.

---

[5] These laws were outliers in any event. The "very general" tradition in the 18th century was "the shooting-in of the new year." THE PENNSYLVANIA-GERMAN, vol. 8, Jan.-Dec. 1807, at 16; *see also* Robbins, *Christmas Shooting Rounds in America and Their Background*, in THE JOURNAL OF AMERICAN FOLKLORE, vol. 86, no. 339, at 50–51 (1973); Robbins, *Wishing in and Shooting in the New Year among the Germans in the Carolinas*, in Yoder, AMERICAN FOLKLIFE 257 (1976).

There are other key distinctions. The New York law, for its part, imposed a far lesser burden on armed self-defense than Texas' 51% carry ban in that it applied only during three days out of the year. And the Virginia law was justified based on a concern that Native Americans could raid the colony at any time. Specifically, the law demonstrates a fear that drunks discharging firearms imperiled the colony's ability to effectively alert its residents of raids (through "alarms," presumably because rogue discharge of arms could confuse fellow colonists) and thwarted the colony's capacity to defend itself from them (because of "spending much powder in vaine," as when discharging a firearm for no reason while in a stupor). *See* Amici Ex. 20. In short, the law was driven by the need to protect against "the common enemie … Indians." *Id.* Even if all of this were not the case, two colonial laws that themselves share little in common hardly suffice to establish a "representative" historical tradition.

***Militia-Focused Regulations.*** Amici then turn to a handful of Founding Era laws concerning the sale of alcohol to (or possession of alcohol by) militiamen. Amici Br. at 19–20. These laws are wholly incomparable to Texas's 51% ban: They differ in "how" they burden Second Amendment protected rights because they aimed at limiting members of the militia from drinking *while they were training*—a very limited regulation that bears no resemblance to a total ban on carrying by anyone in a bar. Indeed, lest they be deemed too controversial at the time, three of the laws clarified that alcohol could be sold as soon as militia members were released from duty for the day:

- The New Jersey law provided that "no Innholder" or other person "without Leave from the Captain or Commanding Officer for the Time being, shall presume to sell any strong Liquor, to any [member of the militia], in such Days or Times that they are obliged to appear in Arms, at the Place of Mustering or Training, or within a Mile thereof, *until after they are dismissed for that Day*." Ex. 21 (emphasis added).

- The Delaware law similarly said that "if any Person or Persons whatsoever, shall sell … at such Places of Muster … any Sort of Strong Drink whatever, such Person so offending, shall forfeit and pay" 40 shillings. Ex. 22.

•     The Pennsylvania law provided that "[n]o company or batallion shall meet at a tavern on any days of exercise, nor shall march to any tavern *before they are discharged*; and any person who shall bring any kind of spiritous liquor to such place of training shall forfeit such liquors so brought for the use of the poor belonging to the township where such offender lives." Ex. 23 (emphasis added).

•     The Maryland law likewise provided that "any Person of the Militia who shall get drunk on any Muster-day or at Muster" shall pay a 10-shilling fine; any person selling liquor within five miles "of any Place of Training to any Person belonging to the Militia on any Muster day *except between the Time of Discharge from such Training for that day and the Sun sitting thereof*," shall pay a fine; and "nothing" in the law "shall be construed to extend to any Merchant or licensed Ordinary-Keeper who shall [sell liquor] in his or her House" to someone not in the militia. Ex. 25.

In short, these were laws that targeted the specific goal of preventing militia members from drinking while on duty. Amici offer no response to Plaintiffs' reliance on *Connelly*, where the Fifth Circuit already explained that such militia-based restrictions fail to establish a regulatory tradition comparable to total disarmament of all who enter an establishment serving alcohol: Because "these militia laws concern[] military service," and "none of them spoke to a militia member's ability to carry outside of military service," "restrictions on the liberties of service members tell us little about the limits acceptable for citizens at large." 117 F.4th at 281.[6]

These laws also imposed very different burdens on offenders: They provided only financial fines, not a felony conviction that imposes up to ten years in prison, permanent disarmament, and loss of voting rights, among other things. As such, this is an additional way in which the laws

---

[6] It appears that these militia restrictions were outliers, as ample authority reveals that, far from being outlawed, drinking was the *custom* at militia musters. 3 THE JOURNAL OF THE REV. FRANCIS ASBURY, BISHOP OF THE METHODIST EPISCOPAL CHURCH, FROM AUGUST 7, 1771, TO DECEMBER 7, 1815, at 121 (1821) (detailing an 1803 encounter with "people coming from a militia muster, drunk, and staggering along the lanes and paths" who "shout[ed] forth the praises of the god of strong drink"); 3 THE NEW-ENGLAND MAGAZINE 110–11 (1832) (a retired officer from the War of 1812 writing that his "habit of drinking" was "less thought of, since it was the universal custom, in all regiments of the militia, with which I had any acquaintance, for the officers, on every muster day, to get gloriously drunk in their country's service").

impose very different burdens and thus flunk *Bruen*'s "how" test. *See Rahimi*, 602 U.S. at 699 (explaining that comparing the "penalty" between modern and historical regulations is a "relevant aspect of [evaluating the] burden" on Second Amendment protected rights).

**Restrictions on Intoxicated Persons**. Amici next cite a series of late 19th century laws restricting the sale of firearms to intoxicated people or prohibiting carry while intoxicated. Amici Br. at 20–21. These regulations are inapt comparators to the 51% carry ban under *Bruen*'s "how" test: they target intoxicated people, whereas Section 46.03(a)(7) is a prophylactic law that disarms *everyone* in bars and restaurants. Again, a separate Texas law criminalizes carrying while intoxicated. Penal Code § 46.02(a-6). So while these laws may show a historical tradition to support Texas' separate prohibition on carrying firearms while intoxicated, they do not establish a historical tradition of banning everyone in a bar from carrying. Likewise, Amici's reliance on *State v. Shelby*, 2 S.W. 468 (Mo. 1886), does not help their case since it was limited to the separate and distinct offense of carrying firearms "when intoxicated, or under the influence of intoxicating drinks," *id.* at 469.

In addition, only one state law (Kansas 1867) in this group of regulations predates Reconstruction. The other laws (Missouri 1874, Wisconsin 1883, Mississippi 1878, Idaho 1909) all come later. On the whole, these laws come too late to be probative of a historical tradition. Setting that aside, these laws are not sufficiently widespread to form a "well-established" and "representative" historical tradition. *Bruen*, 597 U.S. at 30.

In the course of this argument, Amici identify a smattering of 19th century laws and municipal ordinances from the territories. Amici Br. at 21. *Bruen* explained that later-in-time history can serve only to confirm an already existing historical tradition and expressly stated that territorial restrictions are not proper analogues: Laws in the territories are afforded "little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." *Bruen*, 597 U.S. at 67–69. Moreover, these historical laws imposed a far lesser punishment than the third-degree felony prescribed by Texas' law. Violation was a misdemeanor punished by a modest fine or a short time in jail. *See* Exs. 36–39, 41–44.

To be sure, the Ninth Circuit in *Wolford v. Lopez* relied on many of these same regulations to uphold Hawaii's and California's ban on carrying in bars. 116 F.4th 959, 985–86 (9th Cir. 2024). That analysis was flawed. To its credit, the *Wolford* court acknowledged that this "line of regulations is not directly on point" because "the legislatures may have had several purposes, and those laws did not prohibit firearms at all places serving alcohol." *Id.* But it nevertheless gleaned from this limited sample a history of "regulat[ing] in order to mitigate the dangers of mixing alcohol and firearms." *Id.* at 986. This conclusion cannot be squared with *Bruen*'s methodology, which demands a "well-established" and "representative" tradition of regulation. 597 U.S. at 30.

Finally, Amici insist that the 51% Carry Ban is "an even closer fit to this historical tradition than the federal law in *Rahimi* was to the surety and going armed laws that the Supreme Court analyzed." Amici Br. at 25. Not so. The "going armed" laws of affray and the surety tradition were targeted at people who showed a propensity for violence or dangerous behavior, just as the Supreme Court determined that 18 U.S.C. § 922(g)(8), in the case of Rahimi, was targeted at an individual found by a court to pose a danger. *See Rahimi*, 602 U.S. at 698–700. But here Amici rely on targeted laws limited to a subset of individuals (*e.g.*, laws aimed at preventing militia members drinking while on duty and laws on intoxicated people carrying) as supposed analogues for far broader prophylactic bans on *everyone* entering a bar or restaurant. In *Rahimi*'s terms, this is akin to using the laws of affray and surety as justifications for disarming everyone who's in a domestic relationship (rather than just those with a restraining order imposed on them) since we know that *some* of them will turn out to be violent and pose a risk to their spouse or domestic partner. Put simply, Amici's analogies are inapt.

### B. There Is No Well-Established, Representative Historical Tradition Of "Prohibiting Firearms Where Alcohol Is Sold."

Amici briefly argue that the 51% ban is supported by a tradition of "prohibiting firearms where alcohol is sold." Amici Br. at 21–22. The only support offered for this supposed tradition, however, is a handful of territorial (Oklahoma 1890, New Mexico 1853, Arizona 1889) and municipal (San Antonio 1870, New Orleans 1879) regulations. These regulations—historical

"outliers"—are too few in number and too late in time to constitute "a well-established and representative" tradition of any kind. *See Bruen*, 597 U.S. at 30. And while Amici argue that these laws are nevertheless worthy of consideration because they are "'consistent with' contemporaneous state laws," Amici Br. at 22 n.7 (quoting *Antonyuk v. James*, 120 F.4th 941, 1029 (2d Cir. 2024)), the brief does not cite a single State law prohibiting carry at places where liquor was sold.

*Bruen* instructs that late 19th century regulations that are inconsistent with the Second Amendment's original meaning cannot alter the scope of the right to keep and bear arms. 597 U.S. at 36–37. And in the context of territorial laws in particular, the Court cautioned that "the bare existence of … localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition." *Id.* at 67. So too here. A handful of territorial and municipal laws shed no light on the scope of the constitutional right to carry.

### C.    There Is No Well-Established, Representative Historical Tradition Of Prohibiting Firearms At Ballrooms And Social Gatherings.

Finally, Amici insist that the 51% ban is consistent with a historical tradition of "prohibiting the carrying of firearms at ballrooms and social gatherings." Amici Br. at 22–25. Amici's claim rests entirely on a late-19th- and early-20th-century patchwork of territories and frontier states (Texas 1879, New Mexico 1853, Arizona 1889, Oklahoma 1890, Montana 1903) and municipalities (Waco 1891, New Orleans 1879) that banned firearms in places like balls, fandangos, and social events. Amici Br. 22–23. Amici separately discuss Texas' 1870 and 1871 laws similarly prohibiting firearms at public assemblies and ballrooms and a San Antonio law from the same time period. *See* Amici Br. at 5.[7] These laws are too late, too few, and impermissibly contradictory of Founding Era history. If "more than 30 States" in the late 1800s were not enough to establish a tradition in *Espinoza* because they were inconsistent with the absence of such

---

[7] As with other laws of similar vintage, these regulations pose a lesser burden on the right of armed self-defense because they were misdemeanors offenses that carried only modest penalties. *See Rahimi*, 602 U.S. at 699.

regulations at the Founding, 591 U.S. at 482–83, a handful of territorial and post-Reconstruction laws banning carry in certain "social gatherings" cannot support an outright ban on carrying firearms in bars and restaurants. These later regulations are inconsistent with the historical tradition in the Founding Era.

Moreover, as Judge Porter recently explained when considering much of the same historical evidence offered in support of a similar New Jersey law:

> [The] post-Reconstruction evidence consists of laws specifically directed at intoxicated individuals and penalizing the discharge of firearms at saloons. [Citation] By contrast, New Jersey's law applies to everyone, including teetotalers and unintoxicated patrons, at bars, grills, restaurants, and any place where alcohol is sold. The underlying Second Amendment principle cannot simply be "No guns wherever alcohol is present." Such a principle is so broad, undiscriminating, and unlimited that it extinguishes the right.

*Koons v. Att'y Gen. New Jersey*, No. 23-1900, 2025 WL 2612055, at *73 (3d Cir. Sept. 10, 2025) (Porter, J., concurring in the judgment in part and dissenting in part). The same goes here. The regulations Amici rely on "conflict with the Nation's earlier approach to firearm regulation," *Bruen*, 597 U.S. at 67, which did not restrict the carry of firearms in places where liquor was sold, including the taverns that were commonplace at the time of the Founding. Accordingly, these laws "are most unlikely to reflect 'the origins and continuing significance of the Second Amendment.'" *Id.* (quoting *Heller*, 554 U.S. at 614).

\* \* \*

To the extent any "principles" may be gleaned from the parties' briefing, the most important one is this: The Founders were well aware of potential risks associated with "mixing alcohol and firearms," yet there is no evidence of a single State law from the Founding Era through the Fourteenth Amendment's adoption that banned everyone who entered an inn, bar, or tavern from carrying an arm. Given that total absence of regulation, four narrow Founding Era laws banning the sale of alcohol to militia members *while training* cannot possibly be leveraged into a historical "principle" that it's perfectly fine to ban everyone in a bar from carrying. And, setting aside that Civil War-era prohibitions on carrying while intoxicated come too late to establish a relevant tradition or principle, any such principle that intoxicated persons may be disarmed might

justify the *separate* Texas prohibition on carrying while intoxicated (not challenged here), rather than the broad prohibition that sweeps in everyone visiting a bar or restaurant.

## V.    Amici Have Failed To Demonstrate A Historical Tradition Justifying The Ban On Carrying Firearms At Sporting Events.

There is no historical tradition justifying Section 46.03(a)(8)'s ban on carrying "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place." Amici assert that this ban is consistent with a tradition of "prohibiting firearms at schools and places of amusement," Amici Br. at 25, and cite three underlying collections of regulations.

### A.    The Ban On Carrying At All Sporting Events Is Not Relevantly Similar To Narrow On-Campus Restrictions.

Amici first argue that the sporting event ban is consistent with historical efforts by administrators to prohibit firearms on school grounds. This argument falls short on multiple fronts. As an initial matter, Plaintiffs have explained (and Amici acknowledge) that this lawsuit does not challenge Section 46.03(a)(8) to the extent that it applies to events on school grounds or where property owners have separately restricted carrying. Setting that aside, Amici's effort to analogize § 46.03(a)(8)'s broad ban on carrying at all sporting events to the laws that narrowly target carry at schools is at odds with *Bruen*. For one thing, prohibiting carry at *all* sporting events (*including* interscholastic events) imposes a far greater burden on the right of armed self-defense than a limited ban that applies *only* on school grounds. *See Bruen*, 597 U.S. at 29.

Closer analysis shows that the sporting event ban is not relevantly similar to limited restrictions prohibiting firearms on campus. There is no evidence that guns were generally banned from schools in Colonial America before 1791, and the post-ratification evidence shows an acceptance for restricting students' possession and use of firearms.[8] Such restrictions on students

---

[8] *See, e.g.*, Cramer, *Guns On Campus: A History*, 27 Acad. Questions 411 (Dec. 2014), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2998355, manuscript at 12–13 (noting that in many instances, students needed to be armed for militia duty and observing that while

were prominent at colleges and universities at the time of the Founding, and the record demonstrates that those restrictions did not apply to faculty, staff, or visitors.[9] Kopel & Greenlee explain that the historical record does not support "*Heller*'s designation of 'schools' as sensitive places where arms carrying may be banned" outright. 13 Charleston L. Rev. at 250. But in any event, the historical evidence demonstrates that restrictions on firearms at schools were limited to minors or students, so therefore such school-imposed rules cannot serve as analogues for broad-based gun restrictions on law-abiding adults. And of course, Texas' ban applies to all sporting events that take place in any location, and even where a crowd may be relatively small or dispersed. Consider, as one example, a cross country meet that takes place in a rural area far away from school premises.

Moreover, these early on-campus firearms regulations disarmed only students because their schools exercised *in loco parentis* authority over them. *See Lara*, 125 F.4th at 451 (Restrepo, J., dissenting) (evidence "strongly suggest[s] that [authority to bar students from possessing firearms] was not predicated on or justified by the student's presence at a sensitive location, but rather stemmed from the inherent power of the authority standing *in loco parentis*"); *Worth v. Harrington*, 666 F. Supp. 3d 902, 921–22 (D. Minn. 2023); *Worth*, 108 F.4th at 695–96 (acknowledging that "universities had guardianship authority *in loco parentis*," such that they "had many practices that if compelled by the government, would have violated students' constitutional rights"). Historical exercises of schools exercising *in loco parentis* authority to restrict students' use of arms on campus do not support restricting firearm carry by anyone not subject to that sort of authority.[10]

---

"[c]olleges in the Colonial period often prohibited students from hunting, … this does not appear to have been a prohibition on firearms possession").

[9] The University of Virginia instituted a prominent 1825 ban on student possession in response to the students' "spoiled and violent behavior;" they had previously "fired guns in the air, and shot at each other." Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203, 247–48 (2018). Founding Era restrictions focused solely on student conduct. *See Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1120–21 (11th Cir. 2025) (collecting examples of student regulations).

[10] Although colleges and universities were historically understood to possess *in loco parentis* authority over their students, they are no longer understood to have that authority. *See, e.g.*,

It therefore follows that limited bans on students carrying at schools fail *Bruen*'s "how" test: they are not relevantly similar to total bans on carrying by everyone at every sporting event of any kind in the state, whether on a school campus or not. Because Texas does not have *in loco parentis* authority over law-abiding adults who would carry firearms to protect themselves and others in public, historical restrictions on students carrying in schools carry little weight. This conclusion gains further support from *Bruen*'s approving reference to carry by teachers at Freedmen's schools before the Fourteenth Amendment's ratification. *See* 597 U.S. at 61.

**B.    The Ban On Carrying At All Sporting Events Is Not Relevantly Similar To A Purported Tradition Of Restricting Firearms At Literary Or Educational Gatherings.**

Amici strain their efforts to cobble together a historical record even further by asserting that there is a tradition of prohibiting firearms at assemblies for "educational, literary or scientific purposes," and argue that Section 46.03(a)(8) might extend to interscholastic academic contests (debate competitions, science fairs, math olympics, etc.). Amici Br. at 27. Amici identify three state laws (Missouri 1875, Texas 1890, Montana 1903), two territorial laws (Arizona 1889, Oklahoma 1890), and nine miscellaneous local ordinances that all postdate Reconstruction. Such "late-in-time outliers," *Bruen*, 597 U.S. at 70, provide no guidance on the scope of the Second Amendment's original meaning when they are inconsistent with the regulatory climate at the Founding. Furthermore, this argument fails once again because the statute's broad reach— prohibiting carry at *all* sporting and interscholastic events (*including* "literary and educational" interscholastic contests)—imposes a far greater burden on the right of armed self-defense than restrictions limited to "educational," "literary," or "scientific" gatherings. *See Bruen*, 597 U.S. at 29. And these few laws contradict the Nation's Colonial and Founding era historical tradition, discussed in detail below, permitting (and sometimes requiring) firearms in various public assemblies.

---

*McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243–45 (3d Cir. 2010). These historical laws accordingly would not justify firearm bans on college students today.

### C.    There Is No Historical Tradition Of "Prohibiting Firearms Where People Congregate In Large Numbers."

Amici next argue that Section 46.03(a)(8) is supported by historical regulations "prohibiting firearms where people congregate." Amici Br. at 28. This argument rests on the premise that Texas can ban firearms in crowded places. This runs counter to *Bruen'*s recognition of "the general right to publicly carry arms for self-defense," and ignores its instruction that places are not sensitive "simply because [they are] crowded." 597 U.S. at 31. "[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Id.*

Amici are left to argue in favor of banning carry in all places of "congregation" given Section 46.03(a)(8)'s broad sweep: It applies to all "interscholastic event[s]," which on its face prohibits carry at a host of non-sporting events that may take place well outside of school grounds. Indeed, Amici embrace this aspect of the ban. *See* Amici Br. at 27 (explaining that "[i]nterscholastic events can include contests between schools on a variety of subjects in addition to sports including math, science, debate, drama, and music"). But Amici's theory flatly contradicts this Nation's tradition, dating to the Colonial and Founding eras, of permitting carry in all manner of places where people gathered. Public gatherings of all sorts obviously existed at the Founding. Indeed, the Founders themselves used such public gatherings to speak to fellow citizens about American Independence. *See, e.g.,* "American Independence," Samuel Adams Speech (Aug. 1, 1776), https://tinyurl.com/3zued27k (delivered on the steps of the Philadelphia State House). Similarly, to protest British rule and gather to discuss the issues of the day, colonists frequently erected "Liberty Poles" around which they gathered. *See, e.g.*, *Monuments of Colonial New York: George III and Liberty Poles*, Gotham Ctr. (Oct. 15, 2020), https://tinyurl.com/bdzkafap. There is no identifiable historical tradition that firearms were banned at any of the numerous public gatherings at the Founding. Indeed, colonists sometimes arrived armed to political gatherings in which they could potentially clash with British soldiers. At one public gathering, now remembered as the Boston Massacre, British soldiers opened fire on a crowd of colonists in 1770. In defending

the soldiers at trial, John Adams conceded that, in this country, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence." John Adams, Argument for the Defense (Dec. 1770), Nat'l Archives: Founders Online, https://bit.ly/35FCuRh.

Founding Era laws even *required* individuals to arrive armed at certain public gatherings. For example, *Heller* cited a 1770 Georgia law requiring men to carry firearms "'to places of public worship.'" 554 U.S. at 601. Virginia enacted a similar law in 1755, which persisted until 1878, allowing each county's chief militia officer to order all enlisted militiamen "to go armed to their respective parish churches." 6 Hening, The Statutes at Large, Being a Collection of All the Laws of Virginia 534 (1819); *see also* Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty Univ. L. Rev. 653, 697–99 (2014) (reviewing colonial and founding-era historical precedent for requiring firearms at church services).

Laws dating back to the Colonial Era similarly required firearms in all manner of public meetings. *See* Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony 95 (Brown & Parsons eds., 1850) (1643 order) (ordering "that one person in every severall howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, w[i]th powder and shott to e[a]ch meeting"); 1 Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England 190 (White ed., 1853) (1639 order) (ordering that "all such persons…shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets…."); 3 Archives of Maryland 103 (Browne ed., 1885) (1642 order) (ordering that every man "able to bear arms" must carry a firearm while at church); 1 Records of the Colony of Rhode Island and Providence Plantations, In New England 94 (Bartlett ed., 1856) (1639 order) (ordering that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon"); 1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature 174 (Hening ed., 1808) (1631 law requiring "[a]ll men that are fittinge to beare armes, shall bringe their pieces to the church").

Amici do not counter this evidence. Instead, they reach back to the 1300s to derive a tradition from the Statute of Northampton that they claim carried over into the colonies. Amici Br. at 28–29. But *Bruen* unequivocally held that that "the Statute of Northampton … has little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41. First, the Court explained that it is too old to inform the meaning of the Second Amendment at the Founding. *See id.* 41–44. Second, it noted that its prohibition on going or riding armed did not contemplate handguns because they had not been invented. Instead, it focused on large weapons used in combat. *See id.* at 41–42. Third, the Court reasoned that the Statute of Northampton confirmed and echoed the common law "affray" tradition that individuals cannot go armed to terrify others. *See id.* at 43–45; *see also Heller*, 554 U.S. at 587 n.10 (citing Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822), for the proposition that "[i]n this country the constitution guarranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify people unnecessarily").

Because the 1786 Virginia law that Amici cites (at 28) forbidding carry in fairs and markets stems from the Statute of Northampton and prohibits going armed to terrorize others, *Bruen* rejected it as a viable analogue to laws prohibiting public carry by every law-abiding citizens for self-defense. 597 U.S. at 49. The 1816 District of Columbia law cited by Amici similarly prohibits going armed "in fairs or markets, or in other places, in terror of the county." Amici Br. at 28. Such laws that "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people" do not support "broad prohibitions on all forms of public carry." *Bruen*, 597 U.S. at 50.

Amici also cite (at 28) a 1792 North Carolina law. But this putative law—dated after the Declaration of Independence and the Ratification of the Constitution—references what people cannot do by order of the King of England. Ex. 17. As a recent article explains, this citation is "bogus": "The actual source was a 1792 book by a lawyer who thought he was compiling the English statutes in force in North Carolina," but "[l]ater compilers wrote that this work 'was utterly untrustworthy'" and inserted many laws which were never in force. Halbrook, *Faux Histoire of the Right to Bear Arms*: Young v. Hawaii at 21, https://bit.ly/3QyFZA5 (citation omitted). In any

event, the English law the compiler posited was applicable in North Carolina was the Statute of Northampton, which, as *Bruen* made clear, did not prohibit law-abiding citizens from carrying firearms in a peaceable manner. 597 U.S. at 41–42. And to the extent the statute was ever in effect in North Carolina, it ceased to have any force as of January 1838. *See State v. Huntley*, 25 N.C. 418 (N.C. 1843).

Moving beyond these faulty sources, Amici identify a handful of late-19th century regulations—from just two states (Georgia 1870 and Missouri 1875) and three municipalities— prohibiting firearms at "public gatherings." Amici Br. at 29. Because these laws conflict with the earlier tradition permitting (and requiring) bearing arms at public gatherings, they are "most unlikely to reflect the origins and continuing significance of the Second Amendment" and are thus "not … instructive." *Bruen*, 597 U.S. at 67 (cleaned up).

Amici are left with judicial opinions from just a few states upholding the laws just refuted as proper analogues. One of these decisions, *Hill v. State*, dealt with an indictment for carrying in a courthouse, which Plaintiffs do not contest is a sensitive place. 53 Ga. 472 (Ga. 1824). *State v. Shelby* is similarly unpersuasive because it discussed a conviction for carrying while drunk, rather than general public carry for self-defense. *See* 2 S.W. 468, 468 (Mo. 1886). Beyond that, these decisions are not especially probative of the Second Amendment's scope because they "operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*." *Bruen*, 597 U.S. at 68.

\* \* \*

In sum, there is no historical tradition to support Section 46.03(a)(8)'s Carry Ban at sporting events and off-campus "interscholastic events."

## VI. Amici Have Failed To Demonstrate A Historical Tradition Justifying The Ban On Carrying Firearms At Racetracks.

There is no historical tradition justifying Section 46.03(a)(4)'s Carry Ban "on the premises of a racetrack." Amici assert that this ban is consistent with a tradition of "prohibiting firearms at

places of amusement and other locations with large crowds." Amici Br. at 32. This argument falls short of meeting *Bruen*'s test for many reasons.

To being with, *Bruen* dooms any argument that the government can ban firearms based merely on the presence of "large crowds." The Second Amendment does not permit Texas to prohibit carry in "all places of public congregation," as locations are not sensitive "simply because [they are] crowded." *Bruen*, 597 U.S. at 31. "The sensitive-place regulations enumerated in *Bruen* can be expanded to 'new' and 'analogous' places, but not if it means that 'places of public congregation' are excluded from the right to carry for self-defense, even if they are crowded and protected generally by the police." *Koons*, 2025 WL 2612055, at *67 (Porter, J., concurring in the judgment in part and dissenting in part) (quoting *Bruen*).

A look at the historical record bears out *Bruen*'s skepticism. Amici do not dispute that there are precisely zero relevant historical regulations prohibited carry at racetracks. So they spend two pages reviewing the supposed evolution of horseracing to explain why this absence of historical regulation is not fatal to their case. The result? One lonely 1869 Tennessee law that prohibited the carry of pistols at a "race course." Amici Br. at 34; *see* Ex. 59. A single law from a single state is, of course, insufficient to establish a historical tradition. That's not all. The lone Tennessee law, nestled in a series of voting regulations, broadly prohibits carry of all weapons not only at every "race course" but all public assemblies:

> That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, bowie-knife, Arkansas tooth-pick, or weapon in form, shape or size, resembling a bowie-knife, or Arkansas tooth-pick, or other deadly or dangerous weapon.

Ex. 59. Given that Tennessee's law banned arms at all public assemblies it is inconsistent with the historical tradition, discussed above, of both permitting and often requiring the carry of firearms in public assemblies. It therefore sheds no light on the Second Amendment's original meaning.

More to the point, the fact that Amici could dredge up only one law confirms that Texas' racetrack ban is unconstitutional. Despite Amici's assertions to the contrary, horseracing in

America long predates the Founding—Long Island's famed Newmarket Course held its first race in 1665—and with it came government efforts to regulate the various social problems that accompanied those races. *See* Howland, *Let's Not "Spit the Bit" in Defense of "The Law of the Horse": The Historical and Legal Development of American Thoroughbred Racing*, 14 Marq. Sports L. Rev. 473, 483–88 (2004); Riess, THE SPORT OF KINGS AND THE KINGS OF CRIME: HORSE RACING, POLITICS, AND ORGANIZED CRIME IN NEW YORK, 1865–1913 1–15 (2011). Horseracing continued to be heavily regulated throughout the 19th century as it expanded across the Nation. Howland, 14 Marq. Sports L. Rev. at 488–92. Then, as today, these races involved "large crowds." For example, one 1823 race in New York featured a "huge crowd estimated at twenty thousand"— among them Vice President Daniel Tompkins, former Vice President Aaron Burr, and future President Andrew Jackson—watching the finest northern horse face off against the best thoroughbred the south had to offer. Riess, *supra*, at 8. Another race in 1842 had a reported (if disputed) 50,000–70,000 in attendance, described as "a large and unruly audience." *Id.* at 12. In 1866, 25,000 spectators—including General Ulysses S. Grant—attended the opening of Jerome Park, which would inaugurate the Belmont Stakes the following year. *Id.* at 24.

Yet despite the fact that horseracing (and horseracing regulation) has existed since before the Founding, Amici managed to dust off only a single law from shortly after the Fourteenth Amendment's adoption prohibiting firearms at such events. This is insufficient to sustain Texas' carry ban under *Bruen*. "[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

Texas' ban on carrying at racetracks is unconstitutional.

**CONCLUSION**

For the reasons set for the above and in Plaintiffs' previous summary judgment briefs, the Court should grant Plaintiffs' motion for summary judgment, deny Defendant's motion for summary judgment, issue a declaration that Texas' Carry Bans violate the Second Amendment, and enjoin Defendant from enforcing them.

Dated: October 10, 2025

Respectfully submitted,

/s/ Bradley A. Benbrook
Bradley A. Benbrook* (TX Bar No. 24142064)
Stephen M. Duvernay* (TX Bar No. 24139565)
BENBROOK LAW GROUP, P.C.
701 University Avenue, Suite 106
Sacramento, California  95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

R. Brent Cooper (TX Bar No. 04783250)
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas  75202
Telephone: (214) 712-9500
brent.cooper@cooperscully.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 10, 2025, a true and correct copy of the foregoing document and all supporting documents filed concurrently therewith were served via the Court's CM/ECF system to all counsel of record.

/s/ Bradley A. Benbrook
Bradley A. Benbrook